**No. 2024-1460**

IN THE
**UNITED STATES COURT OF APPEALS**
FOR THE FEDERAL CIRCUIT

FUENTE MARKETING LTD.,

*Appellant*

v.

VAPOROUS TECHNOLOGIES, LLC,

*Appellee*

**Appeal from the United States Patent and Trademark Office, Trademark Trial and Appeal Board, Opposition No. 91270800**

# NONCONFIDENTIAL BRIEF FOR APPELLANT FUENTE MARKETING LTD.

VIRGINIA L. CARRON
R. GORDON WRIGHT
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
271 17th Street, NW, Suite 1400
Atlanta, GA 30363-6209
(404) 653-6400

DOUGLAS A. RETTEW
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001-4413
(202) 408-4000

*Attorneys for Appellant Fuente Marketing Ltd.*

June 24, 2024

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 24-1460

**Short Case Caption** Fuente Marketing Ltd. v. Vaporous Technologies, LLC

**Filing Party/Entity** Fuente Marketing Ltd.

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 06/24/2024

Signature: /s/ Virginia L. Carron

Name: Virginia L. Carron

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
| --- | --- | --- |
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Fuente Marketing Ltd. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☑ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

## TABLE OF CONTENTS


I. STATEMENT OF RELATED CASES....1

II. STATEMENT OF JURISDICTION....1

III. STATEMENT OF THE ISSUES....2

IV. STATEMENT OF THE CASE....3

A. Statement of Facts....4

1. Fuente's FUENTE FUENTE OPUS X Cigars and X Mark....5

a. The Enormous Success of Fuente's FUENTE FUENTE OPUS X Products....10

b. FUENTE FUENTE OPUS X Cigars Have Generated Millions in Revenue....11

c. FUENTE FUENTE OPUS X Products Have Been Widely Advertised and Promoted in the United States....12

d. Fuente's FUENTE FUENTE OPUS X Products and X Mark Have Received Extensive Unsolicited Media Attention....14

e. Fuente Diligently Protects its X Mark....16

2. Vaporous's X Dot Mark....17

3. The Board's Decision....18

V. SUMMARY OF ARGUMENT....22

VI. ARGUMENT....24

A. Standard of Review....24

B. The Board Erred in Finding No Likelihood of Confusion Between Fuente Marketing's X Mark and Vaporous's X Dot Mark....25

1. The Board Erred in Finding the Parties' Marks Dissimilar......25

a. Substantial Evidence Does Not Support the Board's Finding That the Parties' Marks Are Dissimilar......27

b. The Board Failed to Compare the Parties' Marks as to Their Sound......36

c. The Board Failed to Weigh the Similarity-of-Marks Factor Through the Lens of the Factors Favoring Fuente Marketing......39

2. The Board Erred in Failing to Accord Fuente Marketing's X Mark a Heightened Scope of Protection......42

a. The Board Gave Insufficient Weight to Its Finding That Fuente Marketing's X Mark is Arbitrary......43

b. The Board Disregarded Substantial Evidence in Finding that Fuente Marketing's X Mark Lacks Commercial Strength......46

3. The Board Erred in Improperly Balancing the Relevant Likelihood-of-Confusion Factors......60

4. The Board Erred in Failing to Resolve Any Doubts Concerning Likelihood of Confusion in Fuente Marketing's Favor......63

VII. CONCLUSION......64

## CONFIDENTIAL MATERIAL OMITTED

The materials omitted from the nonconfidential brief contain confidential business information pursuant to the Trademark Trial and Appeal Board Standard Protective Order. The materials omitted from page 12 describe Fuente Marketing Ltd.'s financial information in the form of dollar amounts describing revenue and amount invested in advertising.

# TABLE OF AUTHORITIES

**Federal Cases** **Page(s)**

*In re AFA Corp.*,
196 USPQ 772 (TTAB 1977) ........49

*Am. Rice, Inc. v. H.I.T. Corp.*,
231 USPQ 793 (TTAB 1986) ........29

*Bd. of Trs. of the Univ. of Ala. v. Pitts*,
107 USPQ2d 2001 (TTAB 2013) ........49

*Bose Corp. v. QSC Audio Prods., Inc.*,
293 F.3d 1367 (Fed. Cir. 2002) ........24

*In re Burndy Corp.*,
300 F.2d 938 (CCPA 1962) ........37

*In re Buty-Wave Prods. Co.*,
198 USPQ 104 (TTAB 1978) ........34

*Calypso Tech., Inc. v. Calypso Cap. Mgmt., LP*,
100 USPQ2d 1213 (TTAB 2011) ........45

*Century 21 Real Estate Corp. v. Century Life of Am.*,
970 F.2d 874 (Fed. Cir. 1992) ........36, 39, 41, 63

*Champagne Louis Roederer, S.A. v. Delicato Vineyards*,
148 F.3d 1373 (Fed. Cir. 1998) (Michel, J., concurring) ........62

*In re Change Wind Corp.*,
123 USPQ2d 1453 (TTAB 2017) ........28

*In re Charger Ventures LLC*,
64 F.4th 1375 (Fed. Cir. 2023) ........62

*In re Chippendales USA, Inc.*,
622 F.3d 1346 (Fed. Cir. 2010) ........42

*Coach Servs., Inc. v. Triumph Learning LLC*,
668 F.3d 1356 (Fed. Cir. 2012) ........36, 39

*In re Coors Brewing Co.*,
343 F.3d 1340 (Fed. Cir. 2003) .....46

*In re Cox Enters.*,
82 USPQ2d 1040 (TTAB 2007) .....33

*In re Data Packaging Corp.*,
453 F.2d 1300 (CCPA 1972) .....49

*In re Dixie Rests., Inc.*,
105 F.3d 1405 (Fed. Cir. 1997) .....25

*Drackett Co. v. H. Kohnstamm & Co.*,
404 F.2d 1399 (CCPA 1969) .....45

*In re E. I. DuPont DeNemours & Co.*,
476 F.2d 1357 (CCPA 1973) .....25

*In re Electrolyte Laboratories, Inc.*,
929 F.2d 645 (Fed. Cir. 1990) .....37

*H.D. Lee Co., Inc. v. Maidenform, Inc.*,
87 USPQ2d 1715 (TTAB 2008) .....44

*Han Beauty, Inc. v. Alberto-Culver Co.*,
57 USPQ2d 1557 (Fed. Cir. 2001) .....25

*Hurst Performance, Inc. v. Henderson Mfg. Co.*,
199 USPQ 48 (TTAB 1978) .....34, 48

*Hurst Performance, Inc. v. Torsten Hallman Racing, Inc.*,
207 USPQ 671 (TTAB 1980) .....34

*In re Hyper Shoppes (Ohio), Inc.*,
837 F.2d 463 (Fed. Cir. 1988) .....63

*In re Johnson & Johnson*,
186 USPQ 559 (TTAB 1975) .....49

*Juice Generation, Inc. v. GS Enters. LLC*,
794 F.3d 1334 (Fed. Cir. 2015) .....44, 46

*Kellogg Co. v. Pack'Em Enters.*,
951 F.2d 330 (Fed. Cir. 1991) ....................61

*Kenner Parker Toys Inc. v. Rose Art Indus., Inc.*,
963 F.2d 350 (Fed. Cir. 1992) ....................39, 46

*Krim-Ko Corp. v. Coca-Cola Bottling Co. of New York*,
390 F.2d 728 (CCPA 1968) ....................26

*Leb. Seaboard Corp. v. R&R Turf Supply Inc.*,
101 USPQ2d 1826 (TTAB 2012) ....................45

*Luzier Inc. v. Marlyn Chem. Co.*,
442 F.2d 973 (CCPA 1971) ....................43

*Michelin Tire Corp. v. General Tire & Rubber Co.*,
202 USPQ 294 (TTAB 1979) ....................32

*Milwaukee Nut Co. v. Brewster Food Serv.*,
277 F.2d 190 (CCPA 1960) ....................44

*In re MN Apparel LLC*,
2021 WL 2201562 (TTAB 2021) ....................48

*In re Nat'l Data Corp.*,
753 F.2d 1056 (Fed. Cir. 1985) ....................39

*Nautilus Grp., Inc. v. ICON Health & Fitness, Inc.*,
372 F.3d 1330 (Fed. Cir. 2004) ....................43

*New Era Cap Co. v. Pro Era, LLC*,
2020 WL 2853282 (TTAB 2020) ....................47

*Nike Inc. v. WNBA Enterprises, LLC*,
85 USPQ2d 1187 (TTAB 2007) ....................37, 38, 39

*In re North Carolina Lottery*,
866 F.3d 1363 (Fed. Cir. 2017) ....................43

*Northwestern Golf Co. v. Acushnet Co.*,
226 USPQ 240 (TTAB 1985) ....................29

*Oakville Hills Cellar, Inc. v. Georgallis Holdings, LLC*, 826 F.3d 1376 (Fed. Cir. 2016) ....................61

*Odom's Tenn. Pride Sausage, Inc. v. FF Acquisition, LLC*, 600 F.3d 1343 (Fed. Cir. 2010) ....................61

*On-Line Careline, Inc. v. Am. Online, Inc.*, 229 F.3d 1080 (Fed. Cir. 2000) ....................25

*Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee en 1772*, 396 F.3d 1369, 1372 (Fed. Cir. 2005) ....................43, 47

*Recot, Inc. v. M.C. Becton*, 214 F.3d 1322 (Fed. Cir. 2000) ....................26, 39

*Sears, Roebuck & Co. v. Haymer*, 263 F.2d 348 (CCPA 1959) ....................44

*Textron Inc. v. Cardinal Eng. Corp.*, 164 USPQ 397, 1969 WL 8396 (TTAB 1969) ....................48

*Textron Inc. v. Maquinas Agricolas "Jacto" S.A.*, 215 USPQ 162 (TTAB 1982) ....................34, 35, 36, 44

*In re Viterra Inc.*, 671 F.3d 1358 (Fed. Cir. 2012) ....................27, 33

*Volkswagenwerk AG v. Rose'Vear Enters., Inc.*, 592 F.2d 1180 (CCPA 1979) ....................37

*In re White Swan Ltd.*, 8 USPQ2d 1534 (TTAB 1988) ....................32

**Federal Statutes**

28 U.S.C. § 1295(a)(4)(B) ....................1

28 U.S.C. § 2107 ....................1

**Rules**

Fed. R. App. P. 4(a) ....................1

**Other Authorities**

J. Thomas McCarthy, 3 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:33 (5th Ed. 2024) ....................34

TMEP § 808.02 ....................28

## I. STATEMENT OF RELATED CASES

No appeal in or from the proceeding below was previously before this Court or any other appellate court. Counsel for appellant is not aware of any other case in this or any other court that will directly affect or be directly affected by this Court's decision in this appeal.

## II. STATEMENT OF JURISDICTION

This is an appeal from the December 14, 2023, decision by the Trademark Trial and Appeal Board ("Board") of the USPTO dismissing Fuente Marketing Ltd.'s opposition against Appellee Vaporous Technologies, LLC's application to register the mark (the "X Dot Mark") for oral vaporizers for smoking purposes based on Fuente Marketing's rights in the standard-character mark X (the "X Mark") for cigars and related accessories.[1] Fuente Marketing timely filed a notice of appeal on February 7, 2024, under 28 U.S.C. § 2107 and Fed. R. App. P. 4(a). This Court has jurisdiction over the appeal under 28 U.S.C. § 1295(a)(4)(B).

[1] As the basis for its opposition, Fuente Marketing asserted that Vaporous's X Dot Mark is likely to be confused with both Fuente Marketing's (1) X Mark and (2) family of X marks. (Appx2.) The Board rejected Fuente Marketing's second basis for opposition, finding that the evidentiary record did not support the existence of a family of marks. (Appx23.) While Fuente Marketing disagrees with the Board's finding, it does not appeal that issue.

## III. STATEMENT OF THE ISSUES

A. Whether, in evaluating the similarity-of-marks factor, the Board:

1. erred by finding, based solely on Vaporous's description of its X Dot Mark, that consumers will perceive Vaporous's mark as a stick figure and not an X, while ignoring evidence demonstrating the dominant role of the X and the impression it is actually likely to leave on consumers, including Vaporous's explanation that its mark "calls to mind" an "X-factor."

2. erred, as a matter of law, by limiting its analysis to visual dissimilarities without considering record evidence related to the appearance, sound, connotation, and commercial impression of the parties' marks.

3. erred, as a matter of law, by failing to consider the similarity of the parties' marks in the context of its other findings, specifically by failing to apply the rule that less similarity is required here because the parties' goods are inherently related and travel in overlapping trade channels to overlapping consumers.

B. Whether, in evaluating the strength-of-mark factor, the Board:

1. erred, as a matter of law, by finding the factor neutral despite

concluding that Fuente Marketing's X Mark is arbitrary as applied to cigars, and thus conceptually strong.

2. erred by finding, without substantial evidence, that Fuente Marketing's X Mark lacks marketplace strength, while ignoring evidence demonstrating the decades of use of the mark as a core pillar of Fuente Marketing's branding for its popular and acclaimed cigars and related accessories, including, among other things, by appearing prominently on the band of every one of those cigars.

C. Whether, in balancing the relevant likelihood-of-confusion factors, the Board erred, as a matter of law, by failing to articulate how it balanced its conflicting findings and by finding no likelihood of confusion despite the relevant factors decisively favoring Fuente Marketing.

## IV. STATEMENT OF THE CASE

Fuente Marketing owns the federally registered X Mark—including in a plain-letter, non-stylized format—for cigars, ashtrays not of precious metal, cigar cutters, and lighters not of precious metal. (Appx54-55.)

On September 18, 2020, Vaporous filed intent-to-use Application Serial No. 90192180 for the X Dot Mark for oral vaporizers for smokers and related vaping products. (Appx48.) On July 31, 2021, Fuente Marketing filed a notice of opposition

against Vaporous's application on the ground that Vaporous's X Dot Mark is likely to be confused with Fuente Marketing's prior-used and well-known X Mark. (Appx2; Appx76.)

On December 14, 2023, the Board dismissed Fuente Marketing's opposition, finding no likelihood of confusion between Fuente Marketing's X Mark and Vaporous's X Dot Mark. (Appx1; Appx46-47.) Fuente Marketing filed a timely notice of appeal. (Appx72; Appx126-128.)

### A. Statement of Facts

Fuente Marketing is one of several tobacco-related companies owned by the Fuente family (collectively, "Fuente"). (Appx139.) Fuente is one of the largest family-owned-and-operated, premium hand-rolled cigar companies in the world. (Appx140; Appx375; Appx768.) Generations of the Fuente family have labored to produce the finest cigars and to make the company world-renowned for its high-quality products. (Appx139-141; Appx768.) Today, Fuente offers various cigar lines under different brands, such as FUENTE FUENTE OPUS X, ARTURO FUENTE, CHATEAU FUENTE, HEMINGWAY, and DON CARLOS. (Appx140; Appx146; Appx334-335; Appx338; Appx379; Appx411; Appx768; Appx774.) As explained below, a significant part of Fuente's success can be attributed directly to its FUENTE FUENTE OPUS X product line and the trademarks under which those products are sold, particularly the X Mark.

### 1. Fuente's FUENTE FUENTE OPUS X Cigars and X Mark

Fuente's history dates back to 1912 when Arturo Fuente Sr. founded A. Fuente & Company in Tampa, Florida. (Appx140.) For many decades, all cigars manufactured by the Fuente family were made with Cuban tobacco. (Appx140.) But this changed shortly after 1962 due to the trade embargo placed on Cuba by the United States. (Appx140-141.) The embargo posed a challenge to cigar manufacturers to find suitable tobacco to use as a wrapper—the outermost layer and often the highest-quality component of a cigar. (Appx140-141; Appx769; Appx1247.)

Facing this challenge, the Fuente family began growing tobacco leaves for wrappers in the Dominican Republic in the late 1980s, with the goal of creating the first premium Dominican puro cigar, i.e., one made entirely with Dominican tobacco. (Appx141; Appx318; Appx543; Appx1256.) Many in the tobacco industry deemed this an impossible task. (Appx317-318; Appx563; Appx778.) Although others, including the Fuente family, had grown tobacco in the Dominican Republic, most Dominican cigars at that point required tobacco grown in other countries to use as wrappers. (Appx317-318; Appx352.) Indeed, cigar wrappers had never been grown outside of Cuba, Connecticut, Cameroon, and a few other locations, and it was a commonly believed that high-quality cigar wrappers could not be grown in the Dominican Republic. (Appx317; Appx565; Appx769; Appx777; Appx778.)

Despite the initial skepticism, the Fuente family was undeterred. Their top-priority experiment, code-named "Project X," generated significant publicity, as the cigar industry and its consumers understood the importance of this special project because it might result in the ability to create a high-quality cigar wrapper from tobacco grown in the Dominican Republic. (Appx141; Appx317-320; Appx535-538; Appx560-563; Appx778.) If successful, the Fuente family's Project X would result in a new source of cigar wrappers, finally opening the door for the cigar industry to increase production of high-quality wrappers after many years of relying on a limited supply from Cuba, Connecticut, Cameroon, and a few other locations. (Appx563; Appx565.)

In 1992, the Fuente family's persistence, intuition, creativity, and multi-million-dollar investment paid off when the first crop of Project X tobacco was harvested. (Appx141; Appx320; Appx536-537.) With that, the Fuente family began to develop a brand for the cigar that would be made with the Project X tobacco. (Appx141-142; Appx536-538.)

After much consideration, the Fuente family decided to name the unique product the FUENTE FUENTE OPUS X. (Appx141; Appx537.) The FUENTE FUENTE portion of the name was chosen to represent Carlos Fuente and Carlos Fuente Jr.—father and son—who each played a vital role in growing the special tobacco and developing the cigar. (Appx537.) The OPUS portion of the name was

selected after Mr. Fuente Jr. came across the word while studying the dictionary, and its meaning resonated with him because it conveyed the cigar as a creative work, masterpiece, and work of a lifetime. (Appx537.) Finally, because the "X" was part of the momentous development effort, serving as the project's code name from day one, the Fuente family wanted it to be in the name of the product. (Appx141; Appx537; Appx563.) The result of Project X became the FUENTE FUENTE OPUS X brand and line of high-quality cigars. (Appx141; Appx537.)

After selecting the product's name, the Fuente family worked assiduously to develop a brand identity that would embody the extraordinary quality of FUENTE FUENTE OPUS X cigars. (Appx141-142; Appx536-538.) For nearly two years, the Fuente family worked with an artist to create the FUENTE FUENTE OPUS X packaging, including the cigar band, the shape and design of the cigar box, the box logos, and the box inserts. (Appx141-142; Appx536-537.) A core identifier in the packaging was the "X," conspicuously and boldly featured on the inner and outer portions of the box and on the center of the cigar band, e.g.:




(Appx172.)[2]

Meanwhile, as the brand was developing, so too was Fuente's plan to bring the FUENTE FUENTE OPUS X cigar to market. Once sufficient amounts of premium Dominican tobacco had been grown, harvested, and aged, the Fuente family selected thirty of Fuente's hundreds of cigar rollers to ensure that the ground-breaking cigar would be handmade by Fuente's most skilled and highly trained artisans. (Appx141; Appx319.) Then, in 1995, Fuente released the first FUENTE FUENTE OPUS X cigar, which generated significant publicity and sparked an immediate and unprecedented demand that remains today. (Appx146; Appx309; Appx352-353; Appx317-320; Appx365-366; Appx379-380; Appx387; Appx477;

---

[2] *See also* Appx540; Appx767.

Appx535-538; Appx540; Appx543; Appx564-565; Appx765; Appx768; Appx771; Appx773.)

Fuente has since expanded its FUENTE FUENTE OPUS X cigar offerings to include a full product line of cigars manufactured exclusively with Dominican tobacco, including the FORBIDDEN X, the OPUS X 25th Anniversary, the OPUS X PerfecXion No. 2, and the OPUS X Oro Oscuro Belicoso XXX. (Appx343; Appx416; Appx418; Appx565-567; Appx773; Appx778.) These cigars, and others in the FUENTE FUENTE OPUS X product line, are all promoted and sold leveraging the core pillar of Fuente Marketing's branding—the X Mark. (Appx146.)

Fuente Marketing is the exclusive owner of the following federal registrations for its X Mark:

| Mark | Reg. No. | Reg. Date | Goods |
|---|---|---|---|
| X | 3254146 | 06/19/2007 | Cigars |
| X | 3285314 | 08/28/2007 | Ashtrays, not of precious metal; Cigar cutters; Lighters not of precious metal |

(Appx54-55; Appx224-227; Appx234-236.) Fuente Marketing has also registered many other marks that prominently feature Fuente Marketing's X Mark, which Fuente uses in connection with cigars and related accessories, including X & design (Reg. Nos. 2536633 and 2347248) (Appx56-27; Appx185-188; Appx201-204); XXX (Reg. No. 3065482) (Appx58; Appx209-211); X TO THE THIRD POWER (Reg. No. 2397955) (Appx59; Appx193-196); SERIEX (Reg. No. 3191113)

(Appx60; Appx215-217); RISING X (Reg. No. 3171080) (Appx61; Appx212-214); FUENTE FUENTE OPUS "X" (Reg. No. 1989060) (Appx62; Appx177-180); FUENTE OPUSX (Reg. No. 2495579) (Appx63; Appx197-200); FUENTE OPUS X & design (Reg. No. 2256200) (Appx64; Appx181-184); FUENTE OPUS X FF & design (Reg. No. 2364801) (Appx65; Appx189-192); FORBIDDENX (Reg. No. 2618671) (Appx66) (Appx205-208); FORBIDDEN X (Reg. No. 3229975) (Appx67; Appx221-223); FUENTE FORBIDDEN X & design (Reg. No. 3258403) (Appx68; Appx228-230); FUENTE FUENTE FORBIDDEN X (Reg. No. 3229664) (Appx69; Appx218-220); PERFECXION X (Reg. No. 3259989) (Appx70; Appx231-233); and SINFUL X (Reg. No. 4332242) (Appx71; Appx237-240). Each of these registrations is valid and subsisting on the Principal Register, and issued before the September 18, 2020, filing date of Vaporous's X Dot Mark application. (Appx48.)

#### a. The Enormous Success of Fuente's FUENTE FUENTE OPUS X Products

FUENTE FUENTE OPUS X cigars have achieved unparalleled success in the cigar industry. (Appx145-154.) Given the importance and extraordinary quality of the first FUENTE FUENTE OPUS X cigar and the significant publicity surrounding its development and release, the brand quickly became well known among U.S. cigar consumers. (Appx309; Appx317-320; Appx387; Appx535-538; Appx543; Appx549-550; Appx560-563; Appx564-565; Appx765; Appx767-768; Appx777.)

A prominent cigar publication, *Cigar Aficionado*, proclaimed that FUENTE FUENTE OPUS X cigars "gained instant cult status among cigar smokers for a number of reasons: the name was unusual, the packaging mysterious, the production extremely limited, and—most importantly—it was made with a Dominican wrapper." (Appx146-147; Appx349.) The cigar likewise garnered early praise from those outside the cigar industry, including from *Forbes*, which, in 1997, declared that the cigar was "a 100% Dominican cigar that [Fidel] Castro himself would envy." (Appx146; Appx768.)

In the years since, FUENTE FUENTE OPUS X cigars have been extremely sought after among cigar smokers, highly coveted, and counted among the most important, recognizable, and high-profile products in the cigar industry. (Appx145-149.) The cigars have been extensively advertised and promoted by Fuente and others through unsolicited media and customer word-of-mouth, sparking unprecedented demand and earning numerous awards and top rankings by prominent publications. (Appx146-154.) As a result, the X Mark has become one of the most well-known and distinctive trademarks in the cigar industry.

#### b. FUENTE FUENTE OPUS X Cigars Have Generated Millions in Revenue

Due to the popularity of the cigar and brand, demand for FUENTE FUENTE OPUS X products far exceeds their supply of more than hundreds of thousands of cigars per year. (Appx146.) As a result, FUENTE FUENTE OPUS X cigars

commonly sell for more than the suggested retail price. (Appx146.) Fuente has sold many millions of dollars' worth of FUENTE FUENTE OPUS X cigars in the United States (Appx146), earning the following U.S. revenue in recent fiscal years.

| **Fiscal Year** | **Revenue from FUENTE FUENTE OPUS X Cigars (in U.S. Dollars)** |
|---|---|
| 2014 | Financial Information |
| 2015 | Financial Information |
| 2016 | Financial Information |
| 2017 | Financial Information |
| 2018 | Financial Information |
| 2019 | Financial Information |
| 2020 | Financial Information |

(Appx1240.)

#### c. FUENTE FUENTE OPUS X Products Have Been Widely Advertised and Promoted in the United States

From 2014 to 2020 alone, Fuente spent over Financial Information dollars advertising and promoting its FUENTE FUENTE OPUS X cigars in the United States. (Appx149; Appx1240.) These cigars have been advertised and promoted in many forms of media, including the Internet, social media, all forms of printed publications, DVDs, and documentary films. (Appx149-154.) Some of the specific ways Fuente has advertised and promoted its FUENTE FUENTE OPUS X products and X Mark include:

- Fuente's websites (arturofuente.com; fuenteagedselection.com, and arturofuente-store.com) and social media pages (Twitter, Instagram,

Facebook, and YouTube). (Appx149-150; Appx416-417; Appx418; Appx425-428; Appx429-432; Appx433-438; Appx439-443; Appx444-447; Appx458-466; Appx467-472; Appx473-478; Appx481-489; Appx490-496; Appx497-501.)

- Print advertisements in many well-known trade and general publications, including *Robb Report* magazine, *Selecta* magazine, *Business Traveler* magazine, *American Way* magazine, *Hemisphere* magazine, *Cigar Aficionado* magazine, *Tobacconist* magazine, *Cigar Snob* magazine, *Cigar Smoker* magazine, *Cigar Lovers* magazine, *Cigars & Leisure* magazine, *CigarsLover Magazine*, *Cigar City* magazine, *Cigar & Cocktail* magazine, *Cigar Society* magazine, *Wine Spectator* magazine, *Whiskey Advocate* magazine, *New York Smoker* magazine, and *Cigar & Spirits* magazine. (Appx503-505; Appx506-507; Appx508-509; Appx510-511; Appx512-513; Appx514-515; Appx516-517; Appx518-519; Appx520-521; Appx524-525; Appx528-529; Appx530-531; Appx532-533.)

- Trade shows and charity events, including *Cigar Aficionado*'s Big Smoke events, Premium Cigar Association Convention & International Tradeshow, and Cigar Heritage Festival. (Appx152-153.)

As a result of this and other extensive promotion and widespread media attention, cigar aficionados and other consumers have been widely exposed to Fuente Marketing's X Mark, resulting in its tremendous public awareness and renown in the United States.

**d. Fuente's FUENTE FUENTE OPUS X Products and X Mark Have Received Extensive Unsolicited Media Attention**

Fuente's FUENTE FUENTE OPUS X brand and products have also received substantial unsolicited media attention and recognition over the years. For example, a 1996 edition of the *Tobacconist* includes an article, "Fuente Fuente OpusX Re-Creates Image of Vintage Cigar Period," discussing the origins and design of the FUENTE FUENTE OPUSX cigar and packaging:





OPUSX

**Fuente Fuente OpusX™ re-creates image of vintage cigar period**

**By Phil Bowling**

The dream that began several years ago for the Fuente family finally became a reality at the end of 1995. The Fuente Fuente OpusX is the result of a lot of "hard work, sweat, tears and prayers," says Carlos Fuente Jr. "This cigar is such a success story that I still pinch myself occasionally to make sure I'm not dreaming."

The Fuente Fuente OpusX features the wrapper grown on the Fuente plantation, Chateau de la Fuente in the Dominican Republic. Both Carlos Fuente Sr. and Jr. took a lot of warnings from friends in the industry when they purchased the farm in the early 1990s and announced their plans to grow tobacco for wrapper.

"It was something we thought we could do and we had faith in the people and the land," Fuente Jr. says. "And the results from the 1992 crop far exceeded all of our hopes and expectations."

However, now that this cigar, with its rich, spicy tastes, has been created, it has become another hot commodity in the premium cigar world. But Fuente says a plan was designed to distribute this cigar and it will take some time to get it out nationally.

"We are trying to go down the East Coast and have made it down to Washington, D.C., so far," Fuente says. "It's fantastic that everyone wants to carry the cigar, but as we stated from the beginning, it is—and always will be—a limited cigar as far as production goes, and we can only make so many at a time."

Initial reports indicate that the cigar has sold tremendously well to date. And to help spread the tasting of the new cigar, Fuente has suggested retailers limit sales to a one- or two-cigars per customer basis.

The new cigar, in a variety of sizes, has suggested retail points from $7 to $13.

**A vintage look**

To help kick off this unique cigar, the Fuente family wanted to do something special. "The art and packaging had to tell the story that the cigar was something different, something special," Fuente says.

"We really wanted to re-create the Old World, turn-of-the-century art that was very common in cigar labels," he says. "There were a lot of strong colors involved in those days. I wanted something that would be powerful in its message, yet elegant in its design."

Fuente Jr. envisioned the idea for the design. And, he jokes, that is likely why it took over a year for an artist to complete the design as he imagined it.

(Appx152; Appx535-538.) Fuente was also recognized by the *Robb Report* magazine as a "Power Player[] of Luxury" in part for "creat[ing] a nationwide

consumer frenzy . . . with the OpusX, the only Dominican cigar that sometimes sells for more than most Havanas." (Appx541-543.) In another example, a 2006 edition of *Black Enterprise* magazine praised the FUENTE FUENTE OPUS X cigar:

> With its robust taste and fine draw, the Fuente Fuente OpusX consistently ranks among the most sought-after cigars in the world. High demand and limited supply have forced many retailers to limit orders to two cigars at a time. The exclusivity and quality of this hand-rolled Dominican Puro cigar makes for an indulgent experience—for those lucky enough to receive them.

(Appx539-540.) Fuente's FUENTE FUENTE OPUS X brand and products have been the subject of similar features by *Forbes*, *Esquire*, *The Wall Street Journal*, *Maxim*, *Cigar Aficionado*, *Halfwheel*, *Cigar Snob*, *Cigars & Spirits*, *SmokeShop*, *Caesars Player*, *Florida Smoker*, *New York Smoker*, *Smoke*, *CigarsLover Magazine*, *Cigar Press*, *South Florida Opulence Magazine*, *Cigar Coop*, *Holt's Cigar Company*, *Atlantic Cigar Company*, and others. (Appx151-152; Appx358-359; Appx546-547; Appx548-550; Appx551-556; Appx557-563; Appx564-579.)

Fuente has received many awards from prominent publications for its FUENTE FUENTE OPUS X brand and products (Appx148-149), including: (1) *Cigar Aficionado*'s 2005 Cigar of the Year for the "Fuente Fuente OpusX Double Corona" cigar (Appx387); (2) *Cigar Aficionado*'s second-ranked cigar of 2020 for the Fuente Fuente OpusX Double Robusto" cigar (Appx393-394); (3) *National Geographic*'s third-ranked cigar for the "Arturo Fuente Opus X Series" cigars

(Appx405-406); (4) *Cigar & Spirits*' second-ranked cigar of 2019 for the "Opus X Angel's Share" cigar (Appx408); (5) *Cigar Insider*'s 2019 and 2020 third-hottest cigar brand as voted by retailers (i.e., brands consumers most frequently request but cannot necessarily obtain) (Appx366; Appx379); and (6) *Cigar & Leisure*'s 2019 "Coolest Cigar Band" for the "Fuente Opus X Lost City" cigar (Appx402; Appx404). Further, prominent cigar publications consistently rank Fuente's FUENTE FUENTE OPUS X cigars in the nineties on a 100-point scale (Appx147-148; Appx320; Appx337-338; Appx342-343; Appx346; Appx349; Appx352-357; Appx361; Appx771; Appx768), and the FUENTE FUENTE OPUS X cigar has received the highest rating of any Dominican cigar ever made (Appx147).

**e. Fuente Diligently Protects its X Mark**

Given the significance of Fuente's FUENTE FUENTE OPUS X product line and the value of Fuente Marketing's X Mark as a source identifier for that line, Fuente has vigilantly protected and enforced its X Mark. (Appx1139). Since the 1990s, Fuente has initiated hundreds of enforcement actions against third parties using, applying for, or registering trademarks in the United States that are likely to cause consumer confusion. (Appx1139.) This includes demand letters, Uniform Domain-Name Dispute-Resolution proceedings, U.S. district court actions, and Board opposition and cancellation proceedings. (Appx1139.) Since 2008 alone,

Fuente has successfully enforced or is in the process of enforcing the X Mark against more than 100 registrations or applications in Class 34. (Appx1139-1146.) As a result of these efforts, Fuente, to the best of its knowledge, has prevented registration of all third-party marks for an "X" standing alone for goods in Class 34 that are not otherwise subject to use limitations based on agreements with Fuente. (Appx1144.)

**2. Vaporous's X Dot Mark**

On September 18, 2020, Vaporous filed intent-to-use Application Serial No. 90192180 for the X Dot Mark covering "oral vaporizers for smoking purposes" and related vaporizer products in Class 34. (Appx48-49.) In its application, Vaporous describes its X Dot Mark as "an abstract stick figure consisting of two diagonal intersecting lines in the shape of a wide stylized letter 'X' and a shaded circle above the letter 'X.'" (Appx48.)

In January 2021, Vaporous launched its first consumer-facing brand—DABX—for vaporizers specifically configured to vaporize concentrates in a wax form, which is commonly referred to as "dabbing." (Appx797-799; Appx813; Appx838.) Vaporous adopted its X Dot Mark to serve as a logo for, and graphical representation of, its DABX brand. (Appx803-804; Appx840.) According to Vaporous, the "X" portion of its X Dot Mark invokes an "X-factor" associated with its DABX products, and the dot represents a "dab." (Appx803-804; Appx840.)

### 3. The Board's Decision

The Board concluded that no likelihood of confusion exists between Fuente Marketing's X Mark and Vaporous's X Dot Mark despite finding that all but one of the relevant likelihood-of-confusion factors was neutral or favored Fuente. (Appx25-47.)

*First*, in analyzing factors related to competitive proximity of the parties' goods, namely Fuente's cigars and Vaporous's oral vaporizers, the Board found that:

- oral vaporizers and cigars share "an inherent relationship because both may be used to ingest tobacco by inhaling" (Appx29);
- oral vaporizers "are marketed as an alternative to traditional tobacco products," such as cigars (Appx29);
- some oral vaporizers are designed to resemble cigars (Appx29);
- consumers who use oral vaporizers are more likely to use traditional tobacco products, such as cigars, than those who do not use oral vaporizers (Appx32);
- oral vaporizers are sold by retailers who also sell cigars (Appx30-31); and
- oral vaporizers and cigars are both listed in many third-party, use-based registrations (Appx31-32).

As a result of these findings, the Board concluded that "the goods are related, travel in overlapping trade channels, and appeal to overlapping consumers"—each of which the Board "weigh[ed] in favor of a likelihood of confusion." (Appx34.)

*Second*, the Board considered record evidence showing that Fuente has used and registered marks for or containing the letter "X" for a variety of goods. (Appx34-38.) The Board concluded that this evidence "somewhat bolsters the finding that [the parties'] goods are related and weighs in favor of finding a likelihood of confusion" (Appx38) because such evidence makes it more likely that consumers will "view [Vaporous's] related goods . . . as an extension of [Fuente's] line [of goods]." (Appx34.)

*Third*, the Board analyzed the strength of Fuente Marketing's X Mark by considering both its conceptual and marketplace strength. (Appx38-39.) Regarding conceptual strength, the Board found that Fuente Marketing's X Mark is "arbitrary as applied to cigars" and thus, conceptually strong. (Appx39-40.) Turning to marketplace strength, the Board accorded "little probative weight" to a handful of agreements relied on by Vaporous showing that Fuente has permitted limited uses of marks featuring an "X" in connection with goods in Class 34 because Vaporous "did not supplement the agreements with any evidence that the allowed uses are taking place." (Appx39.) The Board also acknowledged the substantial and long-standing success of Fuente's cigars offered in connection with the X Mark. (Appx40-41.) For example, the Board found that FUENTE FUENTE OPUS X cigars have been sold since 1995, produced millions in sales revenue, and generated significant publicity in the cigar industry. (Appx41.) Nevertheless, the Board,

relying on only a fraction of the record evidence showing the myriad ways in which Fuente uses the X Mark, found no support demonstrating that "a significant portion of the relevant consuming public recognizes the mark X as a source indicator for [Fuente]." (Appx41-42.) After considering conceptual and marketplace strength, the Board concluded that Fuente Marketing's X Mark "is neither very weak nor very strong" and thus, "entitled to the protection accorded any inherently distinctive mark." (Appx42.)

*Fourth*, the Board found that the lack of evidence showing actual confusion between the parties' marks weighed neither for nor against a finding of likelihood of confusion because "there has not been a sufficient opportunity for actual confusion to occur." (Appx26.)

*Finally*, the Board evaluated the similarity of the parties' marks by comparing only their visual similarities or dissimilarities without considering, as it should have, their sound, connotation, *and* commercial impression. (Appx43-46.) Despite acknowledging that the parties' marks both share the letter "X" and that Fuente Marketing's registered standard character X Mark "is entitled to employ style," including the identical style used to form the "X" in Vaporous's X Dot Mark (Appx44-45), the Board concluded that the "visual differences outweigh [the marks'] partial visual similarity" (Appx44). The Board based this conclusion on its finding that consumers will perceive Vaporous's X Dot Mark as a stick figure, which

"so differs from a letter of the alphabet visually, and in connotation, and commercial impression." (Appx44.) In doing so, the Board ignored substantial record evidence of Vaporous's selection, adoption, and use of its X Dot Mark and instead, myopically relied only on a dictionary definition of "stick figure" (Appx44) and the description in Vaporous's application of its X Dot Mark, to which the parties' stipulated: "Vaporous'[s] X Dot Mark 'consists of an abstract stick figure consisting of two diagonal intersecting lines in the shape of a wide stylized letter X and a shaded circle above the letter X'" (Appx44; Appx48; Appx131). The Board thus weighed the similarity-of-marks factor against a finding of likelihood of confusion. (Appx46.)

After finding the parties' marks dissimilar, the Board then restated its findings on each factor under the heading "Balancing the Factors":

> We have considered all of the arguments and evidence of record, and all relevant *DuPont* factors. The lack of actual confusion and the strength of Applicant's [sic] standard character X mark is neutral. The goods, channels of trade and classes of purchasers to whom sales are made are related or overlap, and this favors a finding of likelihood of confusion. However, the marks create different commercial impressions, and the dissimilarity of the marks weighs against a likelihood of confusion.

(Appx46.) Without any further explanation or analysis, the Board summarily dismissed Fuente Marketing's notice of opposition. (Appx47.)

## V. SUMMARY OF ARGUMENT

The Board committed numerous reversible errors—and jettisoned fundamental principles of trademark law—in how it considered the relevant likelihood-of-confusion factors and ruled against Fuente Marketing.

*First*, the Board failed to rely on substantial evidence and erred as a matter of law in concluding that the parties' marks are dissimilar. The Board's conclusion that consumers will perceive Vaporous's X Dot Mark as a stick figure—its *only* basis for dissimilarity—is unsupported by substantial record evidence. It found so based only on the parties' stipulation to the description of the X Dot Mark in Vaporous's application and a dictionary definition of a stick figure. But the substantial record evidence, which the Board ignored, demonstrates that Vaporous intended for its mark to convey the message of "an X factor," associated with its "dabbing" products offered under its DABX brand. The Board compounded this error by abandoning axiomatic trademark principles. Specifically, the Board failed to evaluate the parties' marks as to their appearance, sound, connotation, *and* commercial impression, running afoul of this Court's precedent. Additionally, the Board evaluated the similarity of the parties' marks in the abstract without considering its findings on factors favoring Fuente Marketing—including that the parties' goods are inherently related and travel in overlapping trade channels to overlapping consumers—which necessarily required the Board to find that less similarity is needed for confusion to

be likely. Analyzing all relevant record evidence through the proper legal lens leads to only one conclusion—the similarities between Fuente Marketing's X Mark for cigars and Vaporous's X Dot Mark for oral vaporizers are sufficient to find for Fuente on this factor.

*Second*, the Board failed to rely on substantial evidence and erred as a matter of law in assigning Fuente Marketing's X Mark the same scope of protection as "any inherently distinctive mark" and finding the strength-of-mark factor neutral. Despite finding that Fuente Marketing's X Mark is arbitrary as applied to cigars, and thus conceptually strong, the Board treated Fuente Marketing's X Mark the same as any inherently distinctive mark, including suggestive marks. But as a matter of fundamental trademark law, *not* all inherently distinctive marks are treated equal or entitled to the same scope of protection. By departing from this core principle, the Board discounted the proper scope of protection to which Fuente Marketing's X Mark is entitled. Additionally, the Board's conclusion that Fuente's mark lacks commercial strength is not supported by substantial evidence. Although the Board acknowledged the substantial commercial success and recognition of Fuente's FUENTE FUENTE OPUS X cigars, the Board nevertheless found that the record evidence fails to support a finding that consumers recognize Fuente Marketing's X Mark as a source identifier for Fuente. In reaching this finding, the Board discounted the significance of the letter X on Fuente's cigar bands and disregarded the myriad

ways Fuente and others use the letter X, both alone and prominently when accompanied by other material, to indicate the source of all cigars in the FUENTE FUENTE OPUS X product line. Had the Board properly analyzed conceptual and marketplace strength, it would have been further compelled to find a likelihood of confusion as Fuente Marketing's X Mark is surely entitled to a scope of protection that extends to a mark differing only by a dot.

*Finally*, in its "Balancing of the Factors," the Board merely restated its findings on each factor and failed to articulate how it arrived at its ultimate conclusion of no likelihood of confusion. Even though it acknowledged that this is not a case where the similarity-of-marks factor is alone dispositive, the Board, with no explanation, effectively treated it as such when dismissing Fuente Marketing's opposition despite finding all other factors neutral or in Fuente's favor. Notwithstanding the Board's opaque analysis, when the relevant likelihood-of-confusion factors are evaluated through the proper legal lens and afforded their due weight, confusion is undeniably likely between Fuente Marketing's X Mark and Vaporous's X Dot Mark.

## VI. ARGUMENT

### A. Standard of Review

The ultimate legal determination of whether a likelihood of confusion exists between the parties' marks is reviewed *de novo*. *Bose Corp. v. QSC Audio Prods.*,

*Inc.*, 293 F.3d 1367, 1370 (Fed. Cir. 2002). The Board's factual conclusions on each likelihood-of-confusion factor are reviewed for support by "substantial evidence," i.e., evidence that a reasonable person could find adequate to support the Board's conclusions. *On-Line Careline, Inc. v. Am. Online, Inc.*, 229 F.3d 1080, 1085 (Fed. Cir. 2000).

### B. The Board Erred in Finding No Likelihood of Confusion Between Fuente Marketing's X Mark and Vaporous's X Dot Mark

The well-established test for determining likelihood of confusion, set forth in *In re E. I. DuPont DeNemours & Co.*, requires a balancing of thirteen non-exclusive factors. 476 F.2d 1357, 1361-62 (CCPA 1973). The Board and this Court may focus on only those factors that are most relevant to the case at hand. *See Han Beauty, Inc. v. Alberto-Culver Co.*, 57 USPQ2d 1557, 1559 (Fed. Cir. 2001). Moreover, the weight given to each factor depends on the particular circumstances of the case. *See In re Dixie Rests., Inc.*, 105 F.3d 1405, 1406-07 (Fed. Cir. 1997). The most relevant factors here are: (1) the similarity of the parties' marks; (2) the relatedness of the parties' goods, trade channels, and classes of consumers; and (3) the strength of Fuente Marketing's X Mark.

#### 1. The Board Erred in Finding the Parties' Marks Dissimilar

The similarity-of-marks factor requires examination of "the marks in their entireties as to the appearance, sound, connotation and commercial impression." *DuPont*, 476 F.2d at 1361. Similarity in any one of these elements may be sufficient

to prove a likelihood of confusion. *See Krim-Ko Corp. v. Coca-Cola Bottling Co. of New York*, 390 F.2d 728, 732 (CCPA 1968) ("It is sufficient if the similarity in either form, spelling or sound alone is likely to cause confusion.") (internal citation omitted). However, "[a]ll relevant facts pertaining to appearance, sound, and connotation must be considered before similarity as to one or more of those factors may be sufficient to support a finding that the marks are similar or dissimilar." *Recot, Inc. v. M.C. Becton*, 214 F.3d 1322, 1329 (Fed. Cir. 2000).

The Board ignored these fundamental principles in finding, without substantial evidence, that the parties' marks are dissimilar. As explained below, the Board's conclusion is based on the Board's unsupported finding that *consumers* will simply *perceive* Vaporous's X Dot Mark as a stick figure and not an X. The Board compounded this error by limiting its analysis to a visual comparison of the parties' marks and failing to consider, in assessing similarity, that the parties' goods are similar and travel in overlapping trade channels to overlapping consumers. Had the Board evaluated all record evidence relevant to the similarity-of-marks factor and considered that evidence through the proper legal lens, it would have been compelled to find that the parties' marks are sufficiently similar to support a likelihood of confusion. The Board clearly erred in concluding otherwise.

**a. Substantial Evidence Does Not Support the Board's Finding That the Parties' Marks Are Dissimilar**

The parties' marks share substantial and unmistakable similarities in appearance, sound, connotation, and overall commercial impression. The Board's contrary conclusion is not based on relevant evidence that a reasonable person would accept as adequate to support that conclusion. *In re Viterra Inc.*, 671 F.3d 1358, 1361 (Fed. Cir. 2012).

The Board's conclusion that the parties' marks are dissimilar is based solely on its finding that Vaporous's X Dot Mark "is a stick figure." (Appx44.) In reaching this finding, the Board relied on the parties' stipulation that "Vaporous'[s] X Dot Mark 'consists of an abstract stick figure consisting of two diagonal intersecting lines in the shape of a wide stylized letter X and a shaded circle above the letter X.'" (Appx44; Appx133.) According to the Board, the parties' stipulation "comports with the definition of a 'stick figure' as 'a drawing showing the head of a human being or animal as a circle and all other parts as straight lines.'" (Appx44.) Based solely on the parties' stipulation and the dictionary definition of "stick figure," the Board reached the hasty conclusion that *consumers* will actually perceive Vaporous's X Dot Mark as a "stick figure," which "is a representation of a human being and so differs from a letter of the alphabet visually, and in connotation, and commercial impression." (Appx44.)

The Board placed undue reliance on the parties' stipulation describing Vaporous's X Dot Mark as a "stick figure." The stipulation simply quotes the description of the X Dot Mark that appears in Vaporous's application: "The mark consists of an abstract stick figure consisting of two diagonal intersecting lines in the shape of a wide stylized letter 'X' and a shaded circle above the letter 'X'." (Appx48.) But, critically, as even the Board acknowledged, because "the issue before us is whether the design mark depicted in the drawing in Applicant's application is similar to Opposer's standard character X mark" (Appx44), Vaporous's own description of its X Dot Mark does not control how consumers will perceive the mark. *See also In re Change Wind Corp.*, 123 USPQ2d 1453, 1459 n.6 (TTAB 2017) ("We note that the drawing of the mark, not the words an applicant uses to describe it, controls what the mark is."); TMEP § 808.02 ("A description cannot be used to restrict the likely public perception of a mark. A mark's meaning is based on the impression actually created by the mark in the minds of consumers, not on the impression that the applicant states the mark is intended to convey."). Nor does the parties' stipulation, that Vaporous described the X Dot Mark the way it did, resolve how consumers will perceive the mark. Indeed, while the Board based its entire similarity finding on the stipulation, it ironically and paradoxically criticized Fuente Marketing for relying on the same stipulation, stating that "[w]hether the stipulation regarding Applicant's design mark specifies that Applicant's stick figure

includes the shape of the letter X is not dispositive in determining whether it is similar to Opposer's X mark." (Appx44.) The Board cannot have it both ways.

Moreover, the Board's myopic focus on Vaporous's X Dot Mark as a "stick figure" disregards the substantial record evidence demonstrating that Vaporous's X Dot Mark will not simply be perceived by consumers as a stick figure. The true significance of Vaporous's X Dot Mark and the message it is likely to project on consumers can only be appreciated by evaluating the record evidence related to Vaporous's selection, adoption, and use of the mark. *See Northwestern Golf Co. v. Acushnet Co.*, 226 USPQ 240, 244 (TTAB 1985) ("Evidence of the context in which a particular mark is used on labels, packaging, etc., or in advertising is probative of the significance which the mark is likely to project to purchasers."); *Am. Rice, Inc. v. H.I.T. Corp.*, 231 USPQ 793, 796-97 (TTAB 1986) (recognizing that an applicant's packaging is relevant to show whether the mark "projects a confusingly similar commercial impression").

Vaporous manufactures and sells electronic vaporizers and associated products. (Appx837.) In January 2021, Vaporous launched its first consumer-facing brand—DABX—for vaporizers specifically configured to vaporize concentrates in a wax form, which is commonly referred to as "dabbing." (Appx797-799; Appx 813; Appx838.) According to Vaporous, it selected the brand DABX because "[u]sing the X with the word DAB invoke[s] an 'X-factor'" (Appx803) and "suggest[s] that

the associated products are interesting and valuable" (Appx840). Vaporous has also stated that the "X" in DABX is "emphasized and stands on its own as an exclamation point after the mild word 'dab'." (Appx895; Appx950.)

Vaporous adopted its X Dot Mark to serve as a logo for, and graphical representation of, its DABX brand. (Appx803-804; Appx840.) Vaporous explained that the stylized X "calls to mind the X-factor of the DABX mark" whereas the dot "represents a dab, or portion of herbal concentrate intended to be vaporized." (Appx803-804.) As a whole, Vaporous contends that the X Dot Mark "calls to mind a simplified stick figure" and "evok[es] a person having the X-factor and being complementary to, and drawing the user's mind to, [Vaporous's] primary DABX mark." (Appx803.) Indeed, the same stylized X featured in Vaporous's X Dot Mark is also used for the "X" in Vaporous's "primary DABX mark."

(Appx48.) (Appx819.)

Vaporous uses both the X Dot Mark and "primary DABX mark" on its DABX products and packaging as well as in its promotional materials, as shown in the examples below:



(Appx812.)




(Appx1111.)




(Appx1064.)

This record evidence is critical because, unlike the stipulated language used in Vaporous's application that the Board myopically focused on, this evidence goes to the heart of the matter—the true meaning and intended impression of Vaporous's X Dot Mark. The dominant role of the stylized X in Vaporous's X Dot Mark is undeniable. The stylized X is a clear portrayal of the letter X, is considerably larger

than the dot, and is an essential feature that gives meaning to Vaporous's X Dot Mark. Vaporous adopted a design that prominently features the letter X to portray an X factor and to link the X Dot Mark to Vaporous's DABX brand and products, thereby conveying, as Vaporous intended, that its associated products are interesting and valuable. (Appx840.) Moreover, if the commercial impression Vaporous wished to convey was simply that of a stick figure, it would have adopted a mark that includes "the head of a human being . . . and *all* other parts [of the body] as straight lines." (Appx44 (emphasis added).) Instead, Vaporous selected an X— unconnected to the dot—to "evok[e] a person having the X-factor." (Appx803.) Thus, irrespective of whether consumers perceive Vaporous's X Dot Mark as a graphical representation of its DABX brand (i.e., the dot representing the descriptive term DAB and the X representing the X-factor) (Appx803-804) or a "simplified stick figure . . . evoking a person having the X-factor" (Appx803), the stylized X is likely to create an impression on an appreciable number of consumers such that confusion with Fuente Marketing's X Mark is likely. *See In re White Swan Ltd.*, 8 USPQ2d 1534, 1536 (TTAB 1988) (noting that if a group that "is not inconsequential" would understand a mark to have a meaning similar to a registered mark, it "will generally still result in a finding of likelihood of confusion"); *Michelin Tire Corp. v. General Tire & Rubber Co.*, 202 USPQ 294, 299 (TTAB 1979) ("[O]ne feature of a mark may be dominant and be given greater force and effect than other parts of the marks

in resolving the question of likelihood of confusion either because this feature is more prominently displayed or featured or because the other features are merely descriptive terms or otherwise lacking in appeal so that this one feature would be the portion most likely to make an impact on the aural and visual faculties of an observer.”).

When viewed in this proper context, the parties’ marks share substantial and unmistakable similarities. Like Vaporous’s X Dot Mark, Fuente Marketing’s X Mark conveys an “X factor” or something extra special. Specifically, Fuente Marketing’s X Mark was adopted as a nod to the Fuente family’s momentous “Project X” development effort, resulting in the first ever premium Dominican puro cigar. (Appx141; Appx537; Appx563.) And due to this unprecedented feat and the extraordinary quality of the cigars, Fuente Marketing’s X Mark has become synonymous in the minds of consumers with a rare and sought-after product. (Appx141; Appx145-149; Appx317-320; Appx387; Appx543; Appx768; Appx773; Appx778; Appx780.) Further, as the Board recognized, because Fuente Marketing’s X Mark is registered in standard characters, its scope extends to the very same stylized X prominently featured in Vaporous’s X Dot Mark. (Appx45); *see Viterra*, 671 F.3d at 1363 (“[A] standard character mark is not limited to any particular font, size, style, or color . . . .”); *In re Cox Enters.*, 82 USPQ2d 1040, 1044 (TTAB 2007) (“We must also consider that applicant’s mark, presented in typed or standard

character form, is not limited to any special form or style as displayed on its goods."). These similarities, as well as the similarity in sound, which the Board improperly failed to consider (*see* Section VI.B.1.b), leave no doubt that the Board erred in weighing the similarity-of-marks factor against likely confusion.

The Board has consistently found letter marks similar where the letters in the compared marks are recognizable and not highly stylized. *See Textron Inc. v. Maquinas Agricolas "Jacto" S.A.*, 215 USPQ 162, 164 (TTAB 1982) ("[R]ather clear portrayals of the letters involved in the compared marks tend to result in 'likelihood of confusion' findings."); *Hurst Performance, Inc. v. Torsten Hallman Racing, Inc.*, 207 USPQ 671, 675-76 (TTAB 1980) (sustaining opposition and finding likelihood of confusion with opposer's "H" mark where applicant's "H" mark was "visibly and essentially a letter 'H' which overpowers the two star designs"); *Hurst Performance, Inc. v. Henderson Mfg. Co.*, 199 USPQ 48, 57 (TTAB 1978) (sustaining opposition and finding likelihood of confusion between stylized "H" marks consisting of additional design features and/or words); *In re Buty-Wave Prods. Co.*, 198 USPQ 104, 106 (TTAB 1978) (sustaining opposition and finding likelihood of confusion between two marks "composed of a letter and design" because the letter "E" forms the dominant portion of each mark and the "striking similarity" of the marks predominate over any differences); J. Thomas McCarthy, 3 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:33 (5th

Ed. 2024) ("[I]f the stylization is minimal and the letters are recognizable, a likelihood of confusion will be found.").

In *Textron*, the Board held that applicant's stylized mark  was likely to cause confusion with opposer's non-stylized mark J and stylized mark . 215 USPQ at 165. In reaching its holding, the Board found that because one of opposer's asserted J marks was non-stylized, "the contrast that would otherwise reinforce an impression of distinctly different marks" was reduced. *Id.* at 164. The Board also found that "all three of the marks (applicant's stylized mark and opposer's stylized and non-stylized marks) are quite clearly J's," notwithstanding that applicant's mark "incorporate[d] some artwork outside the script 'J' (a small circle design to the right of the letter)." *Id.* Unlike letter marks previously found dissimilar, the Board noted that applicant's stylized J was neither "dominated by [another] feature," nor included any other "major design feature superimposed on the letter 'J'." *Id.* The Board thus concluded that the "subordinate differences in design" failed to distinguish applicant's mark from opposer's marks. *Id.* at 165.

Here, as in *Textron*, Fuente Marketing's X Mark and Vaporous's X Dot Mark are "quite clearly" X's, notwithstanding the addition of a dot above the stylized X in Vaporous's X Dot Mark. The stylized X is neither dominated nor obscured by the dot. Further, that Fuente Marketing's X Mark is registered in standard characters and can be displayed in any style reduces the ability of a dot to distinguish Vaporous's

X Dot Mark from Fuente Marketing's X Mark. *See id.* at 164. Given their obvious and substantial similarities in appearance and connotation, the singular distinction between Fuente Marketing's X Mark and Vaporous's X Dot Mark—a dot—is not sufficient to obviate a likelihood of confusion, especially given the Board's finding that the parties' marks identify goods that share an inherent relationship and travel in overlapping trade channels to overlapping consumers. (Appx29; Appx34); *see Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1368 (Fed. Cir. 2012) ("In this fact-specific inquiry, if the parties' goods are closely related, a lesser degree of similarity between the marks may be sufficient to give rise to a likelihood of confusion."); *Century 21 Real Estate Corp. v. Century Life of Am.*, 970 F.2d 874, 877 (Fed. Cir. 1992) ("Despite noting that the opposer's and applicant's services were substantially the same, this finding did not alter the Board's improper tolerance for substantial and confusing similarities between the competing marks."). The Board erred in concluding otherwise and weighing the similarity-of-marks factor against a likelihood of confusion.

#### b. The Board Failed to Compare the Parties' Marks as to Their Sound

The Board improperly reduced its analysis to a visual comparison of the parties' marks without considering facts relevant to the other similarity factors. (Appx43-46.) Hoping to justify its incomplete analysis, the Board noted that "where the marks are not word marks, visual dissimilarities can be dispositive." (Appx43.)

The Board's blanket proposition that every comparison of non-word marks—irrespective of their type or appearance—"turns on visual similarity" (Appx46) is inconsistent with this Court's established precedent. This Court has consistently observed that visual similarity controls the similarity-of-marks analysis only where the marks at issue are (1) "not word marks," *and* (2) "not capable of being spoken." *In re Burndy Corp.*, 300 F.2d 938, 939-40 (CCPA 1962); *see also Volkswagenwerk AG v. Rose'Vear Enters., Inc.*, 592 F.2d 1180, 1182 (CCPA 1979) (same).

In the context of "letter marks" similar to those involved here, this Court and the Board have found that such marks are capable of being spoken. In *In re Electrolyte Laboratories, Inc.*, this Court held that "stylized letter marks," such as  and K+EFF, "partake of both visual and oral indicia, and both must be weighed in the context in which they occur." 929 F.2d 645, 646-47 (Fed. Cir. 1990). Similarly, in *Nike Inc. v. WNBA Enterprises, LLC*, the Board found that the letter "S" in the marks  and  was "capable of being spoken." 85 USPQ2d 1187, 1199 (TTAB 2007). In reaching this finding, the Board noted that, contrary to stylized letter marks previously found to be purely visual symbols that do not sound:

> The stylization of the letter [S] is not so extreme or striking that when viewing the marks in their entireties, the stylization overwhelms the underlying letter making it virtually unrecognizable or subordinate to the overall design. In fact, the stylization itself is not particularly

> distinctive or unusual and in both marks is easily recognizable as the letter "S."

*Id.* (internal citations omitted). The Board thus concluded that "the question of similarity or dissimilarity does not turn in the case only on a visual comparison of the marks" and "when spoken[,] they would have the same letter mark meaning." *Id.*

Like the marks in *Electrolyte* and *Nike*, both Fuente Marketing's X Mark and Vaporous's X Dot Mark are capable of being spoken. There is no dispute—and indeed, Vaporous has acknowledged—that Fuente Marketing's X Mark can be and is pronounced "X." (Appx1194.) As for Vaporous's X Dot Mark, the Board found that because the mark "is a stick figure," it "has no pronunciation." (Appx44.) Notwithstanding the lack of substantial evidence supporting the Board's finding that Vaporous's X Dot Mark "is a stick figure" (*see* Section VI.B.1.a), "the letter [X] is still an essential feature of [the] mark." *Nike*, 85 USPQ2d at 1199. Indeed, Vaporous itself explained that its X Dot Mark comprises of a "stylized X below [a] dot," with the "X" intended to convey an "X-factor." (Appx803-804.) The X Dot Mark is also intended to be a graphical representation of Vaporous's primary mark DABX (Appx803-804; Appx840), for which Vaporous explained "the 'X' is its own separate word/sound . . . and is emphasized and stands on its own as an exclamation point after the mild [and descriptive] word 'dab'" (Appx895; Appx950). Further, the letter "X" in Vaporous's X Dot Mark is not "so highly stylized that the mark[] as a whole would be perceived as [a] purely visual design." *Nike*, 85 USPQ2d at 1198-99.

Indeed, the stylization of the "X" is far less distinctive or unusual than the stylized letter marks in *Nike*, which the Board found were both "easily recognizable as the letter 'S.'" *Id.* at 1199. Accordingly, because the parties' marks are plainly capable of being spoken, the Board was required to consider all relevant evidence pertaining to sound before it resolved the similarity-of-marks factor solely based on visual dissimilarity. *See Recot*, 214 F.3d at 1329-30. The Board's failure to do so constitutes legal error.

**c. The Board Failed to Weigh the Similarity-of-Marks Factor Through the Lens of the Factors Favoring Fuente Marketing**

It is improper to consider the similarity of marks in the abstract. *See Kenner Parker Toys Inc. v. Rose Art Indus., Inc.*, 963 F.2d 350, 352 (Fed. Cir. 1992). As this Court has long recognized, "[t]he basic principle in determining confusion between marks is that marks must be . . . considered in connection with the particular goods or services for which they are used." *In re Nat'l Data Corp.*, 753 F.2d 1056, 1058 (Fed. Cir. 1985). When marks appear on closely related goods that travel in overlapping trade channels to overlapping consumers, the degree of similarity necessary to support a likelihood of confusion declines. *See, e.g.*, *Coach Servs.*, 668 F.3d at 1368; *Century 21*, 970 F.2d at 877. The Board abandoned these axiomatic principles when evaluating the similarity of marks as an independent factor,

unaffected by its findings that the parties' goods, trade channels, and consumers are closely related.

The Board considered several factors related to the competitive proximity of the parties' goods and found that each weighed in favor of likelihood of confusion. *First*, the Board found that the parties' goods, namely Fuente's cigars and Vaporous's oral vaporizers, are inherently related "because both may be used to ingest tobacco by inhaling." (Appx29.) *Second*, the Board found that the parties' goods travel in overlapping trade channels and, in reaching this finding, relied on substantial evidence showing that convenience stores and specialty retailers offer both vaping products and cigars (Appx30-31; Appx34; Appx601-602; Appx603-605; Appx606-608; Appx609-612; Appx613; Appx614-616; Appx617-618; Appx619-621; Appx622-636; Appx637; Appx368-639; Appx1392; Appx1535.) *Third*, the Board found that the parties' goods appeal to overlapping consumers. (Appx34.) As the basis for this finding, the Board relied on substantial evidence showing that vaping products are marketed as an alternative to traditional tobacco products (e.g., cigars and cigarettes) (Appx29; Appx1280; Appx1303; Appx1346) and that consumers who use vaping products are more likely to use traditional tobacco products (Appx32; Appx584-592; Appx593-597; Appx1392). The Board also acknowledged evidence showing that vaping products are sometimes designed to resemble cigars. (Appx29-30; Appx1371; Appx1374.)




(Appx156.) *Finally*, the Board found that Fuente's use and registration of marks comprised of or containing X for a variety of goods other than cigars further "bolsters the finding that [the] goods are related." (Appx38; Appx143-144.)

These multiple findings on the competitive proximity of the parties' goods, trade channels, and consumers—all conclusively favoring Fuente Marketing—"did not alter the Board's improper tolerance for substantial and confusing similarities between the competing marks." *Century 21*, 970 F.2d at 875 (reversing Board's dismissal of opposition). Rather, the Board evaluated the similarity-of-marks factor in the abstract. (Appx43-46.) Had the Board properly weighed the similarity-of-marks factor through the lens of its findings that the parties' goods are inherently related and travel in overlapping trade channels to overlapping consumers—which necessarily mandate that less similarity is required between the marks—the Board would have been compelled to find that the dot in Vaporous's X Dot Mark is not enough to make its mark different. Indeed, no reasonable factfinder could conclude otherwise.

### 2. The Board Erred in Failing to Accord Fuente Marketing's X Mark a Heightened Scope of Protection

"A mark's strength is measured both by its conceptual strength (distinctiveness) and its marketplace strength (secondary meaning)." *In re Chippendales USA, Inc.*, 622 F.3d 1346, 1353-54 (Fed. Cir. 2010).

The Board evaluated both prongs of the strength inquiry. (Appx38-43.) Regarding conceptual strength, the Board found that Fuente Marketing's X Mark is arbitrary as applied to cigars. (Appx39-40.) Turning to marketplace strength, the Board found that the record failed to demonstrate that the relevant consuming public recognizes the X Mark as a source identifier for Fuente. (Appx40-42.) The Board then concluded that Fuente Marketing's X Mark is "neither weak nor very strong" and "entitled to the protection accorded any inherently distinctive mark." (Appx42.) As a result, the Board found the strength-of-mark factor neutral when dismissing Fuente Marketing's opposition. (Appx46.)

The Board erred in its analysis of both the conceptual and marketplace strength of Fuente Marketing's X Mark. First, in rendering the strength of Fuente Marketing's mark "neutral" (Appx46), the Board gave no weight to its finding that the letter "X" is arbitrary as applied to cigars. Second, in evaluating marketplace strength, the Board disregarded substantial evidence showing prominent uses of the letter "X" in connection with Fuente's products.

### a. The Board Gave Insufficient Weight to Its Finding That Fuente Marketing's X Mark is Arbitrary

A trademark's conceptual strength is determined on a spectrum of four categories, from least to most distinctive, that reflect its "eligibility to trademark status and the degree of protection accorded." *In re North Carolina Lottery*, 866 F.3d 1363, 1366 (Fed. Cir. 2017) (citation omitted). In ascending order, those categories are (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. *Id.*

The Board categorized Fuente Marketing's X Mark as arbitrary (Appx40), yet found it entitled to the same scope of protection as "any inherently distinctive mark" (Appx42). Suggestive, arbitrary, and fanciful trademarks are characterized as inherently distinctive to reflect their status as registrable on the Principal Register without proof of secondary meaning. *See Nautilus Grp., Inc. v. ICON Health & Fitness, Inc.*, 372 F.3d 1330, 1340 (Fed. Cir. 2004). But not all inherently distinctive marks are entitled to the same scope of protection.

Arbitrary and fanciful trademarks are recognized as strong marks that are entitled to a broad scope of protection. *See, e.g.*, *Luzier Inc. v. Marlyn Chem. Co.*, 442 F.2d 973, 974 (CCPA 1971) ("[T]his mark is an arbitrary mark . . . entitled to protection as a 'strong' mark."); *Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee en 1772*, 396 F.3d 1369, 1372 (Fed. Cir. 2005) ("VEUVE is an arbitrary term as applied to champagne and sparkling wine, and thus conceptually strong as a trademark."). This is the case for arbitrary letter marks, like Fuente

Marketing's X Mark, which the Board has noted "have generally been given a wide scope of protection on the premise that it is more difficult to remember arbitrarily arranged or presented letters than it is to recall words, phrases, or syllables, thus making the likelihood of confusion among purchasers more probable." *Textron Inc. v. Maquinas Agricolas "Jacto" S.A.*, 215 USPQ at 163.

On the other hand, suggestive trademarks are not entitled to the same scope of protection as their arbitrary and fanciful counterparts. This Court and the Board routinely distinguish between suggestive and arbitrary marks when evaluating a mark's conceptual strength in the context of likelihood of confusion. *See Sears, Roebuck & Co. v. Haymer*, 263 F.2d 348, 349 (CCPA 1959) ("[W]ords of [a suggestive nature] are given less weight than more arbitrary words in determining confusing similarity."); *H.D. Lee Co., Inc. v. Maidenform, Inc.*, 87 USPQ2d 1715, 1727 (TTAB 2008) ("Suggestive marks, in general, are not entitled to the same scope of protection as arbitrary marks."); *Milwaukee Nut Co. v. Brewster Food Serv.*, 277 F.2d 190, 191 (CCPA 1960) ("Obviously it was the purpose of both parties to employ words that are suggestive of the use of the merchandise. In doing so appellee [opposer] necessarily foreclosed the possibility of obtaining the scope of protection that a purely arbitrary mark would deserve."); *Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 1339 (Fed. Cir. 2015) ("Marks that are descriptive or highly suggestive are entitled to a narrower scope of protection, *i.e.*, are less likely to

generate confusion over source identification, than their more fanciful counterparts.”); *Drackett Co. v. H. Kohnstamm & Co.*, 404 F.2d 1399, 1400 (CCPA 1969) (“The scope of protection afforded such highly suggestive marks is necessarily narrow.”).

Here, the Board obscured these established boundaries between the categories of inherently distinctive marks and rendered the distinction between them inconsequential. As a result, the Board diminished the proper scope of protection to which Fuente Marketing’s arbitrary X Mark is entitled. Even though Fuente Marketing’s X Mark is not a suggestive mark, the Board effectively treated it as such by affording the mark the same protection as “any inherently distinctive mark” (Appx42) and giving its conceptual strength no weight when dismissing Fuente Marketing’s opposition (Appx46). And the Board’s finding that Fuente Marketing’s X Mark lacks marketplace strength, while not based on substantial evidence as discussed in Section VI.B.2.b, does not detract from, or warrant discounting, the mark’s conceptual strength. *See Leb. Seaboard Corp. v. R&R Turf Supply Inc.*, 101 USPQ2d 1826, 1832 (TTAB 2012) (finding that opposer’s “arbitrary mark used for a 25-year period, is a strong mark, and the registration is entitled to a broad scope of protection” despite lacking marketplace strength); *Calypso Tech., Inc. v. Calypso Cap. Mgmt., LP*, 100 USPQ2d 1213, 1222 (TTAB 2011) (finding that the record failed to demonstrate the marketplace strength of opposer’s mark but nonetheless

concluding that the strength-of-mark factor weighed in favor of likely confusion because opposer's mark was "arbitrary and strong"). By ignoring the impact of Fuente's mark being arbitrary and sitting on the strong end of the spectrum of distinctiveness, the Board effectively rendered the conceptual-strength inquiry superfluous and irrelevant, which is fundamentally and legally improper.

Had the Board given *any* weight to its finding that Fuente Marketing's arbitrary X Mark is conceptually strong, Fuente Marketing's scope of protection in its X Mark would surely extend to a mark that varies only by a dot above a clear portrayal of the letter X. *Compare Kenner Parker*, 963 F.2d at 352 ("[S]trong marks enjoy a wide latitude of legal protection"), *with Juice Generation*, 794 F.3d at 1338 ("The weaker an opposer's mark, the closer an applicant's mark can come without causing a likelihood of confusion and thereby invading what amounts to its comparatively narrow range of protection."). The Board thus erred in glossing over, and assigning no weight to, this important finding when reaching its ultimate conclusion that confusion is not likely.

#### b. The Board Disregarded Substantial Evidence in Finding that Fuente Marketing's X Mark Lacks Commercial Strength

A trademark's marketplace strength or fame "is not a binary factor, but varies along a spectrum from very strong to very weak." *In re Coors Brewing Co.*, 343 F.3d 1340, 1345 (Fed. Cir. 2003). "Fame for confusion purposes arises as long as a

significant portion of the relevant consuming public . . . recognizes the mark as a source indicator." *Palm Bay*, 396 F.3d at 1375. This recognition may be measured by indirect evidence such as "length of time of use of the mark; widespread critical assessments; notice by independent sources of the goods or services identified by the marks; and the general reputation of the goods or services." *New Era Cap Co. v. Pro Era, LLC*, 2020 WL 2853282, at *12 (TTAB 2020).

In evaluating the marketplace strength of Fuente Marketing's X Mark, the Board acknowledged the substantial commercial success and recognition that Fuente's FUENTE FUENTE OPUS X cigars have achieved since their introduction to market in 1995. (Appx40-41.) Nevertheless, the Board found that the record fails to demonstrate the commercial strength of Fuente Marketing's X Mark because the letter X, when used by Fuente or others through unsolicited media, "is integrated into the coined term OPUSX in the FUENTE FUENTE OPUSX mark and serves as background to the letters FF on the cigar band." (Appx42.) Although the Board acknowledged evidence showing that third parties describe Fuente's products using a space between OPUS and X, the Board "was not swayed" by what it described as "a few examples" in the record. (Appx42.) The Board's findings not only disregard substantial record evidence showing the myriad ways in which Fuente Marketing's X Mark is used by Fuente and others to indicate the source of Fuente's products but

also discounts the prominence of Fuente Marketing's X Mark on Fuente's cigar bands.

Fuente has used the X Mark for decades to promote and sell its celebrated cigars and related accessories in the FUENTE FUENTE OPUS X product line. (Appx141.) The Board's limited focus on the "term OPUSX" in the "FUENTE FUENTE OPUSX mark" disregards record evidence showing that the X Mark is used in a myriad other ways, including in the name of every cigar in the FUENTE FUENTE OPUS X product line, including, for example, the FORBIDDEN X, the RISING X, the OPUS X PerfecXion No. 2, and the OPUS X Oro Oscuro Belicoso XXX. (Appx173; Appx343; Appx418; Appx773; Appx778.) And Fuente Marketing's X Mark is often presented alone or otherwise displayed prominently when accompanied by other material such that the "X" creates a separate and distinct commercial impression to consumers. *See In re MN Apparel LLC*, 2021 WL 2201562, at *3 (TTAB 2021) ("A mark creates a separate and distinct commercial impression if it is not 'so entwined (physically or conceptually) with other material that it is not separable from it in the mind of the consumer.'" (citation omitted)); *Textron Inc. v. Cardinal Eng. Corp.*, 164 USPQ 397, 1969 WL 8396, at *3 (TTAB 1969) ("There is no statutory limitation on the number of trademarks that one may use on or in connection with a particular product to indicate origin thereof in commerce."); *Hurst Performance, Inc. v. Henderson Mfg. Co.*, 199 USPQ at 50, 57

(finding that "the letter 'H' is a visual and significant portion of [opposer's] mark" "consisting of a stylized letter 'H' enclosed with an inclined rhomboid with rounded corners with the name 'HURST' extending through the horizontal bar" of the stylized letter). For example, to draw attention to the X Mark as a source identifier, Fuente promotes its FUENTE FUENTE OPUS X product line using "look-for" advertisements stating, for example, "When you see X, you see Fuente." (Appx494); *see also Bd. of Trs. of the Univ. of Ala. v. Pitts*, 107 USPQ2d 2001, 2017 (TTAB 2013) ("The Board and other courts have long noted the importance of [look for] advertising in establishing the existence of acquired distinctiveness."); *In re Data Packaging Corp.*, 453 F.2d 1300, 1304 (CCPA 1972) ("Appellant's advertising clearly shows that it intended to develop trademark recognition of its color-coded rings, and the affidavits which it has submitted persuade us . . . that its design is being recognized in the industry as indicative of the source *or* origin with appellant."); *In re Johnson & Johnson*, 186 USPQ 559, 560 (TTAB 1975) (finding advertisements directing consumers to "look for" applicant's design mark demonstrated that the mark was "not mere background" for applicant's other marks appearing with the design mark); *In re AFA Corp.*, 196 USPQ 772, 775 (TTAB 1977) (finding it "significant" that applicant advertised its arbitrary color arrangement with phrases such as "Gold and Black Means AFA" "to develop trademark recognition").

The record includes numerous other examples of Fuente Marketing's X Mark prominently featured in promotional material, consumer commentary, and unsolicited media attention:

| **Example Uses of X Standing Alone**[3] |
| --- |




(Appx494.)



(Appx490.)



(Appx568.)

| **Example Uses of X Isolated From Other Material**[4]<br>**(e.g., Opus X, Rising X, Forbidden X, etc.)** |
| --- |




(Appx382 (annotated).)

[3] *See also* Appx546; Appx552; Appx563.

[4] *See also* Appx309; Appx318-320; Appx337-338; Appx343; Appx359; Appx408; Appx418; Appx441; Appx460-461; Appx469-471; Appx474; Appx481; Appx503; Appx549-550; Appx552; Appx560; Appx565; Appx1572; Appx1577.



JANUARY 1996

ARTURO FUENTE LAUNCHES OPUS X

Arturo Fuente's long-awaited super premium brand, Opus X, began reaching consumers in late November after many delays. The cigars—originally slated for release in September 1994—are being distributed to a small number of stores in the northeast (from Boston to Washington, D.C.). The date for national distribution has yet to be decided.

(Appx317 (annotated).)




(Appx404 (annotated).)



TEN BEST

—CIGARS—

My son and co-author, Andrew, knows a lot about cigars; in fact, several years ago we collaborated on a book about them, *The Cigar Connoisseur.* Here are the best gleaned from research he conducted for that.

1 – COHIBA

Cuba

The Cohiba cigar brand was introduced in 1968 and soon became the flagship brand of the Cuban cigar industry. Developed initially as a medium-bodied cigar for presentation only by officials of the Cuban government, Cohiba was marketed widely beginning in 1982. The initial sizes were the Lancero, the Corona Especiale, and the Panetela, with the Esplendido, Robusto, and Exquisito added in 1989. In 1992, in honor of the 500th anniversary of Columbus's discovery of the Caribbean, the Siglo series was introduced. The Cohiba cigar has become one of the most coveted cigars in the world. The tobacco used for Cohibas is grown only on certain plantations in the Vuelta Abajo province of Pinar del Río.

2 – TRINIDAD

Cuba

This cigar was marketed for the first time in February 1998, when it was presented in Havana during the annual gala in which the "Hombre Habano del Año" awards are bestowed. But it was already well known to connoisseurs everywhere because a variation of it had been around since 1969. Named after one of Cuba's prettiest cities, the Trinidad had been produced exclusively for Fidel Castro himself. It's a medium- to full-bodied smoke.

3 – ARTURO FUENTE OPUS X SERIES

Dominican Republic

The Fuente family has been making cigars for three generations. They manufacture a wide range of cigars, but we like those in the Opus X series, especially the double Corona, Robusto, and Perfection #2.

4 – MONTECRISTO

Cuba

Montecristo started in 1935 as a new brand from the Menendez and Garcia families. We've been told that it was named after Alexandre Dumas's novel, *The Count of Montecristo.* Whatever the source, we enjoy the "monties" for their colorado claro wrapper, superb aroma, medium to full flavor, and tangy taste.

PRODUCTS ✦ 107

(Appx406 (annotated).)




(Appx173.)




(Appx430.)




(Appx442.)



Opus X Cigars - BestCigarPrices.com

New Best Friend You
stCigarPrices.com B
info@bestcigarprices.com

Toll Free Phone:888-41-CIGAR (888-412-4427)
Monday-Saturday 9-5 Eastern

- List of All Cigars
- Shop by Brand
- Search
- Email Sign Up
- Free Catalog
- Cigars
- Humidors
- Accessories
- Machine Made
- Exotics
- Free Shipping
- Flavored Cigars
- Small Cigars
- Samplers
- Bundles
- Best Sellers
- Gift Samplers
- Nicaraguan
- Honduran
- Dominican
- Log In
- FAQ
- Testimonials
- Contact Us
- About Us

Continue Shopping | View Cart

## Opus X Cigars

Arturo Fuente Opus X cigars are some of the rarest, most sought after cigars in the world, a fact that is validated by Cigar Aficionado. Opus X cigars are Dominican Puro cigars, which is something that is extremely hard to do, but that didn't stop Arturo Fuente to create one of the first ultra-premium cigars. Opus X cigars are also unique in that they have been used as somewhat of a marketing tool for Arturo Fuente. There are a plethora of different shapes and sizes of Opus X cigars that were made in limited quality. Some examples of these are the Opus X Dan Marino Football Cigar, a astounding 6 x 160 (yes, 160) cigar that is shaped like a football, with laces and all. The Sammy Sosa Baseball Bat cigar is shaped like a baseball bat, and Opus X has also made a variety of culebra (which means snake in Spanish) cigars, as well as various cigars for celebrities such as the Opus X Trump Tower and the Opus X Crowning Glory (for Pope John Paul II). Although these Opus X cigars were made in extremely limited quantities (some less than a full box), the regular Opus X line is almost just as hard to get your hands on. Retailing at above thirty dollars a stick, most who question the quality of an Opus X cigar have yet to try one.

- Opus X Belicoso XXX
- Opus X Double Corona
- Opus X Forbidden X Lancero
- Opus X Fuente Fuente
- Opus X Perfection X
- Opus X Perfecxion #2
- Opus X Perfecxion #4
- Opus X Perfecxion #5
- Opus X Perfecxion X
- Opus X Reserve de Chateau
- Opus X Reserve de Chateau
- Opus X Robusto
- Opus X Robusto
- Opus X Super Belicoso

(Appx778.)



Sign up for our newsletter & cigar specials:
EMAIL ADDRESS: SIGN UP

Cigars Direct | Cigars | Cigar Singles | Cigar 5-Packs | Cigar of the Month Club | View Cart | Login

Search Our Site:
Cigar Search :: Advanced Search

Cigar Catalog:
Cigars
Cigar of Month Club
Gift Certificates
Cigar Accessories
Cigar Singles
Win Free Cigars!

Store Links:
Cigar Catalog
Cigar Brands
Featured Cigars
Cigar Specials
Cigar Search
Contact Us Form
View Cart

## Opus X Cigars

CigarsDirect.com is committed to supplying our customers with the world renowned **Fuente Fuente Opus X**. Due to limited production of these fabulous cigars we try to offer the most competitive market price. We pride ourselves on delivering you fresh **Opus X Cigars** in a timely manner. All **Opus X Cigar** orders ship with in 24 Hours, with exception to Saturday, Sunday & Holiday orders. We look forward to earning your business with unmatched customer service and inventory. Below you will find **Fuente Fuente Opus X** Humidors, Gift packs, Sampler packs, Cigars, and much more. If the Opus X is your favorite cigar please sign up for our **Free Fuente Fuente Opus X Giveaway**. No purchase necessary to win. Enjoy your cigar shopping.

(Appx780.)

**Examples Uses of X Emphasized[5]**
**(e.g., OpusX, PerfecXion, ForbiddenX)**




(Appx416.)




(Appx387.)

---

[5] *See also* Appx342-343; Appx346; Appx349; Appx352-357; Appx359; Appx365-366; Appx379-380; Appx387; Appx393; Appx400; Appx473; Appx533; Appx535; Appx537-538; Appx540; Appx 543; Appx547; Appx551-554; Appx560; Appx564; Appx573; Appx583; Appx1576.



| HOTTEST BRANDS | |
|---|---|
| 1 Padrón | 46.8% |
| 2 Arturo Fuente | 29.9% |
| 3 Fuente Fuente OpusX | 18.2% |
| 4 Liga Privada | 14.3% |
| 5 Rocky Patel | 13.0% |
| 6 Oliva | 11.7% |
| 7 Davidoff | 10.4% |
| 7 La Flor Dominicana | 10.4% |
| 9 Encore by E.P. Carrillo | 9.1% |
| 10 My Father | 7.8% |

(Appx366 (annotated).)



THE HOTTEST CIGAR BRANDS IN AMERICA

Brands Requested Most Often by Consumers

| | |
|---|---|
| 1 Padrón 1964 Anniversary Series | 29.9% |
| 2 Arturo Fuente | 26.4% |
| 3 Fuente Fuente OpusX | 16.1% |
| 4 Liga Privada | 14.9% |
| 5 La Flor Dominicana | 13.8% |
| 6 Rocky Patel | 11.5% |
| 7 Davidoff | 9.2% |
| 7 Oliva Serie V | 9.2% |
| 9 My Father | 8.0% |
| 10 Montecristo | 6.9% |

*Source: CIGAR INSIDER*

(Appx379 (annotated).)




(Appx494.)




**Fuente Fuente OpusX™ re-creates image of vintage cigar period**

**By Phil Bowling**

The dream that began several years ago for the Fuente family finally became a reality at the end of 1995. The Fuente Fuente OpusX is the result of a lot of "hard work, sweat, tears and prayers," says Carlos Fuente Jr. "This cigar is such a success story that I still pinch myself occasionally to make sure I'm not dreaming."

The Fuente Fuente OpusX features the wrapper

will take some time to get it out nationally.

"We are trying to go down the East Coast and have made it down to Washington, D.C., so far," Fuente says. "It's fantastic that everyone wants to carry the cigar, but as we stated from the beginning, it is—and always will be—a limited cigar as far as production goes, and we can only make so many at a time."

Initial reports indicate that the cigar has sold tremendously well to date. And to help spread the tasting of the new cigar, Fuente has suggested retailers limit sales to a one- or two-cigars per customer basis.

The new cigar, in a variety of sizes, has suggested retail points from $7 to $13.

(Appx536.)




(Appx473.)

Further, Fuente Marketing's X Mark is prominently featured on all FUENTE FUENTE OPUS X cigar bands and packaging in a manner that is instantly recognizable, especially in view of the substantial advertisement and promotion of the X Mark by Fuente and others through unsolicited media. As for the cigar bands, the Board's reduction of Fuente Marketing's X Mark to "background" material (Appx42) is clearly contradicted by a visual inspection of the bands. The X Mark is *always* positioned in the center of the cigar bands, displayed in a color distinct from the other elements adjacent to the X Mark, and sized larger than the other elements on the band:


(Appx342.)


(Appx352.)


(Appx493.)


(Appx474.)

Similarly, at the point of sale, Fuente's FUENTE FUENTE OPUS X cigars are presented in boxes, humidors, or other containers that prominently display Fuente Marketing's X Mark often in a color distinct from and size larger than other material on the containers:


(Appx1225.)



(Appx1217.)



(Appx434.)



(Appx433.)




(Appx446.)




(Appx435.)

Through these prominent and long-standing uses, Fuente's X Mark has acquired a separate identity that signals to consumers that Fuente's cigars and related accessories come from one and only one source.

The marketplace strength of Fuente Marketing's X Mark is further evidenced by Fuente's diligent enforcement against third parties applying for, registering, and using marks likely to cause confusion with Fuente Marketing's X Mark. (Appx1139-1144.) Indeed, the only record evidence related to third-party "X" marks was "accord[ed] little probative weight" by the Board because Vaporous failed to

introduce evidence showing that any of the handful of third-party marks it relied on are used in commerce. (Appx39.)

For these reasons, when considering all relevant evidence under the correct legal standard, the record substantially supports a finding that Fuente Marketing's X Mark is recognized by a substantial portion of the relevant consuming public as a source identifier for Fuente. The Board erred in concluding otherwise.

### 3. The Board Erred in Improperly Balancing the Relevant Likelihood-of-Confusion Factors

The Board's balancing—or lack thereof—of the relevant likelihood-of-confusion factors underscores its erroneous decision. After finding that all other relevant likelihood-of-confusion factors either favored Fuente Marketing or were neutral, the Board improperly elevated the similarity-of-marks factor to dispositive status without supplying any analysis to suggest how it balanced its conflicting findings. Instead, the Board concluded its decision by restating its findings for each factor:

> We have considered all of the arguments and evidence of record, and all relevant *DuPont* factors. The lack of actual confusion and the strength of Applicant's [sic] standard character X mark is neutral. The goods, channels of trade and classes of purchasers to whom sales are made are related or overlap, and this favors a finding of likelihood of confusion. However, the marks create different commercial impressions, and the dissimilarity of the marks weighs against a likelihood of confusion.

(Appx46.) As a result, it is unclear what weight or legal significance, if any, the Board afforded its findings conclusively favoring Fuente Marketing or how the Board reached its ultimate conclusion of no likelihood of confusion. The only thing that is clear, unfortunately, is that each factor was viewed in a silo that did not impact the other factors. This, as explained, was legally erroneous.

This case does not present circumstances that justify dismissal of Fuente Marketing's opposition based solely on the Board's subjective and unsupported finding that "consumers would not perceive [Vaporous's] design mark as a letter X, but as a stick figure." (Appx46.) Indeed, although the Board recognized that the similarity-of-marks ***and*** similarity-of-goods factors "largely are determinative here" (Appx24), the Board treated the similarity-of-marks factor *alone* determinative (Appx46). The elevation of a single factor to dispositive status in this case constitutes legal error. To be sure, in the few instances where this Court has upheld Board decisions assigning the similarity-of-marks factor dispositive weight, the compared marks were found to have "substantial and undisputed differences." *Kellogg Co. v. Pack'Em Enters.*, 951 F.2d 330, 332-33 (Fed. Cir. 1991); *see also Odom's Tenn. Pride Sausage, Inc. v. FF Acquisition, LLC*, 600 F.3d 1343, 1346 (Fed. Cir. 2010) ("[T]he visual distinctions between the marks at issue here create unquestionably different commercial impressions, thereby precluding a finding of likelihood of confusion."); *Oakville Hills Cellar, Inc. v. Georgallis Holdings, LLC*, 826 F.3d

1376, 1381-82 (Fed. Cir. 2016) (affirming Board decision finding that "the marks create significantly different commercial impressions" such that confusion was unlikely (citation omitted)). Unlike those cases, here, Fuente Marketing's X Mark and Vaporous's X Dot Mark share substantial and undisputed *similarities*, at least one of which even the Board could not ignore (*see* Appx44-45) despite erring in its similarity-of-marks analysis (*see* Section VI.B.1). And based on the Board's opaque "balancing" of the relevant likelihood-of-confusion factors, neither this Court nor the parties can reasonably discern the path to the Board's conclusion that the similarity-of-marks factor outweighed all other factors favoring Fuente Marketing. *See In re Charger Ventures LLC*, 64 F.4th 1375, 1384 (Fed. Cir. 2023) (noting that "a decision of less than ideal clarity" will only be upheld where "the agency's path may reasonably be discerned" (citation omitted)); *Champagne Louis Roederer, S.A. v. Delicato Vineyards*, 148 F.3d 1373, 1376 (Fed. Cir. 1998) (Michel, J., concurring) (same).

Notwithstanding the Board's incomplete analysis, when the relevant likelihood-of-confusion factors are evaluated through the proper legal lens and afforded proper weight, it is clear that the Board erred in reaching its ultimate conclusion. The record includes considerable evidence, which the Board disregarded, showing confusing similarities in the appearance, sound, connotation, and overall commercial impression of the parties' marks. (*See* Sections

VI.B.1.a-VI.B.1.b.) A proper weighing of this evidence with the Board's findings favoring Fuente Marketing magnifies the likelihood of consumer confusion. (*See* Section VI.B.1.c.) And even if Fuente Marketing's X Mark were only "entitled to the protection accorded any inherently distinctive mark," as the Board improperly found (*see* Section VI.B.2), the parties' marks, considered in connection with the inherently related goods they identify, are sufficiently similar to support a finding of likelihood of confusion. Here, however, assigning any weight to the conceptual or commercial strength of Fuente Marketing's X Mark, which the Board improperly failed to do (*see* Sections VI.B.2.a-VI.B.2.b), leaves no doubt that a mark consisting of a small dot above a clear portrayal of the letter X is well within the scope of marks likely to cause confusion with Fuente Marketing's X Mark. Indeed, the Board effectively gave the arbitrary and federally registered X Mark no scope of protection. The Board thus erred in improperly balancing these factors, which decisively favor Fuente.

#### 4. The Board Erred in Failing to Resolve Any Doubts Concerning Likelihood of Confusion in Fuente Marketing's Favor

The Board has repeatedly held in trademark cases that all doubts as to whether confusion, mistake, or deception is likely should be resolved in favor of the senior user. *See, e.g.*, *In re Hyper Shoppes (Ohio), Inc.*, 837 F.2d 463, 464-65 (Fed. Cir. 1988) ("any doubts about likelihood of confusion . . . must be resolved against applicant as newcomer"); *Century 21*, 970 F.2d at 878 (same). Fuente Marketing has

established that it is the senior user and registrant of the X Mark; that its mark is arbitrary; and that Vaporous is the newcomer. Thus, any doubts as to the existence of a likelihood of confusion between the parties' marks should have been resolved in Fuente Marketing's favor. It was error for the Board not to do so.

## VII. CONCLUSION

For the reasons stated above, the Board's decision should be reversed, and Fuente Marketing's opposition sustained.

Date: June 24, 2024

Respectfully submitted,

/s/ *Virginia L. Carron*
Virginia L. Carron
R. Gordon Wright
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
271 17th Street, NW, Suite 1400
Atlanta, GA 30363-6209
404-653-6400

Douglas A. Rettew
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
901 New York Ave., NW
Washington, D.C. 20001-4413
202-408-4000

*Attorneys for Appellant*
*Fuente Marketing Ltd.*

# ADDENDUM

This Opinion Is Not a
Precedent of the TTAB

Mailed: December 14, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

———

Trademark Trial and Appeal Board

———

*Fuente Marketing Ltd.*
*v.*
*Vaporous Technologies, LLC*

———

Opposition No. 91270800

———

Virginia L. Carron and R. Gordon Wright of Finnegan Henderson Farabow Garrett & Dunner LLP for Fuente Marketing Ltd.

Glen L. Nuttall of Klein, O'Neill & Singh, LLP for Vaporous Technologies, LLC

———

Before Bergsman, Dunn, and Thurmon,
Administrative Trademark Judges.

Opinion by Dunn, Administrative Trademark Judge:

Vaporous Technologies, LLC (Applicant) seeks registration on the Principal Register of the mark for:

> oral vaporizers for smoking purposes; oral vaporizers for smoking purposes for use with liquid nicotine solutions; oral vaporizers for smoking purposes for use with electronic cigarette liquid (e-liquid); oral vaporizers for smoking purposes for use with oils, waxes and isolates containing CBD being solely derived from hemp with a delta-9 tetrahydrocannabinol concentration of not more than 0.3

> percent on a dry weight basis; oral vaporizers for smoking purposes for use with oils waxes and isolates having a tetrahydrocannabinol concentration of more than 0.3 percent on a dry weight basis; all of the foregoing goods are exclusively for use with tobacco products, cannabis products solely derived from hemp with a delta-9 tetrahydrocannabinol (THC) concentration of not more than 0.3 percent on a dry weight basis, and CBD products solely derived from hemp with a delta-9 tetrahydrocannabinol (THC) concentration of not more than 0.3 percent on a dry weight basis, in International Class 34.

The application includes the description: "The mark consists of an abstract stick figure consisting of two diagonal intersecting lines in the shape of a wide stylized letter 'X' and a shaded circle above the letter 'X.'"[1]

Fuente Marketing Ltd. (Opposer) filed a notice of opposition to registration of Applicant's mark on the ground of likelihood of confusion under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d). Opposer pleads eighteen registered marks encompassing or including the letter X in connection with cigars and cigar-related products.[2] Opposer claims the pleaded marks have been used and promoted as a family of marks, are famous, and that Applicant's mark so resembles Opposer's family of X marks and the individual registered standard character X marks (but not the other individual marks) as to be likely, when used on or in connection with Applicant's services, to cause confusion, or to cause mistake or deception.

[1] Application Serial No. 90192180 filed September 18, 2020, under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b), based upon Applicant's allegation of a bona fide intention to use the mark in commerce.

[2] The pleaded registrations are summarized in connection with the discussion of entitlement to a statutory claim.

In its answer, Applicant denied the salient allegations in the notice of opposition.[3] The proceeding has been fully briefed.[4]

## I. The Record

The record includes the pleadings and, pursuant to Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), the file of the opposed application.

### A. Opposer's evidence:

- testimony declaration and exhibits of President Carlos Fuente,[5]
- rebuttal testimony declaration and exhibit of Director and Vice President Karen Smith,[6]

---

[3] Applicant included as "Affirmative Defenses" assertions that the notice of opposition fails to state a claim, that amplify Applicant's denials, and that seek to reserve the right to add affirmative defenses, none of which are true affirmative defenses. *See Advance Magazine Publishers, Inc. v. Fashion Elec., Inc.*, 2023 USPQ2d 753, *1 n.4 (TTAB 2023). Because Applicant did not pursue any purported insufficiency in Opposer's pleading by way of motion, or argue it in its brief, Applicant has waived it. *Alcatraz Media, Inc. v. Chesapeake Marine Tours Inc.*, 107 USPQ2d 1750, 1753 n.6 (TTAB 2013), *aff'd mem.*, 565 F. App'x 900 (Fed. Cir. 2014).

[4] We overrule Opposer's objection in its reply brief (37 TTABVUE 25-26) to consideration of Applicant's forty-five page trial brief as filed one day late, lacking a case index, and employing 1.5 spacing which violates the page limit of fifty-five pages. We find Applicant's non-compliance was not "meant to be a subterfuge to circumvent the rule regarding the length of the brief," *L'Oreal S.A. v. Marcon*, 102 USPQ2d 1434, 1435 n.4 (TTAB 2012), and consideration of the brief aids our determination of the case. *See also Hole In 1 Drinks, Inc. v. Lajtay*, 2020 USPQ2d 10020, at *2 (TTAB 2020) ("[T]he Board, in its discretion, will consider Respondent's arguments in his brief, for whatever persuasive value they may have despite his failure to properly format the brief."). Applicant is reminded to comply with all Board requirements in future proceedings.

[5] 8 (public) and 9 TTABVUE (confidential). Citations to evidence submitted under seal as confidential with a version for public viewing will refer to the public version, and discuss the confidential information only in general terms.

[6] 24 (confidential) and 25 (public) TTABVUE. Applicant filed a purported objection, which included attached evidence, challenging the probative value of the Opposer's rebuttal declaration. 27 (confidential) and 28 (public). The appropriate way to challenge a rebuttal declaration is cross-examination of the declarant under Trademark Rule 2.123(a), not filing impermissible sur-rebuttal evidence. Trademark Rule 2.121(a) ("No testimony shall be taken or evidence presented except during the times assigned, unless by stipulation of the parties

- notice of reliance with excerpts from the testimony from Applicant's Rule 30(b)(6) witness J. Christian Rado (Applicant's Manager), Applicant's discovery responses, and Internet materials.[7]

B. Applicant's evidence:

- testimony declaration and exhibits of Manager J. Christian Rado,[8]
- notice of reliance with excerpts from the testimony from Opposer's Rule 30(b)(6) witness Vice President of Sales Karl Herzog, Opposer's discovery responses, USPTO trademark application records for third party marks, and Internet materials.[9]

In addition, the parties filed a stipulation, approved by the Board, addressing the submission of evidence and establishing facts relevant to the likelihood of confusion determination.[10] With respect to evidence, the parties stipulated that Opposer was the owner of the pleaded registrations; that various documents produced as disclosures or discovery were authentic for the purpose of admission into evidence; and that the discovery deposition testimony of four specified witnesses could be introduced into evidence by either party.[11] The relevant stipulations of fact will be described in connection with the likelihood of confusion analysis.

---

approved by the Board, or upon motion granted by the Board, or by order of the Board."). No further consideration will be given to Applicant's "objection."

[7] 14 (confidential) and 15 (public) TTABVUE, 12 TTABVUE; 10, 11 TTABVUE. Opposer also submitted excerpts from the depositions of witnesses Gregory Nakano and Zachary Carr, (10, 11 TTABVUE) who were not identified by title and whose testimony was not relied upon by either party.

[8] 17 TTABVUE.

[9] 18 (Herzog confidential), 19 – 21 TTABVUE, and 26 (Herzog public).

[10] 7 TTABVUE.

[11] 7 TTABVUE 1, 3-5, 8.

## II. Statutory Entitlement to Oppose

To establish statutory entitlement to oppose under Section 13 of the Trademark Act, 15 U.S.C. § 1063, Opposer must demonstrate a real interest in the proceeding and a reasonable belief of damage. *Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 2020 USPQ2d 10837 at *3 (Fed. Cir. 2020); *see also Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 111 USPQ2d 1058, 1062 (Fed. Cir. 2014).

Opposer introduced status and title copies of its pleaded registrations for marks including the letter X, which Applicant stipulated are owned by Opposer.[12]

| **Pleaded registration<br>Date of issue<br>Status** | **Mark** | **Goods** |
|---|---|---|
| 3254146<br>06/19/2007<br>renewed | X | Cigars, in Int. Cl. 34 |
| 3285314<br>08/28/2007<br>renewed | X | Ashtrays, not of precious metal; cigar cutters; lighters not of precious metal, in Int. Cl. 34 |
| 1989060<br>07/23/1996<br>renewed | FUENTE FUENTE OPUS “X”<br><br>The English translation of the word “FUENTE” is “fountain”. | Cigars, in Int. Cl. 34 |
| 2397955<br>10/24/2000<br>renewed | X TO THE THIRD POWER | Cigars, in Int. Cl. 34 |

[12] 8 TTABVUE 40-103 (registrations) and 7 TTABVUE 3-5 (stipulation).

| **Pleaded registration**<br>**Date of issue**<br>**Status** | **Mark** | **Goods** |
|---|---|---|
| 2495579<br>10/09/2001<br>renewed | FUENTE OPUSX<br><br>The word "FUENTE" is Spanish for "fountain". | Cigar and cigarette lighters of non-precious metal, in Int. Cl. 34 |
| 2618671<br>09/10/2002<br>renewed | FORBIDDENX | Cigars, in Int. Cl. 34 |
| 3065482<br>03/07/2006<br>renewed | XXX | Cigars, in Int. Cl. 34 |
| 3171080<br>11/14/2006<br>renewed | RISING X | Cigars, in Int. Cl. 34 |
| 3191113<br>01/02/2007<br>renewed | SERIEX | Cigars, in Int. Cl. 34 |
| 3229664<br>04/17/2007<br>renewed | FUENTE FUENTE FORBIDDEN X<br><br>The foreign wording in the mark translates into English as fountain. | Cigars, in Int. Cl. 34 |
| 3229975<br>04/17/2007<br>renewed | FORBIDDEN X | Cigars, in Int. Cl. 34 |
| 3259989<br>07/10/2007<br>renewed | PERFECXION X | Cigars, in Int. Cl. 34 |
| 4332242<br>05/07/2013<br>renewed | SINFUL X | Cigars, in Int. Cl. 34 |

| **Pleaded registration**<br>**Date of issue**<br>**Status** | **Mark** | **Goods** |
|---|---|---|
| 2256200<br>06/29/1999<br>renewed | [no description]<br><br>The English translation of "FUENTE" is "fountain". | Cigars, in Int. Cl. 34 |
| 2347248<br>05/02/2000<br>renewed | [no description] | Cigars, in Int. Cl. 34 |
| 2364801<br>07/04/2000<br>renewed | [no description]<br><br>The English translation of "FUENTE" is "fountain". | Cigar protectors, humidors, in Int. Cl. 34 |
| 2536633<br>02/05/2002<br>renewed | [no description] | Smoker's articles; ashtrays not made of precious metal; cigar protectors; humidors; lighters not made of precious metal, in Int. Cl. 34 |
| 3258403<br>07/03/2007<br>renewed | [no description] | Cigars, in Int. Cl. 34 |

| **Pleaded registration<br>Date of issue<br>Status** | **Mark** | **Goods** |
|---|---|---|
| | The foreign wording in the mark translates into English as Fuente as fountain. | |

In conjunction with the pleaded likelihood of confusion claim, this registration evidence is sufficient to establish Opposer's entitlement to a statutory cause of action. *See Empresa Cubana Del Tabaco* 111 USPQ2d at 1062; *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000).

We disagree with Applicant's argument that, because Opposer purportedly has come to agreement with third parties allowing them to use marks on goods similar to Applicant's mark and goods, Opposer's asserted belief in damage from registration of Applicant's mark is not reasonable.[13] Opposer's reasonable belief in damage proximately caused by registration of the applied-for mark is established by its assertion of "a likelihood of confusion which is not wholly without merit." *Corcamore, LLC, v. SFM, LLC*, 978 F3d 1298, 2020 USPQ2d 11277 at *8 (Fed. Cir. 2020) (*quoting Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185, 188 (CCPA 1982)).

Even if the Board ultimately finds that Opposer cannot prove its likelihood of confusion claim, this does not mean that Opposer's assertion of a belief of damage is not reasonable. *See Golden Gate Salami Co. v. Gulf States Paper Corp.*, 332 F.2d 184,

[13] 35 TTABVUE 17.

141 USPQ 661, 664 (CCPA 1964) ("We would not agree with the board's statement that 'The issue involved in a proceeding of this character, however, is whether or not petitioner is damaged by the registration in question.' … There would seem to be a very real difference between a statutory provision referring to a belief in damage, which is all we have, and a provision requiring proof of damage, which we do not have."). [14]

## I. Priority and Likelihood of Confusion

Under Section 2(d) of the Trademark Act, a mark may not be registered if it "consists of or comprises a mark which so resembles a mark registered in the Patent and Trademark Office, or a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion…." To prevail on the likelihood of confusion ground under Section 2(d) of the Trademark Act, Opposer bears the burden to prove by a preponderance of the evidence both priority of use and likelihood of confusion. *Cunningham v. Laser Golf Corp.*, 55 USPQ2d at 1848; *Bose Corp. v. QSC Audio Prods. Inc.*, 293 F.3d 1367, 63 USPQ2d 1303, 1305 (Fed. Cir. 2002) ("The burden of proof rests with the [plaintiff] ... to produce sufficient evidence to support the ultimate conclusion of [priority of use] and likelihood of confusion."). As already stated, Opposer pleads a likelihood of confusion between Applicant's mark and its registered standard character X mark and its common law family of X marks.

[14] Third party use of X marks for related goods is relevant to the determination of likelihood of confusion, and Applicant's evidence will be addressed later in this opinion. *See Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 115 USPQ2d 1671, 1674 (Fed. Cir. 2015).

### A. Priority as to registered standard character X marks

Because Opposer has made its registrations of record, including Registration Nos. 3254146 (cigars) and 3285314 (ashtrays, not of precious metal; cigar cutters; lighters not of precious metal) for X in standard characters, and Applicant has not counterclaimed to cancel, priority is not an issue as to the marks and goods covered by the registrations. *See Top Tobacco LP v. N. Atl. Op. Co.,* 101 USPQ2d 1163, 1169 (TTAB 2011) (citing *King Candy, Co. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 82 USPQ 108 (CCPA 1974)); *see also Massey Junior Coll., Inc. v. Fashion Inst. of Tech.*, 492 F.2d 1399, 181 USPQ 272, 275 n.6 (CCPA 1974) ("[P]rior use need not be shown by a plaintiff relying on a registered mark unless the defendant counterclaims for cancellation.").

### B. No priority as to a family of marks

Opposer is less successful in proving priority of use with respect to its alleged family of X marks. "A family of marks is a group of marks having a common characteristic ... [and] only arises if the purchasing public recognizes that the common characteristic is indicative of a common origin of the goods." *Han Beauty, Inc. v. Alberto-Culver Co.*, 236 F.3d 1333, 57 USPQ2d 1557, 1559 (Fed. Cir. 2001) (quoting and citing *J & J Snack Foods Corp. v. McDonald's Corp.*, 932 F.2d 1460, 18 USPQ2d 1889, 1891 (Fed. Cir. 1991)). "To establish ownership of a family of marks, it must be shown by competent evidence prior use of marks sharing a recognizable common characteristic, and that prior to the entry into the field of the opponent's mark, the marks containing the claimed family feature or at least a substantial number of them, were used and promoted together by the proponent in such a manner as to create

public recognition coupled with an association of common origin predicated on the family feature." *Shenzhen IVPS Tech. Co. Ltd. v. Fancy Pants Products, LLC*, 2022 USPQ2d 1035 at *17 (TTAB 2022) (internal quotes and citation omitted). *Accord Citigroup Inc. v. Capital City Bank Group, Inc.*, 94 USPQ2d 1645 (TTAB 2010), *aff'd*, 637 F.3d 1344, 98 USQ2d 1253 (Fed. Cir. 2011) ("[O]pposer has not established that it had a family of marks prior to applicant's first use of its mark. Therefore, the likelihood of confusion analysis will be based solely on the use of the individual marks in opposer's registrations."). As with any finding of common law priority, we "look at the evidence as a whole, as if each piece of evidence were part of a puzzle which, when fitted together, establishes prior use." *W. Fla. Seafood Inc. v. Jet Rests. Inc.*, 31 F.3d 1122, 31 USPQ2d 1660, 1663 (Fed. Cir. 1994).

For priority, Applicant is entitled to rely on its September 18, 2020 application filing date, which also serves as its constructive use date. Trademark Act 7(c), 15 USC 1057(c); *see also Herbko Intern., Inc. v. Kappa Books, Inc.*, 308 F3d 1156, 64 USPQ2d 1375, 1377 (Fed. Cir. 2002) ("Kappa is not entitled to priority without evidence that the relevant public associated [its] mark with a single source before Herbko's ITU filing date."); *Syngenta Crop Prot. Inc. v. Bio-Chek LLC,* 90 USPQ2d 1112, 1119 (TTAB 2009) ("[A]pplicant may rely without further proof upon the filing date of its application as a 'constructive use' date for purposes of priority.").

Opposer defines its family of marks as marks "prominently featuring the Standard Character X mark" without indicating where in the mark the common characteristic

will appear.[15] This is unusual because trademark owners generally adopt a consistent pattern of use of the common characteristic to aid public recognition of the family of marks. *See, for example, Motorola, Inc. v. Griffiths Elec., Inc.,* 317 F.2d 397, 137 USPQ 551, 552 (CCPA 1963) (Opposer, manufacturer of vacuum tubes and TV picture tubes "is admittedly the prior user and registrant of a series of 'Golden' marks [GOLDEN VOICE, Golden View, GOLDEN BEAM, Golden Heart, GOLDEN M, and GOLDEN SATELLITE]".); *New Era Cap Co., Inc. v. Pro Era, LLC,* 2020 USPQ2d 10596, at *6 (TTAB 2020) ("Opposer alleges that it owns a family of ERA formative marks … with different prefixes, such as DRYERA, COOLERA, SOLARERA, WINTERERA, DIAMOND ERA, and MICROERA in connection with "headwear, hats, caps, knit hats, and baseball caps"). As shown in the chart of Opposer's pleaded marks alleged to form a family, X sometimes appears as the first and separate character in a literal term (X TO THE THIRD POWER), the last and separate character in a literal term (RISING X), the last letter in a coined term (FUENTE OPUSX), is repeated three times (XXX), or forms a background design resembling an X for the letters FF. *Compare McDonald's Corp. v. McSweet, LLC*, 112 USPQ2d 1268, 1276 (TTAB 2014) (MCDONALDS and MCFLURRY held not members of the family because they do not follow the family structure of a MC prefix combined with a generic or descriptive term).

In support of its claim of priority based on its family of marks, Opposer offers the declaration of its principal Mr. Fuente averring that the letter X is arbitrary and

[15] 30 TTABVUE 15.

distinctive as applied to cigars and cigar-related products, and Opposer's family of X marks have been used together for more than a decade – prior to Applicant's September 18, 2020 priority date – to promote its cigars and cigar-related products, and contends "[d]ue to this extensive advertisement and promotion and the years of sales of the X-branded products in association with the Family of Marks, the purchasing public and the cigar industry recognize that the common characteristic Standard Character X mark is indicative of the origin… ."[16] As we explain, we find that this statement is not supported by record evidence.

More specifically, we credit Mr. Fuente' testimony that Opposer began use of the mark FUENTE FUENTE OPUSX on cigars in 1995, and that, since then, the FUENTE FUENTE OPUSX cigars have produced millions of dollars in sales and generated significant attention in cigar industry publications.[17] Because we do not find an "X design," we partially credit Mr. Fuente' testimony that FUENTE FUENTE OPUSX cigars are sold with "a cigar band bearing the famous X design trademark."[18] While the cigar band is prominent in Opposer's advertisements and third party articles about the FUENTE FUENTE OPUSX cigars, we find the cigar band, as shown below, comprises the literal element FUENTE FUENTE OPUSX, and an XFF design comprising two letter Fs against ornate crossed lines in a letter X:

---

[16] 30 TTABVUE 28-29. The pleaded registrations have no probative value by themselves in showing how consumers may perceive Opposer's marks. *See Hester Indus., Inc. v. Tyson Foods Inc.*, 2 USPQ2d 1645, 1647 (TTAB 1987) ("[I]t is well settled that the mere ownership of a number of marks sharing a common feature (or even ownership of registrations thereof) is insufficient to establish a claim of ownership of a 'family' of marks[.]").

[17] 8 TTABVUE 9.

[18] 8 TTABVUE 5.

| Cigar band shown in Fuente's Declaration Ex. A[19] | Reg. No. 2256200 |
| --- | --- |
|  |  |

We also differ from Opposer in its conclusion that the mere presence of the letter X is recognized as creating a family of X marks.[20] When X is combined with other elements to form the FUENTE FUENTE OPUSX and cigar band mark, the X in the resulting marks differs visually, does not always make a separate commercial impression, is not used in the same way, and so will not be recognized as the common characteristic indicating a member of a family of marks.

We take judicial notice that the letter X is defined as both part of the alphabet ("the 24th letter of the English alphabet") and as a common design element

[19] 8 TTABVUE 25.

[20] Applicant argues that Opposer does not and has not used X alone as a mark. 34 TTABVUE 21-23. To the extent this argument contends Opposer cannot prove a common law family of X marks (or that the pleaded X mark is not strong), it is permissible. To the extent this argument contends that Opposer's X registrations (Nos. 3254146 and 3285314) are invalid, the argument is impermissible absent a counterclaim to cancel the registrations. Trademark Rule 2.106 (b)(3)(ii), 37 CFR 2.106 (b)(3)(ii). Moreover, because Registration Nos. 3254146 and 3285314 are more than five years old, nonuse when the applications were filed is no longer an available ground for cancellation. *Western Worldwide Enterprises Group, Inc. v. Qinqdao Brewery*, 17 USPQ2d 1137, 1139 (TTAB 1990) ("[A] registration that is over five years old may be cancelled solely on the grounds set forth in Section 14(c).").

("something shaped like or marked with the letter X"),[21] and we find that the different uses of X by Opposer reflect the different meanings. More specifically, the letter X in OPUSX will be recognized as a letter of the alphabet forming an integrated part of the coined literal term OPUSX. To the degree the X in OPUSX is slightly enlarged on the cigar band, it does not detract from the impression that it is the last letter in OPUSX and not a separable element creating a separate commercial impression from the term OPUSX. *Cf. RxD Media, LLC v. IP Application Dev. LLC*, 125 USPQ2d 1801, 1810 (TTAB 2018), *aff'd*, 377 F. Supp. 3d 588 (E.D. Va. 2019), *aff'd*, 986 F.3d 361, 2021 USPQ2d 81 (4th Cir. 2021) ("Opposer has not established that IPAD creates a separate commercial impression from the term iPad.mobi. Simply stating that .mobi is a generic TLD is not sufficient to show that the term IPAD creates a separate commercial impression on potential consumers when used in connection with a web-based software application where users may access and store personal information.").

In contrast, the letter X on the cigar band which is not part of OPUSX will be recognized as the background design for the letters FF comprising two lines which flare at each endpoint and then divide into two curling lines and which cross in a way that could be viewed as an X:

[21] *Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/x. Accessed Dec. 5 2023. The Board may take judicial notice of dictionary definitions, including online dictionaries that exist in printed format or have regular fixed editions. *In re Cordua Rests. LP*, 110 USPQ2d 1227, 1229 n.4 (TTAB 2014), *aff'd*, 823 F.3d 594, 118 USPQ2d 1632 (Fed. Cir. 2016). In fact, X has many definitions, not only other noun meanings, but meanings as a verb, an adjective, a mathematics symbol, and an abbreviation. However, for the purpose of this decision, we focus on the two definitions listed.




Even if the X in the XFF cigar band design is recognized as a letter X and not merely a design, it does not resemble the last letter in the coined term OPUSX for the purpose of finding that the marks form a family. That is, the cigar band XFF design does not follow the pattern of adding an X to a word to coin a new term as in Opposer's term OPUSX in the FUENTE FUENTE OPUSX mark. *See J & J Snack Foods,* 18 USPQ2d at 1891 ("Recognition of the family is achieved when the pattern of usage of the common element is sufficient to be indicative of the origin of the family."). *Compare AMF, Inc. v. Am. Leisure Prods., Inc.,* 474 F.2d 1403, 177 USPQ 268, 269 (CCPA 1973) ("[T]here is no doubt but that opposer has advertised its [SAILFISH, SUNFISH,CATFISH, FLYING FISH] marks as a family of 'fish' trademarks. In its brochures appellant combines its registered trademarks with a fish silhouette corresponding in shape to that of the particular fish name in the mark being promoted.") (internal quotes omitted); *7–Eleven Inc. v. Wechsler*, 83 USPQ2d 1715, 1720 (TTAB 2007) ("[W]hen opposer's customers serve themselves, they must select

the appropriate cup. [One exhibit comprises] a counter display where the BIG GULP, SUPER BIG GULP, and DOUBLE GULP sizes are offered together as menu selections.”).

Opposer’s evidence of a family of marks largely comprises displays of the mark FUENTE FUENTE OPUSX, or the cigar label including those words and the XFF design, or other elements of the cigar band which Opposer separately registered, namely FUENTE OPUSX and the XFF design. However, because Opposer registered the cigar band mark as a whole, we do not find that the separate elements on the cigar band will perceived as multiple marks. Opposer does not promote X marks together each time it uses its cigar band in an advertisement.

The evidence of multiple X marks used together by Opposer is scant. Opposer asserts that a family of marks is shown by “unsolicited media coverage” of “FUENTE FUENTE OPUSX cigars and other products bearing the X Marks.[22] The articles from the Tobacconist, Black Enterprise, and Cigar Lovers, and the review from the Halfwheel cigar blog, include the literal mark FUENTE FUENTE OPUSX and the cigar label, and, as stated, we do not find these two marks are perceived as a family of X marks.[23] Below is an example from Tobacconist of an Opposer promotion employing multiple X marks but not promoting a family of X marks:

[22] 8 TTABVUE 15-16, 399-443.

[23] 8 TTABVUE 398-402, 402-403, 420-426, 428-443. The October 3, 1996 Wall Street Journal article “Cigar Shortage Draws New Brands Into Market,” and the January 1999 Robb Report article refer only to OPUSX cigars, which is not one of Opposer’s pleaded marks. 8 TTABVUE 404-407, 411-414.



OPUSX

Fuente Fuente OpusX™ re-creates image of vintage cigar period

By Phil Bowling

will take some time to get it out nationally.

"We are trying to go down the East Coast and have made it down to Washington, D.C., so far," Fuente says. "It's fantastic that everyone wants to carry the cigar, but as we stated from the beginning, it is—and always will be—a limited cigar as far as production

[24]

A May/June 2015 article in the trade publication Cigar Snob discusses a partnership creating a limited edition Hublot-Fuente watch ranging in price from $16,000 to $125,000, which includes the pleaded mark FORBIDDEN X on the watch face and the cigar band X design, without the letters FF, on the watch band. This promotion also uses multiple X marks without promoting a family of X marks.




[25]

---

[24] 8 TTABVUE 399.

[25] 8 TTABVUE 408-410. Moreover, because the X is separated from FORBIDDEN, is a different size and placed behind the word, the watch face may be perceived as bearing the two marks FORBIDDEN and X, and not the mark FORBIDDEN X.

The evidence supporting the testimony "Fuente advertises and promotes FUENTE FUENTE OPUSX cigars **and other products bearing its X Marks**, including smokers' articles and luxury goods," (**emphasis** added) through its worldwide webpages, social media pages, trade publications, general interest publications, industry trade shows does not show a family of marks prior to Applicant's priority date.[26] The evidence shows a handful of uses of a single X design with FUENTE FUENTE OPUSX or FORBIDDEN X, or many uses of the XFF design with FUENTE FUENTE OPUSX or FORBIDDEN X, or the unpleaded marks FFOX or OPUSX. We address an undated[27] advertisement from Opposer's website to demonstrate that the advertisement does not show multiple X marks promoted together so as to create public recognition of the family of marks.

[26] 8 TTABVUE 12-16 (FUENTE declaration), and 272-442 (Exhibits H-K to FUENTE declaration).

[27] By "undated," we mean the date the promotion was posted or made public is missing. The Internet materials include the date they were accessed, which was during Opposer's trial period and thus not useful for establishing priority over Applicant's September 18, 2020 filing date.



[28]

With respect to the occurrence of X marks in the advertisement, the pleaded FORBIDDEN X mark is shown below the pleaded XFF design and FUENTE FUENTE OPUSX marks, but the X is not promoted in a way that the public would recognize it as the common feature in a family of marks. As noted above, the stylized X in FORBIDDEN X is physically separated from FORBIDDEN and appears as a background design which is not clearly an X, is integrated with other elements like stylized letters and a key design, and does not resemble the stylized X in XFF design mark above it, and does not resemble OPUSX in FUENTE FUENTE OPUSX.

[28] 8 TTABVUE 309.

Opposer also relies on its own advertisements in print publications to show a family of X marks, but we find this evidence unpersuasive. For example, Opposer's advertisement below from the January/February 2020 Cigar Snob shows the FUENTE FUENTE OPUSX mark in literal form on the packaging and as part of the cigar band, and the cigar box lid bears the XFF mark. For the reasons stated, we do not find that this is Opposer's use of different marks with a common pattern employing an X element that would be perceived as a family of marks.



[29]

Similarly, Opposer's advertisement below from the March 2019 Cigar Journal shows the cigar band in full at the top and excerpts from the cigar band showing a partial OPUSX and a partial XFF design in the lower corners:

[29] 8 TTABVUE 370.



[30]

We do not regard this advertisement showing the cigar band in full and partial form as showing multiple X marks. We also note that the FF on the cigar label echoes the AF shown in the ARTURO FUENTE logo at the bottom of the advertisement. The

---

[30] 8 TTABVUE 372.

recurrence of F and FUENTE in Opposer's promotions decreases any likelihood that the XFF design will be perceived as merely an X mark.

The visual examples purported to show use of multiple X marks together, attached to and incorporated in Mr. Fuente's declaration, also are unconvincing. The testimony introducing the display of the XFF design mark and the X design mark shown below is uninformative, stating merely that the exhibit is a "photograph[] of cigars bearing this X design trademark and other X marks," without stating when the photograph was taken, if the photograph was used to promote the goods, or ever seen by members of the cigar-consuming public.[31]


[32]

In sum, after careful review, we find that the evidence does not support that multiple X marks have been used and promoted together by Opposer in such a manner as to create public recognition of a family of marks.

Accordingly, we give Opposer's claim of priority based on its family of marks no further consideration.

[31] 8 TTABVUE 6.

[32] 8 TTABVUE 23.

While Opposer could plead a likelihood of confusion with its family of marks and with each individual pleaded mark alleged to be part of that family, Opposer chose not to do so, restricting its claim to likelihood of confusion with the family of marks and the two individual standard character X marks. Accordingly, no family of marks having been found, we address likelihood of confusion with respect to Opposer's standard character X marks.

### C. **Likelihood of confusion**

Our determination under Trademark Act Section 2(d) is based on an analysis of all probative facts in evidence that are relevant to the factors bearing on the issue of likelihood of confusion. *In re E. I. DuPont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973) (*DuPont*) (enumerating thirteen factors to be considered when testing for likelihood of confusion). "Whether a likelihood of confusion exists between an applicant's mark and a previously registered mark is determined on a case-by-case basis, aided by application of the thirteen *DuPont* factors." *Omaha Steaks Int'l, Inc. v. Greater Omaha Packing Co.*, 908 F.3d 1315, 128 USPQ2d 1686, 1689 (Fed. Cir. 2018).

In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the goods. *See Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976) ("The fundamental inquiry mandated by § 2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks."). Those factors largely are determinative here. Nevertheless, we must consider each relevant *DuPont* factor for which there are arguments and evidence. *Cai v. Diamond Hong,*

*Inc.*, 901 F.3d 1367, 127 USPQ2d 1797, 1800 (Fed. Cir. 2018) ("Not all of the DuPont factors are relevant to every case, and only factors of significance to the particular mark need be considered.") (*quoting In re Mighty Leaf Tea*, 601 F.3d 1342, 94 USPQ2d 1257, 1259 (Fed. Cir. 2010)).

Because there appears to be some confusion as to how the lack of actual confusion fits into the analysis, we take it up first.[33]

### 1. Lack of Actual Confusion

The eighth *DuPont* factor addresses "the length of time during and the conditions under which there has been concurrent use without evidence of actual confusion." *DuPont,* 177 USPQ at 567. "A showing of actual confusion would of course be highly probative, if not conclusive, of a high likelihood of confusion. The opposite is not true, however." *In re Majestic Distilling Co*., 315 F.3d 1311, 65 USPQ2d 1201, 1205 (Fed. Cir. 2003). "The absence of any reported instances of confusion is meaningful only if the record indicates appreciable and continuous use by [defendant] … of its mark for a significant period of time in the same markets as those served by [plaintiff] … under its mark[]." *Citigroup Inc. v. Capital City Bank Grp., Inc.*, 94 USPQ2d at 1660.

---

[33] There appears to be similar confusion about how bad faith adoption is proven in the likelihood of confusion analysis. A finding of bad faith relevant to likelihood of confusion requires adoption of the mark with "an intent to confuse" customers. *QuikTrip W., Inc. v. Weigel Stores, Inc.*, 984 F.3d 1031, 2021 USPQ2d 35, *4 (Fed. Cir. 2021). The Federal Circuit and the Board repeatedly have held that mere knowledge of a prior similar mark is insufficient to demonstrate bad faith in adoption. *See Monster Energy Co. v. Lo*, 2023 USPQ2d 87 at *48 (TTAB 2023) and cases cited therein. We find the evidence (12 TTABVUE 7) that Applicant knew of Opposer's use of "at least one of Fuente's marks," not when it adopted its own mark, but by the time Applicant filed its application, falls far short of establishing bad faith adoption intended to confuse customers.

Here, there is no dispute that there has been no actual confusion between the parties' respective marks and goods, and, more significant here, no allegation that there has been the necessary appreciable and continuous use by Applicant for actual confusion to arise. For example, the testimony and other evidence regarding Applicant's sales, advertising and geographic trading areas shows that Applicant has a de minimis market presence. In discovery Applicant stated that its use of its mark began with online marketing and sales throughout the United States in January 2021.[34] Therefore, we find that there has not been a sufficient opportunity for actual confusion to occur.[35]

This factor is neutral.

### 2. Similarity of the Parties' Goods, Trade Channels, and Classes of Purchasers

We address the second, third, and fourth *DuPont* factors, assessing the similarity or dissimilarity of the parties' goods, trade channels, and "the conditions under which and buyers to whom sales are made, i.e. 'impulse' vs. careful, sophisticated purchasing.'" *DuPont,* 177 USPQ at 567. The goods of the Applicant and the Opposer do not have to be the same to find a likelihood of confusion, the goods need only be related in some manner and/or the circumstances surrounding their marketing are

[34] 12 TTABVUE 18.

[35] While acknowledging that "typically" this factor considers only actual confusion between the parties' marks, Applicant argues that "evidence of multiple [third party] marks employing an X being used in connection with vaporizers without yielding any confusion with Fuente's X-Marks" is relevant to a lack of confusion between Opposer and Applicant. 35 TTABVUE 40. While true that third party evidence is generally relevant to likelihood of confusion, it is not relevant to actual confusion between Opposer and Applicant. Third party use comes up with both the relationship between the goods and the strength of Opposer's mark.

such that they could give rise to the mistaken belief that they emanate from the same source. *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1369, 101 USPQ2d 1713, 1722 (Fed. Cir. 2012). Our determination must be based on the identification of goods in the pleaded registrations and subject application, because they define the scope of the benefit of registration. *Stone Lion Capital Partners, LP v. Lion Capital LLP,* 746 F.3d 1317, 110 USPQ2d 1157, 1162 (Fed. Cir. 2014).

Applicant's goods are listed in full at the beginning of this opinion but are shortened for convenience to "oral vaporizers for smoking."[36] Vaporizers for smoking use hot air convection to deliver the substance without combustion by producing an aerosol, or vapor.[37] An electronic cigarette is a handheld battery-powered vaporizer that simulates smoking without combusting tobacco.[38] Other vaporizers for smoking may function to electronically heat concentrates, such as oils, waxes, and isolates.[39] In response to an interrogatory, Applicant stated:

> Broadly speaking, use of a vaporizer to vaporize a vaporizing medium without combustion and then inhaling the vaporized medium is referred to as "vaping." Applicant's product is more specialized than just vaping. Applicant's product

[36] We reject Opposer's allegation that the identification of goods identifies a per se violation of the Controlled Substance Act (CSA). 30 TTABVUE 49. While awkwardly worded, the identification specifies the goods are for use with tobacco and hemp products. We also reject Opposer's allegation that, through the deposition testimony of Applicant's witnesses, Applicant has admitted unlawful use under the CSA because (i) Applicant testified that its goods are used for dabbing with unregulated, or legal under the CSA, goods, and there are definitions of "dab" limited to illegal uses, and (ii) Applicant testified that it sells its product to third party dispensaries that occasionally provide it to cannabis users. 39 TTABVUE 50. Because Opposer fails to identify illegal use by Applicant, Opposer fails to prove any threat to the reputation of its cigars, and these allegations warrant no further consideration.

[37] 10 TTABVUE 40 (Smoking, Wikipedia)

[38] 10 TTABVUE 61 (Vaporizers, Wikipedia)

[39] 17 TTABVUE 3-4; also 10 TTABVUE 40, 61, 12 TTABVUE 22.

is specifically directed to vaping herbal concentrates in a wax form (or other solid or near-solid form), which often is referred to as "dabbing" or a "dab."[40]

Applicant's identification of goods describes both types of vaporizers, those that vape, or dab, concentrates but also those that vape "liquid nicotine solutions," "electronic cigarette liquid," and "tobacco products."[41] A depiction of Applicant's goods is below:


[42]

Opposer's goods are cigars and ashtrays, not of precious metal; cigar cutters; lighters not of precious metal, in International Class 34. Cigars are comprised of tobacco leaves used as filler, binder, and wrapper, and "used as intended, the filler, binder, and wrapper each burn when heat is applied to one end of the cigar, and the resulting smoke is inhaled through an opposite end of the cigar."[43] Because the

---

[40] 12 TTABVUE 22.

[41] Because, as stated above, our determination is based on the goods as listed in the application, Applicant's contention (35 TTABVUE 37) that it intends to restrict use of the mark to hemp products will be given no consideration. An appropriate motion to amend the goods should have been filed before trial to allow Opposer to seek discovery and to submit evidence and argument regarding the likelihood of confusion with Applicant's mark for the amended goods. *See Monster Energy Co. v. Lo*, 2023 USPQ2d at *9-10. Applicant states that after Opposer's trial period closed, Applicant requested Opposer's consent to such a motion to amend but was refused. *Id.*

[42] 17 TTABVUE 244. Applicant refers to its mark as "Dab Man." *Id.* at 4.

[43] 18 TTABVUE 23, 19 TTABVUE 10.

ashtrays, cigar cutters, and lighters have no nexus to oral vaporizers for smoking which do not produce ash, require cutting, or rely on combustion, we will focus on the relationship between Applicant's goods and Opposer's cigars. That is, of the two standard character X registrations, we will focus on likelihood of confusion with Registration No. 3254146 for "cigars."

By definition, the products of Applicant and Opposer have an inherent relationship because both may be used to ingest tobacco by inhaling. Applicant's user ingests vapor created by electronic heating, and Opposer's user ingests smoke created by burning. The application and registrations themselves may provide evidence of the relationship between the goods. *Hewlett-Packard Co. v. Packard Press Inc.*, 281 F.3d 1261, 62 USPQ2d 1001, 1005 (Fed. Cir. 2002). *See also Top Tobacco, LP v. N. Atl. Operating Co.*, 101 USPQ2d 1163, 1170 (TTAB 2011) (cigarettes, pocket machines for rolling cigarettes, cigarette tubes, pocket machines for filling cigarette tubes, and filter tips for cigarettes complementary to tobacco because the goods may be used together "to roll or make their own cigarettes."). The record also shows that oral vaporizers for smoking are marketed as an alternative to traditional tobacco products.[44] Some resemble cigars:

[44] 10 TTABVUE 40 (Smoking, Wikipedia); 63 (Vaporizers, Wikipedia), 106 (The Conversation blog post), 154 (CSP [Convenience Store Products] article).



[45]



[46]

Turning to the trade channels, the identification of Applicant's goods and those in the cited registration have no trade channel or consumer class limitations. Thus, they are presumed to move in all channels of trade usual for such goods and are available to all potential classes of ordinary consumers. *See Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1846 (Fed. Cir. 2000) (affirming Board finding that where the identification is unrestricted, "we must deem the goods to travel in all appropriate trade channels to all potential purchasers of such goods'). The record

[45] 10 TTABVUE 131.

[46] 10 TTABVUE 134.

includes an article discussing the expansion of smoke shops traditionally offering cigars and cigarettes to offer vape products such as oral vaporizers for smoking and electronic cigars and cigarettes.[47] One convenience store trade article noted that tobacco products are one of four key drivers for the convenience store industry, and within tobacco products, sales of cigars and vape products have increased.[48]

Opposer submitted pages from websites for 11 smoke shops offering both vaping products and cigars (CigarandSmokeShop.com, SmokeWorldVape.com, The Premium Smoke Shop & Market, VillageSmoke.com, Fort Myers Beach Smoke Shop, Puff City Smoke Shop, Smokes$Less, Smokes On State, The Bamboo Eater, Star Tobacco, Brightleaf Tobacco).[49] This evidence demonstrates that oral vaporizers for smoking and cigars travel in overlapping channels of trade and, because oral vaporizers are considered in some respects to be an alternative to cigars, to some of the same customers. *See In re Ox Paperboard, LLC,* 2020 USPQ2d 10878, at *6 (TTAB 2020) ("This evidence is not from 'big box' retail stores or online retailers selling a wide variety of goods, but rather from specialty retailers … evidence that several retailers offer products of both the Registrant and Applicant [supports a finding that] the channels of trade and classes of consumers overlap.").

Opposer also submitted copies of 17 third-party used-based registrations (Nos. 4988602, 5983546, 6037809, 6087243, 6087244, 6164689, 6172009, 6195449,

---

[47] 10 TTABVUE 150-160.

[48] 11 TTABVUE 135.

[49] 8 TTABVUE 465-503.

6248425, 6285092, 6295941, 6311021, 6317081, 6349384, 6349385, 6530666, 6802708) showing the same mark registered for both oral vaporizers for smoking and cigars.[50] Third-party registrations for goods listed in both the application and registration, when based on use in commerce, may have probative value to the extent that they serve to suggest that the listed goods are of a type that may emanate from the same source. *See In re I-Coat Co.,* 126 USPQ2d 1730, 1738 (TTAB 2018); *In re Infinity Broad. Corp.,* 60 USPQ2d 1214, 1217-18 (TTAB 2001); *In re Mucky Duck Mustard Co. Inc.,* 6 USPQ2d 1467, 1470 n.6 (TTAB 1988), *aff'd mem.* 864 F.2d 149 (Fed. Cir. 1988).

With respect to the sophistication of purchasers and conditions of purchase, Opposer points out that traditional tobacco users overlap with those who vape tobacco. A 2018 National Library of Medicine study on nicotine dependence recruited cigarette smokers, e-cigarette users, and dual users.[51] The National Institute on Drug Abuse website states that "vaping might serve as an introductory product for preteens and teens who then go on to use other nicotine products," [m]ore than 30% of teens who start using ecigarettes begin smoking traditional tobacco products within six months" and that "[t]hose who used e-cigarettes also smoked more cigarettes than those who didn't."[52]

---

[50] 8 TTABVBUE 505-573. Because United States consumers will not encounter the goods in commerce, we do not include registrations based on foreign use (Registration Nos. 4920256, 4934735, 5332097, 5516220, 5630157, 5652096, 6178154).

[51] 8 TTABVUE 447.

[52] 8 TTABVUE 457.

In response to this evidence of the relationship between the parties' goods, channels of trade, and classes of customer, Applicant makes two arguments, neither of which we find convincing. First, Applicant argues that its goods are limited to hemp concentrates, and they appeal to more sophisticated consumers.[53] Because the identification of goods in the application specifies that Applicant's goods will be used with tobacco products, we cannot limit the comparison of the goods based on Applicant's current use. The Court of Appeals for the Federal Circuit stated "the authority is legion" that whether a likelihood of confusion with a registered mark bars an applicant's mark "must be decided on the basis of the identification of goods set forth in the application regardless of what the record may reveal as to the particular nature of an applicant's goods, the particular channels of trade or the class of purchasers to which the sales of goods are directed." *Octocom Sys., Inc. v. Hous. Comput. Servs. Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990).

Second, Applicant contends that draft and executed agreements regarding third party use of X marks on oral vaporizers for smoking, produced by Opposer in discovery, prevent Opposer from arguing here that use of X marks on oral vaporizers creates a likelihood of confusion with its X mark for cigars.[54] While it is true the agreements, which are confidential and will not be discussed in detail, often allowed concurrent use, Opposer is and remains entitled to make individual decisions about individual third party marks, the degree to which they threaten a likelihood of

[53] 35 TTABVUE 36.

[54] 35 TTABVUE 7-17, 18 TTABVUE 246-322.

confusion, and how in its business judgment consumer confusion can be avoided. The earliest agreement was executed in 2013, and as Opposer stated in the rebuttal testimony of Director and Vice President Karen Smith:

> At this time, electronic vaporizers were only beginning to gain popularity in the United States, and neither Fuente nor others imagined the proliferation electronic vaporizers would eventually experience. For instance, Fuente and others did not fully understand the channels of trade through which electronic vaporizers would be marketed or sold or the classes of consumers that would use electronic vaporizers. Because of this, Fuente had no reason to believe that in 2013 consumers would confuse its X Marks with [the third party's] applied-for mark for electronic vaporizers.[55]

In short, Opposer's earlier agreements, regarding arrangements for the use of X marks on other oral vaporizers for smoking to avoid a likelihood of confusion, do not compel Opposer to believe a similar arrangement with Applicant would be sufficient to avoid likelihood of confusion.

Because the goods are related, travel in overlapping trade channels, and appeal to overlapping consumers, these factors weigh in favor of a likelihood of confusion.

### 3. Variety of Goods on Which a Mark Is or Is Not Used

The ninth *DuPont* factor considers "The variety of goods on which a mark is or is not used (house mark, "family" mark, product mark)." *DuPont*, 177 USPQ at 567. If a party in the position of plaintiff uses its mark on a wide variety of goods or services, then purchasers are more likely to view a defendant's related goods or services under a similar mark as an extension of the plaintiff's line. *DeVivo v. Ortiz*, 2020 USPQ2d 10153 at *14 (TTAB 2020). *See also Kenner Parker Toys,* 22 USPQ2d at 1458

[55] 25 TTABVUE 5-6.

("Kenner's lengthy and extensive use of the PLAY-DOH mark on a wide variety of toy products emphasizes the mark's fame and strength."). This factor may favor a finding that confusion is likely if the goods or services are not obviously related, but has less impact if the parties' goods or services in issue are identical or closely related. *Genesco Inc. v. Martz*, 66 USPQ2d 1260, 1271 (TTAB 2003).

Here, Mr. Fuente averred "[i]n addition to cigars and smokers' articles, Fuente has used or is currently using its Family of X Marks in association with a variety of other goods, including furniture, clothing, watches, spirits, coffee, chocolate, and other luxury goods," and "Fuente has obtained federally registered and common law trademarks incorporating the mark X in association with many of these goods.[56] Opposer submitted copies of its registrations summarized below:[57]

| **Registration<br>Date of issue<br>Status** | **Mark** | **Goods** |
|---|---|---|
| 2641600<br>10/29/2002<br>renewed | | Shirts, baseball caps, sweatshirts, and hats, in International Class 25 |
| 2889398<br>09/28/2004<br>renewed | FORBIDDEN X | Assorted brandies and liquors, in International Class 33 |
| 2949372<br>05/10/2005<br>renewed | | Distilled spirits; brandy spirits; and potable spirits, in International Class 33. |

[56] 8 TTABVUE 7,.

[57] 8 TTABVUE 104-163.

| **Registration**<br>**Date of issue**<br>**Status** | **Mark** | **Goods** |
|---|---|---|
| | The mark consists of the letter "O" containing the letters "FF" intertwined with the letter "X". | |
| 3194766<br>01/02/2007<br>renewed | FORBIDDENX | Clothing, namely, baseball caps, shirts, t-shirts, jackets, in International Class 25 |
| 3358980<br>12/25/2007<br>renewed | <br>The mark consists of stylized versions of the letter O encircling the letter X, with the letters F and F imposed over the center. | Fountain pens; Pens, in International Class 16 |
| 4289262<br>02/12/2013<br>renewed | <br>The mark consists of stylized versions of the letter "X" over the letter "O", with the letters "F" and "F" imposed over the center of the "X". | Cuff links, in International Class 14 |
| 4827597<br>10/06/2015<br>renewed | FORBIDDEN X | Watches, in International Class 14<br><br>Humidors, in International Class 34 |

| **Registration**<br>**Date of issue**<br>**Status** | **Mark** | **Goods** |
|---|---|---|
| 5306088<br>10/10/2017<br>Sec. 8 filed | FUENTE OPUSX<br><br>The English Translation of the word "FUENTE" in the mark is "FOUNTAIN". | Hats; Jackets; Shirts, in International Class 25 |
| 5396587<br>02/06/2018 | FUENTE FUENTE FORBIDDENX<br><br>The English Translation of the word "FUENTE" in the mark is "FOUNTAIN". | Chocolate, in International Class 30. |
| 5503975<br>06/26/2018 | The mark consists of the letter "O" containing the letters "FF" intertwined with the letter "X". | chocolate; coffee, in International Class 30 |
| 5504689<br>06/26/2018 | FORBIDDEN X | Coffee, in International Class 30 |
| 5590619<br>10/23/2018 | FUENTE FUENTE FORBIDDEN X<br><br>The English translation of "FUENTE" in the mark is "fountain". | Chocolate, in International Class 30. |
| 5966615<br>01/21/2020 | | Beverage glassware, in International Class 21. |

| **Registration**<br>**Date of issue**<br>**Status** | **Mark** | **Goods** |
|---|---|---|
| | The mark consists of the letter "O" containing the letters "FF" intertwined with the letter "X". | |

While none of the goods are more closely related to Applicant's oral vaporizers for smoking than Opposer's cigars and cigar-related products, we find this evidence of Opposer's use and registration of X marks for a variety of goods somewhat bolsters the finding that goods are related and weighs in favor of finding a likelihood of confusion. *See Nike, Inc. v. WNBA Ent., LLC*, 85 USPQ2d 1187, 1195 (TTAB 2007) ("The fact that opposer applies its [registered] marks to a variety of sports products makes it more likely that purchasers, aware of opposer's use of the mark on a variety of sports products, when seeing a similar mark used in connection with backpacks, duffel bags and other sports bags, are likely to believe that these products are also being produced or sponsored by opposer.").

4. **Strength of Opposer's Marks**

To ascertain the scope of protection to which it is entitled, we consider the strength of Opposer's standard character X mark. *Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 115 USPQ2d 1671, 1674 (Fed. Cir. 2015) ("The weaker an opposer's mark, the closer an applicant's mark can come without causing a likelihood of confusion and thereby invading what amounts to its comparatively narrower range

of protection."); *Bose Corp.,* 63 USPQ2d at 1309 ("[the marks ACOUSTIC WAVE and WAVE] are famous and thus entitled to broad protection"). A mark can be conceptually strong or commercially strong. *See In re Chippendales USA, Inc.*, 622 F.3d 1346, 96 USPQ2d 1681, 1686 (Fed. Cir. 2010) ("A mark's strength is measured both by its conceptual strength … and its marketplace strength …."). The fifth *DuPont* factor enables Opposer to prove that its pleaded mark is entitled to an expanded scope of protection by adducing evidence of "[t]he fame of the prior mark (sales, advertising, length of use)."[58] *Sock It To Me, Inc. v. Aiping* Fan, 2020 USPQ2d 10611, at *8 (quoting *DuPont*, 177 USPQ at 567).[59]

With respect to its conceptual strength, Opposer's pleaded mark X in standard characters is registered on the Principal Register without a claim of acquired distinctiveness and so is treated as inherently distinctive.[60] *See New Era Cap Co., Inc. v. Pro Era, LLC*, 2020 USPQ2d 10596, at *10 (TTAB 2020) ("Opposer's mark is inherently distinctive as evidenced by its registration on the Principal Register

---

[58] While *DuPont* factor five specifies the "fame" of the mark, the Court of Appeals for the Federal Circuit also considers the "strength" of the mark under that factor. *See Stone Lion* 110 USPQ2d at 1160 ("the Board found factor five—the strength of Lion's marks—was neutral because Lion failed to show "that its marks are well-known in the financial services field."); *Kenner Parker Toys, Inc. v. Rose Art Indus., Inc.*, 963 F.2d 350, 22 USPQ2d 1453, 1458 (Fed Cir. 1992) ("Famous or strong marks enjoy a wide latitude of legal protection.").

[59] The sixth *DuPont* factor allows Applicant to contract Opposer's scope of protection with evidence of "[t]he number and nature of similar marks in use on similar goods." *DuPont*, 177 USPQ at 567. Applicant contends that nine draft and executed agreements between Opposer and third parties over the past ten years, that allow the third parties to use X marks on goods similar to Applicant's goods, shows there is a low likelihood of confusion. 35 TTABVUE 7. However, because Applicant did not supplement the agreements with any evidence that the allowed uses are taking place, we accord little probative weight to the agreements.

[60] Applicant erroneously contends (35 TTABVUE 16-30) that Opposer's pleaded X in standard character mark is not in use. We address those contentions only as they affect the degree of protection to be accorded the inherently distinctive mark.

without a claim of acquired distinctiveness under Section 2(f) of the Trademark Act."). As set forth earlier, X is defined, among other things, as a letter of the alphabet and a design element, something shaped like the letter X, and on their face, both definitions are arbitrary as applied to cigars. *See Palm Bay,* 73 USPQ2d at 1692 ([A]n arbitrary term is "conceptually strong as a trademark.").

With respect to its commercial strength under the fifth *DuPont* factor, the fame of the prior mark, we must determine where to place Opposer's mark on the "spectrum" of marks, which ranges from "very strong to very weak." *Joseph Phelps Vineyards, LLC v. Fairmont Holdings, LLC*, 857 F.3d 1323, 122 USPQ2d 1733, 1734 (Fed. Cir. 2017) (*quoting In re Coors Brewing Co*., 343 F.3d 1340,68 USPQ2d 1059, 1063 (Fed. Cir. 2003)). Fame, if it exists, plays a dominant role in the likelihood of confusion analysis because famous marks enjoy a broad scope of protection or exclusivity of use. *Bose Corp.,* 63 USPQ2d at 1305. Fame for confusion purposes arises as long as a significant portion of the relevant consuming public recognizes the mark as a source indicator. *Palm Bay,* 73 USPQ2d at 1694.[61]

The record shows that the FUENTE brand of cigars was founded by Mr. Fuente' grandfather, and Mr. Fuente has been in the business for more than 50 years.[62] Opposer submitted a 1995 article from the Cigar Insider newsletter describing Opposer's cigar launch of "Opus X," a super-premium brand of cigar made with

[61] Contrary to Opposer's contention (30 TTABVUE 36), Applicant has not stipulated that Opposer's mark is famous. The stipulation (7 TTABVUE 7) "Cigars bearing one or more of Fuente's X Marks are recognized as among the best in the world" pertains to recognition of the cigars and not the mark.

[62] 8 TTABVUE 3.

wrappers from the Dominican Republic, and, at less than a million cigars each year, a small part of Opposer's annual production of 28 million cigars.[63] A 1997 consumer poll conducted by Cigar Aficionado identified Fuente as the leader in the brand categories of "everyday cigar," and "desert island cigar,"[64] In that same poll, Fuente's new FUENTE FUENTE OPUSX cigar was recognized in the new brand category.[65]

As set forth above in connection with priority based on a family of marks, the mark FUENTE FUENTE OPUSX and the cigar band shown below have been in use on cigars since 1995, and since then the FUENTE FUENTE OPUSX cigars have produced millions of dollars in sales and generated significant attention in cigar industry publications.[66]




However, the evidence of record does not provide a basis for finding that the strength of the FUENTE FUENTE OPUSX mark or the cigar label have created consumer recognition of the letter X as a source indicator for Opposer's cigars. As

[63] 8 TTABVUE 181-184.

[64] 8 TTABVUE 167-196, especially 168, 169,

[65] 8 TTABVUE 173.

[66] 8 TTABVUE 9-17.

noted in connection with the family of marks discussion, the letter X is integrated into the coined term OPUSX in the FUENTE FUENTE OPUSX mark and serves as background to the letters FF on the cigar band. As shown by this excerpt from Opposer's brief, when Opposer cites evidence of recognition of X, it does not refer to X alone but to FUENTE FUENTE OPUSX:[67]

| | |
|---|---|
| BestCigarPrices.com: | "Arturo Fuente Opus X Cigars are some of the rarest, most sought after cigars in the world." |
| cigarsdirect.com: | "[T]he world-renowned Fuente Fuente Opus X" |
| *SmokeShop* magazine: | "Fuentes grow tobacco for their famed Fuente Fuente OpusX cigars." |
| *Cigar Aficionado* magazine: | "The OpusX is among the most sought-after brands in cigar history." |
| atlanticcigar.com: | "Arturo Fuente Cigars are some of the most widely renowned in the world"; "Though Arturo Fuente is well known for many cigars, it is perhaps the Arturo Fuente Fuente Opus X that defines the name." |

[68]

Because Opposer's most celebrated goods are identified as FUENTE FUENTE OPUSX and bear a cigar label with a prominent XFF, and the record includes only a handful of examples of X used alone, we do not find that a significant portion of the relevant consuming public recognizes the mark X as a source indicator for Opposer. Opposer's registered mark X is neither very weak nor very strong, it is entitled to the protection accorded any inherently distinctive mark. *See Sabhnani v. Mirage Brands,*

[67] We are not swayed by a few examples where third parties describe the mark as including a space between OPUS and X when the record is replete with Opposer's display of OPUSX.

[68] 30 TTABVUE 36.

*LLC*, 2021 USPQ2d 1241, at *26 (TTAB 2021) (quoting *Bell's Brewery, Inc. v. Innovation Brewing*, 125 USPQ2d 1340, 1347 (TTAB 2017)).

### 5. **Similarity of the Marks**

Turning to the first *DuPont* factor, we must compare the marks "in their entireties as to appearance, sound, connotation and commercial impression." *Palm Bay*, 73 USPQ2d at 1691 (quoting *DuPont*, 177 USPQ at 567. "The proper test is not a side-by-side comparison of the marks, but instead 'whether the marks are sufficiently similar in terms of their commercial impression' such that persons who encounter the marks would be likely to assume a connection between the parties." *Cai v. Diamond Hong, Inc.*, 901 F.3d 1367, 127 USPQ2d 1797, 1801 (Fed. Cir. 2018) (*quoting Coach Servs.*, 101 USPQ2d at 1721 ).

In a case where the marks are not word marks, visual dissimilarities can be dispositive. *See, e.g., Odom's Tenn. Pride Sausage, Inc. v. FF Acquisition, LLC*, 600 F.3d 1343, 93 USPQ2d at 2032; *In re Electrolyte Lab'ys, Inc.*, 929 F.2d 645, 16 USPQ2d 1239, 1240 (Fed. Cir. 1990); *Volkswagenwerk AG v. Rose'Vear Enters.*, Inc., 592 F.2d 1180, 201 USPQ 7, 9 (CCPA 1979); *In re Burndy Corp.*, 300 F.2d 938, 133 USPQ 196, 197 (CCPA 1962). The focus is on the recollection of the average purchaser, who normally retains a general rather than a specific impression of trademarks. *Joel Gott Wines LLC v. Rehoboth Von Gott Inc.*, 107 USPQ2d 1424, 1430 (TTAB 2013). In this case, because the goods at issue are cigars and oral vaporizers, the average purchaser is an ordinary consumer who is a smoker.

As stated, Opposer has registered the letter X in standard characters, and Applicant's mark is shown below:



The parties stipulated "Vaporous' X Dot Mark 'consists of an abstract stick figure consisting of two diagonal intersecting lines in the shape of a wide stylized letter 'X' and a shaded circle above the letter 'X'" and [Applicant's] X Dot mark and each of Fuente's X Marks include the letter 'X'. [69] We agree Applicant's mark is a stick figure. Notwithstanding that part of the figure is in the shape of a letter X, a stick figure is a representation of a human being and so differs from a letter of the alphabet visually, and in connotation, and commercial impression.[70] A stick figure has no pronunciation, and so does not sound like the letter X. In comparing Applicant's stick figure mark to Opposer's letter X mark, we find their visual differences outweigh their partial visual similarity.

---

[69] 7 TTABVUE 5. This stipulation comports with the definition of a "stick figure" as "a drawing showing the head of a human being or animal as a circle and all other parts as straight lines." *Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary /stick%20figure. Accessed Nov. 14, 2023.

[70] Opposer's focus (30 TTABVUE 37) on the stipulation that Applicant's mark includes a body "in the shape of a wide stylized letter 'X'" to support its likelihood of confusion claim is misplaced. It is the drawing of the mark that determines what the mark is. *See Kohler Co. v. Honda Giken Kogyo K.K.*, 125 USPQ2d 1468, 1488 (TTAB 2017) ("Applicant's application 'drawing depicts the mark to be registered.'") (internal citations omitted). Whether the stipulation regarding Applicant's design mark specifies that Applicant's stick figure includes the shape of the letter X is not dispositive in determining whether it is similar to Opposer's X mark. The issue before us is whether the design mark depicted in the drawing in Applicant's application is similar to Opposer's standard character X mark.

To be clear, we agree with Opposer that the owner of a registered standard character mark is entitled to employ style, including that of the Applicant.[71] *See In re Viterra Inc.*, 671 F.3d 1358, 101 USPQ2d 1905, 1909 (Fed. Cir. 2012); *In re Davia*, 110 USPQ2d 1810, 1814 (TTAB 2014); Trademark Rule 2.52(a), 37 CFR 2.52(a). However, even if Opposer employed the identical stylization used by Applicant in creating the X-shaped body of its stick figure, the marks would not be confusingly similar. The omission of the circle, or head, in Opposer's X mark would prevent Opposer's letter X mark creating a similar commercial impression to Applicant's stick figure mark.

We find that Opposer's assertion "Applicant's addition of a 'shaded circle above the letter 'X" does nothing to meaningfully distinguish the parties' marks in the minds of consumers"[72] is belied by Opposer's stipulation that Applicant's mark is a stick figure, and improperly asks us to consider only the lower part of Applicant's mark. Even if Opposer had not stipulated that Applicant's mark is a stick figure, because the similarity or dissimilarity of the marks is determined based on the marks in their entireties, our analysis may not be predicated on dissecting the marks into their various components. *In re Nat'l Data Corp.*, 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985); *see also Franklin Mint Corp. v. Master Mfg. Co.*, 667 F.2d 1005 , 212 USPQ 233, 234 (CCPA 1981) ("It is axiomatic that a mark should not be dissected and considered piecemeal; rather, it must be considered as a whole in determining

[71] 30 TTABVUE 38.

[72] 30 TTABVUE 38.

likelihood of confusion."). The circle, or head of the stick figure, in Applicant's mark is about half the size of one of the straight lines, and so comprises about a fifth of the mark. This is not a minor or unnoticeable feature of the mark as a whole, or matter which can be dissected from the remainder of Applicant's mark.[73]

Where, as here, the comparison of the marks turns on visual similarity, the conclusion cannot be based entirely on objective criteria. *See Burndy*, 133 USPQ at 197 ("Since this is, of necessity, a subjective opinion, no amount of discussion of the matter can add to the statement of our conclusion which is predicated on the apparent visual differences in the marks."). Based on this record, we find consumers would not perceive Applicant's design mark as a letter X, but as a stick figure. The dissimilarity between the marks weighs against finding a likelihood of confusion.

### 6. **Balancing the Factors**

We have considered all of the arguments and evidence of record, and all relevant *DuPont* factors. The lack of actual confusion and the strength of Applicant's standard character X mark is neutral. The goods, channels of trade and classes of purchasers to whom sales are made are related or overlap, and this favors a finding of likelihood of confusion. However, the marks create different commercial impressions, and the dissimilarity of the marks weighs against a likelihood of confusion.

---

[73] We find no support for Opposer's argument (30 TTABVUE 38) that Applicant's mark would be perceived as a letter X because "[c]onsumers are familiar with a symbol above a letter, e.g., é, ä, and ñ, where the letter remains the dominant feature and the symbol merely indicates emphasis." Diacritics are marks which alter the phonetic value of not just any letter of the alphabet, but ten defined letters, or letter combinations, none of which include the letter X or a diacritic in the form of a large single circle. M*erriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/diacritic. Accessed Nov. 16, 2023.

**DECISION**

The notice of opposition to registration of Applicant's mark on the ground of likelihood of confusion is dismissed.

FORM 30. Certificate of Service

Form 30
July 2020

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF SERVICE

**Case Number** 24-1460

**Short Case Caption** Fuente Marketing Ltd. v. Vaporous Technologies, LLC

**NOTE:** Proof of service is only required when the rules specify that service must be accomplished outside the court's electronic filing system. See Fed. R. App. P. 25(d); Fed. Cir. R. 25(e). Attach additional pages as needed.

I certify that I served a copy of the foregoing filing on 06/24/2024

by ☐ U.S. Mail ☐ Hand Delivery ☑ Email ☐ Facsimile
☐ Other: ____________

on the below individuals at the following locations.

| Person Served | Service Location (Address, Facsimile, Email) |
|---|---|
| Glen L. Nuttall | Glen.nuttall@fisherbroyles.com |
| | |
| | |
| | |
| | |

☐ Additional pages attached.

Date: 06/24/2024

Signature: /s/ Virginia L. Carron

Name: Virginia L. Carron

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 24-1460

**Short Case Caption:** Fuente Marketing Ltd. v. Vaporous Technologies, LLC

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 11,831 words.

- [ ] the filing has been prepared using a monospaced typeface and includes ___________ lines of text.

- [ ] the filing contains ___________ pages / ___________ words / ___________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ___________).

Date: 06/24/2024

Signature: /s/ Virginia L. Carron

Name: Virginia L. Carron

FORM 31. Certificate of Confidential Material

Form 31
July 2020

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 24-1460

**Short Case Caption:** Fuente Marketing Ltd. v. Vaporous Technologies, LLC

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).
- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

The foregoing document contains 9 number of unique words (including numbers) marked confidential.

☑ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☐ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 06/24/2024

Signature: /s/ Virginia L. Carron

Name: Virginia L. Carron