**No. 2024-1460**

IN THE
**UNITED STATES COURT OF APPEALS**
FOR THE FEDERAL CIRCUIT

FUENTE MARKETING LTD.,

*Appellant*

v.

VAPOROUS TECHNOLOGIES, LLC,

*Appellee*

**Appeal from the United States Patent and Trademark Office,
Trademark Trial and Appeal Board, Opposition No. 91270800**

**REPLY BRIEF FOR APPELLANT
FUENTE MARKETING LTD.**

VIRGINIA L. CARRON
DOUGLAS A. RETTEW
R. GORDON WRIGHT
FINNEGAN, HENDERSON, FARABOW,
   GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001-4413
(202) 408-4000

*Attorneys for Appellant
Fuente Marketing Ltd.*

September 3, 2024

# TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................1

II.    ARGUMENT........................................................................................2

      A.     The Board Erred in Finding the Parties' Marks Dissimilar ..................2

           1.     The Parties' Stipulation Is Not Alone Substantial
Evidence Supporting the Board's Finding That the
Parties' Marks Are Dissimilar .....................................................4

           2.     Vaporous's Attempts to Undermine the Evidence Ignored
by the Board Fail.......................................................................11

           3.     Vaporous's Argument That the X Dot Mark Cannot Be
Pronounced Lacks Merit ............................................................14

           4.     Vaporous Fails to Justify the Board's Failure to Weigh
the Similarity-of-Marks Factor Through the Lens of the
Factors Favoring Fuente ............................................................16

      B.     The Board Erred in Failing to Accord Fuente's X Mark a
Heightened Scope of Protection.........................................................19

           1.     Vaporous Misstates the Board's Finding on Commercial
Strength ...................................................................................20

           2.     Vaporous's Description of the Record Evidence
Demonstrating the Commercial Strength of Fuente's X
Mark Is Factually and Legally Erroneous...............................21

           3.     The Third-Party Marks Identified by Vaporous Do Not
Detract from the Commercial Strength of Fuente's X
Mark ........................................................................................24

      C.     The Board Erred in Improperly Balancing the Relevant
Likelihood-of-Confusion Factors.......................................................27

III.    CONCLUSION..................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*7-Eleven, Inc. v. Wechsler*,
   83 USPQ2d 1715 (TTAB 2007) .................................................................................25

*AMF Inc. v. Am. Leisure Prods., Inc.*,
   474 F.2d 1403 (Fed. Cir. 1973) .................................................................................26

*Anheuser-Busch, LLC v. Innvopak Sys. Pty Ltd.*,
   115 USPQ2d 1816 (TTAB 2015) ...............................................................................17

*Bellbrook Dairies, Inc. v. Hawthorn-Melody Farms Dairy, Inc.*,
   253 F.2d 431 (CCPA 1958) .......................................................................................13

*CBS Inc. v. Morrow*,
   708 F.2d 1579 (Fed. Cir. 1983) .................................................................................17

*Century 21 Real Est. Corp. v. Century Life of Am.*,
   970 F.2d 874 (Fed. Cir. 1992) ..............................................................................16, 18

*Champagne Louis Roederer, S.A. v. Delicato Vineyards*,
   148 F.3d 1373 (Fed. Cir. 1998) .................................................................................29

*In re Change Wind Corp.*,
   123 USPQ2d 1453 (TTAB 2017) .................................................................................7

*Coach Servs., Inc. v. Triumph Learning LLC*,
   668 F.3d 1356 (Fed. Cir. 2012) .................................................................................16

*In re Detroit Athletic Co.*,
   903 F.3d 1297 (Fed. Cir. 2018) .................................................................................17

*DuoProSS Meditech Corp. v. Inviro Med. Devices, Ltd.*,
   695 F.3d 1247 (Fed. Cir. 2012) ...................................................................................6

*Fort James Operating Co. v. Fort Royal Paper Converting*,
   83 USPQ2d 1624 (TTAB 2007) .................................................................................22

*Han Beauty, Inc. v. Alberto-Culver Co.*,
   236 F.3d 1333 (Fed. Cir. 2001) .................................................................................25

*In re i.am.symbolic, llc,*
    866 F.3d 1315 (Fed. Cir. 2017) ...................................................................5, 11, 25

*J & J Snack Foods Corp. v. McDonald's Corp.,*
    932 F.2d 1460 (Fed. Cir. 1991) ...................................................................6

*Jack Daniel's Props., Inc. v. VIP Prods. LLC,*
    599 U.S. 140 (2023)...................................................................7

*Kellogg Co. v. Pack'Em Enters., Inc.,*
    951 F.2d 330 (Fed. Cir. 1991) ...................................................................28

*Kimberly-Clark Corp. v. H. Douglas Enters., Ltd.,*
    774 F.2d 1144 (Fed. Cir. 1985) ...................................................................13

*Magno-Humphries Labs., Inc. v. Leiner Health Prods. Inc.,*
    2002 WL 220903 (TTAB Feb. 12, 2002), *aff'd*, 56 F.App'x 501
    (Fed. Cir. 2003)...................................................................24, 25

*In re Medline Indus.,*
    2020 USPQ2d 10237 (TTAB 2019) ...................................................................6

*Michelin Tire Corp. v. General Tire & Rubber Co.,*
    202 USPQ 294 (TTAB 1979) ...................................................................20

*In re Moringa Nyugyo Kabushiki Kaisha,*
    120 USPQ2d 1738 (TTAB 2016) ...................................................................26

*In re Nationwide Indus. Inc.,*
    6 USPQ2d 1882 (TTAB 1989) ...................................................................13

*New Era Cap Co. v. Pro Era, LLC,*
    2020 WL 2853282 (TTAB 2020) ...................................................................22

*Nike Inc v. WNBA Enters., LLC,*
    85 USPQ2d 1187 ...................................................................14, 15

*Northwestern Golf Co. v. Acushnet Co.,*
    226 USPQ 240 (TTAB 1985) ...................................................................12

*Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee en
    1772*, 396 F.3d 1369 (Fed. Cir. 2005) ...................................................................21, 25

*philosophy, inc. v. Wilson*,
   2012 WL 975573 (TTAB Mar. 7, 2012) ........................................................13

*Proctor & Gamble Co. v. Keystone Auto. Warehouse, Inc.*,
   191 USPQ 468 (TTAB 1976) ....................................................................22

*Recot, Inc. v. M.C. Becton*,
   214 F.3d 1322 (Fed. Cir. 2000) ................................................................15

*Schwarzkopf v. John H. Breck, Inc.*,
   340 F.2d 978 (CCPA 1965) ........................................................................6

*In re Shell Oil Co.*,
   992 F.2d 1204 (Fed. Cir. 1993) ................................................................14

*Specialty Brands, Inc. v. Coffee Bean Distribs., Inc.*,
   748 F.2d 669 (Fed. Cir. 1984) ..................................................................12

*Spireon, Inc. v. Flex Ltd.*,
   71 F.4th 1355 (Fed. Cir. 2023) ................................................................25

*Stewart-Warner Corp. v. United States*,
   748 F.2d 663 (Fed. Cir. 1984) ....................................................................4

*Textron Inc. v. Maquinas Agricolas "Jacto" S.A.*,
   215 USPQ 162 (TTAB 1982) ....................................................................29

*Torrefazione Italia LLC v. Trinidad Coffee Co.*,
   2016 WL 1130189 (TTAB Mar. 10, 2016) ................................................6

*In re Viterra*,
   671 F.3d 1358 (Fed. Cir. 2012) ................................................................10

*In re White Swan Ltd.*,
   8 USPQ2d 1534 (TTAB 1988) ................................................................10

**Statutes**

15 U.S.C. § 1057 ..............................................................................................12

15 U.S.C. § 1115(b) ........................................................................................20

Lanham Act ..................................................................................................2, 7

**Other Authorities**

J. Thomas McCarthy, 3 MᴄCᴀRTHY ON TRADEMARKS AND UNFAIR
COMPETITION § 23:33 (5th ed. 2024)..................................................................29

*Merriam-Webster.com Dictionary*, https://www.merriam-
webster.com/dictionary/abstract (last visited Aug. 22, 2024) ..............................4

S. Rep. No. 1333, 79th Cong., 2d Sess. (1946) ........................................................2

# I.   INTRODUCTION

The Board committed reversible errors and abandoned fundamental principles of trademark law in considering the relevant likelihood-of-confusion factors and ruling against Fuente. Vaporous's scattershot arguments—which misstate the Board's findings, mischaracterize the record, and misapply the law—fail to justify affirmance of the Board's flawed decision.

Vaporous devotes considerable time attempting to defend the Board's decision to give conclusive weight to the parties' stipulation, which simply and unremarkably quotes the description of the X Dot Mark in Vaporous's application, in finding the parties' marks dissimilar. Like the Board, Vaporous ignores a key word in the stipulation—"abstract"—which modifies "stick figure," and, in doing so, wrongly assumes that consumers will simply perceive the X Dot Mark as a stick figure and nothing else. But the stipulation does not alone support the Board's finding, as it expresses nothing about how the mark will be perceived by consumers—who's perspective is paramount when determining the likelihood of confusion. The substantial record evidence, jettisoned by the Board, shows that the stylized X in Vaporous's "*abstract* stick figure" is not only visually dominant but also the essential feature giving meaning to the mark and is most likely to leave an impression on consumers.

When the relevant likelihood-of-confusion factors are evaluated under the proper legal standards and afforded their due weight, confusion is likely between X and ✶ as applied to related goods traveling in overlapping trade channels to overlapping consumers. The Board's contrary conclusion effectively gave Fuente's arbitrary and federally registered X Mark no scope of protection and is inconsistent with the "sound public policy" underlying the Lanham Act, which "requires that trademarks should receive nationally the greatest scope that can be given them." S. Rep. No. 1333, 79th Cong., 2d Sess., at 6 (1946), reprinted in U.S.C.C.A.N. 1274, 1277.

For these and the other reasons discussed in Fuente's opening brief and below, the Board's decision must be reversed.

## II. ARGUMENT

### A. The Board Erred in Finding the Parties' Marks Dissimilar

The Board ignored and failed to rely on substantial evidence and erred as a matter of law in concluding that the parties' marks are dissimilar. As detailed in Fuente's opening brief, the Board's entire similarity analysis was based on the parties' stipulation describing Vaporous's X Dot Mark, which the Board treated as conclusively establishing that *consumers* will perceive the mark merely as a stick figure, ignoring that that figure is an X with a small, detached dot. In so doing, the Board ignored the potent record evidence from Vaporous demonstrating the

2

importance of the "X" in impressing consumers. (Opening Br. at 29-33.) The Board compounded this error by failing to evaluate the parties' marks as to their similar sound and failing to alter the degree of similarity necessary to support likely confusion despite finding that the parties' goods are inherently related and travel through overlapping trade channels to overlapping consumers. (Opening Br. at 36-41.)

Vaporous's arguments are not persuasive. First, it attempts to prop up the Board's flawed analysis by stretching the import of the parties' stipulation to suggest that it was a concession that the parties' marks are dissimilar and was alone sufficient to resolve the similarity-of-marks factor without regard to the other evidence. (Resp. Br. at 8-11.)[1] Second, Vaporous downplays the record evidence the Board ignored by misapplying the law and misrepresenting Fuente's arguments on the significance of such evidence. (Resp. Br. at 11-15.) Third, despite substantial record evidence demonstrating otherwise, Vaporous contends that the "X" in the X Dot Mark is "subordinate to the overall design," and thus, the Board properly disregarded similarities in sound. (Resp. Br. at 15.) Finally, Vaporous suggests that because the Board's findings on the parties' trade channels and consumers were based on

---

[1] All citations to "Resp. Br." are to the Corrected Principal Brief for Appellee Vaporous Marketing, LLC (Dkt. 24).

presumptions, the Board appropriately ignored those findings when evaluating the similarity of marks. (Resp. Br. at 16-18.)

1. **The Parties' Stipulation Is Not Alone Substantial Evidence Supporting the Board's Finding That the Parties' Marks Are Dissimilar**

Vaporous complains that Fuente is "attempt[ing] to undermine the stipulation to which it agreed." (Resp. Br. at 9.) Not so. Fuente does not dispute that it stipulated that "Vaporous'[s] X Dot Mark 'consists of an abstract stick figure consisting of two diagonal intersecting lines in the shape of a wide stylized letter X and a shaded circle above the letter X.'" (Appx44; Appx133.) But contrary to Vaporous's contention, Fuente did not agree that the X Dot Mark "is a stick figure." (Resp. Br. at 8, 9, 14, 16.) Importantly, Vaporous ignores a key part of the stipulation—the word "abstract," which directly qualifies "stick figure." (Appx44; Appx133.) This is significant, as the adjective "abstract" is defined as, among other things, "difficult to understand" and "disassociated from any specific instance." *Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/abstract (last visited Aug. 22, 2024).[2] It was erroneous for Vaporous and the Board to ignore that word because the "difficult to understand" and "disassociated" stick figure here necessarily conveys something else: the letter X. And by ignoring that word and

---

[2] The Court may take judicial notice of dictionary definitions. *See Stewart-Warner Corp. v. United States*, 748 F.2d 663, 669 (Fed. Cir. 1984).

failing to consult other record evidence probative of the overall impression of Vaporous's X Dot Mark (as detailed below), the Board's entire similarity-of-marks analysis was contaminated, as it converted the analysis into a comparison between Fuente's X Mark and any ordinary "stick figure [that] is a representation of a human being and so differs from a letter of the alphabet visually, and in connotation, and commercial impression." (Appx44.)

Moreover, notwithstanding the Board's incomplete reading of the stipulation to find that the X Dot Mark is merely a stick figure, the stipulation alone does not support the Board's finding that the parties' marks are dissimilar. (Appx46.) The Board gave the stipulation undeserved conclusive weight, jettisoning all other record evidence, to reach its unsubstantiated conclusion that "***consumers*** would not perceive Applicant's design mark as a letter X, but as a stick figure." (Appx46 (emphasis added).) In wrongly assuming consumers would turn a blind eye to the fact that this ✖ looks like an X, the Board itself ignored evidence demonstrating otherwise.

Under the similarity-of-marks factor, "[t]he proper test is . . . whether the marks are sufficiently similar in terms of their commercial impression such that *persons who encounter the marks* would be likely to assume a connection between the parties." *In re i.am.symbolic, llc*, 866 F.3d 1315, 1323 (Fed. Cir. 2017) (emphasis added) (citation omitted). This is because "it is from the perspective of the consumer

that likelihood of confusion is determined." *J & J Snack Foods Corp. v. McDonald's Corp.*, 932 F.2d 1460, 1463 (Fed. Cir. 1991); *see also DuoProSS Meditech Corp. v. Inviro Med. Devices, Ltd.*, 695 F.3d 1247, 1253 (Fed. Cir. 2012) ("The commercial impression that a mark conveys must be viewed through the eyes of the consumer.").

Here, the parties' stipulation says nothing about how ***consumers*** will perceive Vaporous's X Dot Mark. Indeed, Vaporous acknowledges that the stipulation is nothing more than the description of the X Dot Mark that appears in Vaporous's application. (Resp. Br. at 8.) Other than that description, the Board relied on no record evidence to support its finding on the similarity-of-marks factor. (Appx44-46.) Vaporous does not dispute this, nor does it point to other record evidence that could have supported the Board's finding. (Resp. Br. at 10-11.)

A party's description of its mark, whether stipulated to or not, is not determinative of how consumers will perceive the mark. *See Torrefazione Italia LLC v. Trinidad Coffee Co.*, 2016 WL 1130189, at *11 (TTAB Mar. 10, 2016) (non-precedential) ("Regardless of how the animal is described [in the parties' stipulation], we find that consumers are likely to recognize the animals portrayed in the marks as griffins."); *Schwarzkopf v. John H. Breck, Inc.*, 340 F.2d 978, 980 (CCPA 1965) ("[T]he record shows what the mark sought to be registered is and facts cannot be stipulated to be other than what they are shown by the record to be."); *In re Medline Indus.*, 2020 USPQ2d 10237, at *39 n. 38 (TTAB 2019)

("[C]onsumers are unaware of descriptions [in an application]."); *In re Change Wind Corp.*, 123 USPQ2d 1453, 1459 n.6 (TTAB 2017) ("We note that the drawing of the mark, not the words an applicant uses to describe it, controls what the mark is."); TMEP § 808.02 ("A description cannot be used to restrict the likely public perception of a mark."). This truth is rooted in fundamental principles, for the trademark laws exist to prevent consumer confusion. As the Supreme Court recently explained, making consumers "think that one producer's products are another's," is the "cardinal sin" of the Lanham Act. *Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140, 157 (2023). To the point here, consumers are not privy to the words an applicant uses to describe its mark before an administrative agency; their perception is formed by what they see, by the mark itself.

Paradoxically, the Board recognized this principle when it criticized Fuente for relying on the same stipulation, stating: "[w]hether the stipulation regarding Applicant's design mark specifies that Applicant's stick figure includes the shape of the letter X is not dispositive in determining whether it is similar to Opposer's X mark." (Appx44.) Thus, by its own sensical logic, it was erroneous for the Board to treat the stipulation as dispositive to the expense of all other evidence.

And that evidence—showing that X and ⮾ convey a confusingly similar commercial impression on consumers—was potent in both quality and quantity. It included:

- Vaporous adopted the X Dot Mark to serve as a logo for, or graphical representation of, its DAB X brand under which it offers "electronic dab device[s]." (Appx797-799; Appx803-804; Appx 813; Appx838; Appx840; Appx1105.)

- Vaporous intended the X Dot Mark to "evok[e] a person having the X-factor and being complementary to, and drawing the user's mind to, [Vaporous's] primary DABX mark." (Appx803.) To achieve this, Vaporous used a stylized X that "calls to mind the X-factor of the DABX mark" under a dot that "represents a dab, or portion of herbal concentrate intended to be vaporized" with the DAB X products. (Appx803-804.)

- Vaporous's packaging and promotional materials bearing the X Dot Mark reinforce the message it intends the mark to portray—an "X factor" that makes its products "more interesting and valuable than competing" products (Appx803)—by using phrases such as "evolution of dabbing" (Appx1110) and "[a]dvanced [d]abbing [t]echnology" (Appx1111).

- Vaporous uses both the X Dot Mark and DAB X mark on its DAB X products and packaging as well as in its promotional materials. (Appx814; Appx821; Appx824-825; Appx827-830; Appx1064-1088; Appx1090-1103; Appx1108; Appx1111-1113.) As shown below, when those marks are displayed together, the same stylized X prominently featured in the X Dot Mark also appears in

8

Vaporous's DAB X mark. Indeed, the only difference between the marks as displayed is that the X Dot Mark substitutes a dot in place of, and to represent, the term "DAB"—which is descriptive of Vaporous's "dabbing" products and admitted by Vaporous to be a "mild word" and "relatively minor" compared to the "X." (Appx895-896; Appx950-951.)



(Appx1092 (annotated))    (Appx1090 (annotated))



(Appx827)

9

This evidence, unlike the stipulation on which the Board myopically focused, is highly probative of the commercial impression Vaporous's X Dot Mark conveys to consumers. It demonstrates that consumers will appreciate the significance of the visually dominant stylized X—whether it be as the feature of an "*abstract* stick figure" conveying the "X-factor" or as the feature of a graphical representation of "DAB X" tying the mark to the DAB X brand and products. Importantly, the record is void of any evidence indicating that consumers will perceive the X Dot Mark simply as a stick figure or that Vaporous promotes or even refers to the mark as a stick figure or "Dab Man" in any public, non-litigation materials to foster such a perception among consumers.

In this context, it is clear that the X Dot Mark conveys a commercial impression confusingly similar to that of Fuente's arbitrary X Mark. *See In re White Swan Ltd.*, 8 USPQ2d 1534, 1536 (TTAB 1988) (noting that if a group that "is not inconsequential" would understand a mark to have a meaning similar to a registered mark, it "will generally still result in a finding of likelihood of confusion"). This confusing similarity is amplified by the fact that Fuente's X Mark is registered in standard characters, and thus, its scope extends to the very same stylized X prominently featured in Vaporous's X Dot Mark. *See In re Viterra*, 671 F.3d 1358, 1363 (Fed. Cir. 2012) ("[A] standard character mark is not limited to any particular font, size, stylize, or color . . . ."). Indeed, for this reason, the chart in Vaporous's

brief is both incomplete and deceptive. (Resp. Br. at 2.) Vaporous conveniently omits that the analysis must involve a comparison between Vaporous's mark and Fuente's standard character X Mark. A proper comparison of these marks evaluated in the context of all relevant record evidence, leaves no doubt that the parties' marks "are sufficiently similar in terms of their commercial impression such that persons who encounter the marks would be likely to assume a connection between the parties." *In re i.am.symbolic*, 866 F.3d at 1323 (citation omitted). The Board erred in concluding otherwise based solely on the parties' stipulation and in weighing the similarity-of-marks factor against a likelihood of confusion.

**2.  Vaporous's Attempts to Undermine the Evidence Ignored by the Board Fail**

Having conceded that the Board's finding of dissimilarity is based on nothing more than the parties' stipulation (Resp. Br. at 11), Vaporous attempts to justify that myopic analysis and unsubstantiated finding. It presents two arguments to suggest that the evidence ignored by the Board—even if such evidence "goes to 'the true meaning and intended impression'" of the X Dot Mark—would not alter the Board's finding of dissimilarity. (Resp. Br. at 14.) Both arguments fail.

First, Vaporous claims that Fuente "tries to increase the significance of advanced, hidden meanings" of the X Dot Mark that would not be understood by average purchasers. (Resp. Br. at 11.) But those so-called "hidden meanings"—i.e., that the dot represents a "dab" (or a portion of herbal concentrate) vaporized by

Vaporous's DAB X products and that the stylized X portrays an X-factor associated with those products—are the messages Vaporous testified that it intends the X Dot Mark to convey to consumers. (Appx803-804; Appx840.) And far from "hidden," based on the context in which the X Dot Mark is used, it does not take a sophisticated consumer to understand the significance of the stylized X. *See Northwestern Golf Co. v. Acushnet Co.*, 226 USPQ 240, 244 (TTAB 1985) ("Evidence of the context in which a particular mark is used on labels, packaging, etc., or in advertising is probative of the significance which the mark is likely to project to purchasers."); *Specialty Brands, Inc. v. Coffee Bean Distribs., Inc.*, 748 F.2d 669, 672 (Fed. Cir. 1984) (finding applicant's labels for SPICE VALLEY spices depicting a sailing vessel negated applicant's claim that its mark conveyed a different commercial impression from that of SPICE ISLANDS). As shown above, the X Dot Mark is commonly displayed alongside the DAB X mark, with both marks employing the same stylized X and differing only in that the X Dot Mark substitutes a dot in place of, and to represent, the descriptive term "DAB." *See* Section II.A.1. And because Vaporous's application does not claim color as a feature of the X Dot Mark (Appx48; Appx877), a registration would provide Vaporous the exclusive right to use the X Dot Mark in commerce in any colors, including by displaying the stylized X in a color different from that of the dot to further emphasize the significance of the stylized X. *See* 15 U.S.C. § 1057.

12

Second, Vaporous argues that if consumers recognize the X Dot Mark as a graphical representation of the DAB X brand, "such consumers would, of necessity, tie the [X Dot Mark] to the DAB X mark, and not to Fuente's X." (Resp. Br. at 13-14.) This argument is misplaced. While the larger context or trade dress in which a mark actually appears is relevant to show whether the mark projects a confusingly similar commercial impression, "the fact that [an applicant] applies an[] additional name or trade-mark to its product is not sufficient to remove the likelihood of confusion." *Bellbrook Dairies, Inc. v. Hawthorn-Melody Farms Dairy, Inc.*, 253 F.2d 431, 433 (CCPA 1958); *In re Nationwide Indus. Inc.*, 6 USPQ2d 1882, 1884 (TTAB 1989) (noting that "it is settled that evidence of the context in which a mark is used on labels, packaging, advertising, etc., is probative of the significance which the mark is likely to project to purchasers" but rejecting applicant's argument "that there is no likelihood of confusion because the mark 'RUST BUSTER' is used in close association with applicant's mark 'SNAP'" (citation omitted)); *philosophy, inc. v. Wilson*, 2012 WL 975573, at *24 (TTAB Mar. 7, 2012) (non-precedential) ("[A] distinction in trade dress cannot weigh against likelihood of confusion with respect to the registration of a mark because such trade dress might well be changed at any time." (citing *Kimberly-Clark Corp. v. H. Douglas Enters., Ltd.*, 774 F.2d 1144, 1147 (Fed. Cir. 1985)). As such, because Vaporous seeks to register the X Dot Mark alone, the marketplace use of DAB X or any other marks with the X Dot Mark

13

does not weigh against likely confusion as to source, as Vaporous suggests. *See In re Shell Oil Co.*, 992 F.2d 1204, 1207 n.4 (Fed. Cir. 1993) ("Although Shell argues that its use of RIGHT-A-WAY would be used in association with other Shell trademarks, the proposed registration is not so limited.").

### 3. Vaporous's Argument That the X Dot Mark Cannot Be Pronounced Lacks Merit

Vaporous argues that the Board was justified in not considering similarity in sound. (Resp. Br. at 15.) Vaporous does not dispute that Fuente's X Mark is capable of being spoken. (Resp. Br. at 15.) Instead, it attempts to distinguish the Board's decision in *Nike Inc v. WNBA Enters., LLC*, 85 USPQ2d 1187, 1199 (TTAB) by claiming that unlike the letter "S" in the marks and at issue there, the stylized X in the X Dot Mark is "subordinate to the overall design" because it is a "stipulated fact [] not in dispute" that the X Dot Mark "is a stick figure." (Resp. Br. at 15.) But Vaporous again misrepresents and stretches the import of the parties' stipulation and cherry picks a quote from *Nike*, stripping it of context.

As discussed above, the parties did not stipulate that Vaporous's X Dot Mark "is a stick figure," but rather an "abstract" one—i.e., a stick figure that is difficult to understand and disassociated from any specific instance. Working from that incomplete reading of the stipulation, Vaporous assumes, as did the Board, that consumers will in fact perceive the X Dot Mark merely as a stick figure that "has no pronunciation." (Appx44; Resp. Br. at 15.) But the record evidence, that Vaporous

downplays and the Board ignored, belies Vaporous's contention that the stylized X is "subordinate to the overall design," making the X Dot Mark incapable of being spoken. (Resp. Br. at 15); *see also* Sections II.A.1, II.A.2.

Irrespective, Vaporous's reliance on the "subordinate to the overall design" language from *Nike* is misleading. Vaporous omits the factors the Board considered to inform its decision that the letter "S" in both highly stylized star designs, and , was not "virtually unrecognizable *or* subordinate to the overall design" and thus, capable of being spoken. *Nike*, 85 USPQ2d at 1199 (emphasis added). In reaching that decision, the Board found that the letter "S" was "still an essential feature of each mark [because] [t]he stylization of the letter is not so extreme or striking that when viewing the marks in their entireties, the stylization overwhelms the underlying letter." *Id.*

Applying this precedent, it is indisputable that Vaporous's X Mark is capable of being spoken. The stylization of the "X" in the X Dot Mark is far less extreme or striking than the stylized letter "S" in both marks at issue in *Nike*, which the Board found were "easily recognizable as the letter 'S.'" *Id.* at 1199. Accordingly, because Vaporous's X Dot Mark is plainly capable of being spoken and Vaporous does not dispute that the same is true of Fuente's X Mark, the Board erred by reducing its similarity analysis to a visual comparison of the parties' marks without considering all relevant evidence pertaining to appearance, connotation, *and* sound. *See Recot,*

15

*Inc. v. M.C. Becton*, 214 F.3d 1322, 1329 (Fed. Cir. 2000) ("All relevant facts pertaining to appearance, sound, and connotation must be considered before similarity as to one or more of those factors may be sufficient to support a finding that the marks are similar or dissimilar.").

### 4. Vaporous Fails to Justify the Board's Failure to Weigh the Similarity-of-Marks Factor Through the Lens of the Factors Favoring Fuente

In evaluating the parties' marks, the Board failed to apply, or even mention, the axiomatic principle of trademark law that the degree of similarity needed to support a finding of likely confusion reduces where the parties' identified goods are closely related and travel through overlapping trade channels to overlapping consumers. *See, e.g.*, *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1368 (Fed. Cir. 2012); *Century 21 Real Est. Corp. v. Century Life of Am.*, 970 F.2d 874, 877 (Fed. Cir. 1992). To justify the Board's abandonment of this principle, Vaporous argues that the Board's findings on the trade channels and consumers factors merit less weight. (Resp. Br. at 16-18.) According to Vaporous, the Board's "presum[ption] that both parties' goods move in similar channels of trade [to similar] classes of consumers . . . does not reflect reality" (Resp. Br. at 18) because Fuente's cigars are "marketed through only high end outlets to high-end consumers" (Resp. Br. at 7). Vaporous's argument mischaracterizes the Board's analysis and is simultaneously legally irrelevant and flawed.

16

The Board did not presume that the parties' goods travel through overlapping trade channels to overlapping consumers. It presumed, as it must, that because the goods identified in Vaporous's application and Fuente's pleaded registrations are not limited to any trade channel or class of consumer, they "move in all channels of trade usual for such goods and are available to all potential classes of consumers." (Appx30.). That presumption is mandated by long-standing precedent because "[t]he question in an opposition is not whether the applicant may use a mark as it actually does or intends to do, but whether the applicant is entitled to the registration it seeks." *Anheuser-Busch, LLC v. Innvopak Sys. Pty Ltd.*, 115 USPQ2d 1816, 1825 (TTAB 2015); *see also CBS Inc. v. Morrow*, 708 F.2d 1579, 1581 (Fed. Cir. 1983) ("[A]lthough a registrant's current business practice [in connection with which the mark is used] may be quite narrow, they may change at any time."). For this reason, the factors related to the competitive proximity of the parties' goods must be determined as the goods are identified in the involved application and registration. *See In re Detroit Athletic Co.*, 903 F.3d 1297, 1308 (Fed. Cir. 2018) ("The third *DuPont* factor—like the second factor—must be evaluated with an eye toward the channels specified in the application and registration, not those as they exist in the real world.").

That is what the Board did. It considered the record evidence demonstrating that cigars and oral vaporizers are inherently related and travel through overlapping

trade channels to overlapping consumers. (Appx29-34; Opening Br. at 40-41.) Fuente also submitted evidence showing that cigars and oral vaporizers are commonly sold at relatively low price points such that they are subject to impulse buying. (Appx1561-1564; Appx1570-1572.) Thus, contrary to Vaporous's argument, the Board correctly found that these factors favored Fuente and did not err by failing to restrict the scope of goods covered by Fuente pleaded registrations.

The Board did, however, err by evaluating the similarity of marks as an independent factor unaffected by its findings that the parties' goods, trade channels, and consumers are closely related. (Appx43-46; Opening Br. at 39-41); *see also Century 21*, 970 F.2d at 877 (reversing Board's dismissal of opposition where its findings on factors related to competitive proximity of the parties' goods "did not alter the Board's improper tolerance for substantial and confusing similarities between the competing marks"). The Board's failure to do so is particularly significant given its acknowledgement that "the similarities between the marks and the similarities between the goods . . . largely are determinative here." (Appx24.) Had the Board adhered to the established principle that its findings on the factors conclusively favoring Fuente mandate less similarity between the marks, it would have been compelled to find that the X Mark and X Dot Mark are sufficiently similar to support likely confusion.

**B.** **The Board Erred in Failing to Accord Fuente's X Mark a Heightened Scope of Protection**

The Board also failed to rely on substantial evidence and erred as a matter of law in assigning Fuente's X Mark the same scope of protection as "any inherently distinctive mark" and finding the strength-of-mark factor neutral. (Appx42; Appx46.) As detailed in Fuente's opening brief, the Board abandoned fundamental trademark law by treating Fuente's X Mark the same as any inherently distinctive mark, including suggestive marks, despite finding Fuente's X Mark arbitrary, and thus conceptually strong, as applied to cigars. (Opening Br. at 43-46.) The Board further discounted the proper scope of protection to which Fuente's X Mark is entitled by discounting the significance of the X Mark on Fuente's cigar bands and disregarding the myriad ways Fuente and others have used the X Mark, both alone and prominently with other elements, for decades to indicate the source of all cigars in the acclaimed FUENTE FUENTE OPUS X product line. (Opening Br. at 46-60.)

In its response, Vaporous does not address the Board's error in evaluating the *conceptual* strength of Fuente's X Mark. Instead, it attempts to defend the Board's unsupported finding on *commercial* strength. (Resp. Br. at 19-26.) But Vaporous's scattershot arguments misstate the Board's findings, mischaracterize the record, and misapply the law. When evaluated under the proper legal standards, the Board's finding is not supported by substantial evidence.

### 1. Vaporous Misstates the Board's Finding on Commercial Strength

Vaporous contorts the Board's finding on commercial strength into what it calls "a damning factual finding." (Resp. Br. at 22.) But the Board did not find what Vaporous claims. The Board did not find that "Fuente's mark X is NOT recognized as a source indicator for Fuente." (Resp. Br. at 22.) Nor did the Board find that "Fuente's standard character X does not function as a trademark." (Resp. Br. at 22.) To the contrary, the Board explicitly rejected Vaporous's argument that Fuente "does not and has not used X alone as a trademark" (Appx14), finding that Vaporous "erroneously contends . . . that [Fuente's] pleaded X in standard characters is not in use" (Appx39).

In assessing commercial strength or fame, the Board found no record support demonstrating that "a *significant portion* of the relevant consuming public recognizes the mark X as a source indicator for [Fuente]." (Appx42 (emphasis added).) But this is far from the conclusion Vaporous describes. It says nothing about whether Fuente's X Mark serves a trademark function or is recognized as a source indicator. Indeed, Fuente's incontestable registrations for the X Mark (Appx54-55) are conclusive evidence "that it serves as a trademark in and of itself to identify and distinguish [Fuente's goods] in commerce." *Michelin Tire Corp. v. General Tire & Rubber Co.*, 202 USPQ 294, 298 (TTAB 1979); *see also* 15 U.S.C. § 1115(b). The Board's commercial strength finding was only that the Board did not place Fuente's

X Mark on the high end of the *commercial* strength or fame spectrum. (Appx40); *see also Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee en 1772*, 396 F.3d 1369, 1375 (Fed. Cir. 2005) ("[L]ikelihood of confusion fame 'varies along a spectrum from very strong to very weak," with marks on the very strong end of the spectrum recognized by "a significant portion of the relevant consuming public . . . as a source indicator." (citation omitted)). This does not detract from the mark's *conceptual* strength. And as explained below and detailed in Fuente's opening brief, the finding on commercial strength is unsupported by substantial evidence. (Opening Br. at 46-60.)

### 2. Vaporous's Description of the Record Evidence Demonstrating the Commercial Strength of Fuente's X Mark Is Factually and Legally Erroneous

Vaporous does not dispute that the Board ignored the substantial record evidence identified in Fuente's opening brief demonstrating the myriad ways in which Fuente and others have used the X Mark. Instead, Vaporous contends that Fuente's X Mark is commercially weak because that record evidence demonstrates that the X Mark "is <u>never</u> used alone" but rather "only with and/or incorporated into other marks." (Resp. Br. at 20.) This is factually and legally wrong.

First, as established in Fuente's opening brief, the X Mark has been used as a standalone mark. (Opening Br. at 48, 50.) And again, the Board emphatically rejected Vaporous's contention to the contrary. (Appx14; Appx39.)

Second, and more fundamentally, Vaporous appears to misunderstand that a mark need not to be used "alone" to achieve marketplace recognition.[3] Were this so, few marks could achieve commercial strength in today's modern world, as it is rare that a mark is presented "alone" without *any* accompanying material, imagery, and/or designs. While Vaporous attempts to thrust this unreasonable standard on Fuente, the law does not. *See Proctor & Gamble Co. v. Keystone Auto. Warehouse, Inc.*, 191 USPQ 468, 474 (TTAB 1976) ("[I]t is settled that a product label can bear more than one trademark without diminishing the identifying function of each portion."); *Fort James Operating Co. v. Fort Royal Paper Converting*, 83 USPQ2d 1624, 1629 (TTAB 2007) (same). The proper inquiry is not the extent to which the X Mark has been used "alone" but rather, the extent to which it has been used in a manner that creates a separate and distinct commercial impression. *See Proctor & Gamble*, 191 USPQ at 474 ("The salient question is whether the designation in question, as used, will be recognized in and of itself as an indication of origin for [the] particular product."); *New Era Cap Co. v. Pro Era, LLC*, 2020 WL 2853282, at *12 (TTAB 2020) (listing criteria for measuring commercial strength).

---

[3] For example, Vaporous posits that Fuente is "attempt[ing] to reincarnate its failed . . . contention that there is a 'family' of X marks." (Resp. Br. at 21.) Vaporous is incorrect. The Board's family of marks finding was based on the evidence not showing a consistent pattern of use of "X" (Appx21) or "multiple X marks . . . used and promoted together" (Appx23). That finding does not render all uses of the letter X with other elements irrelevant when assessing the X Mark's commercial strength.

Applying this proper standard, the record evidence substantially supports a finding that Fuente's X Mark is commercially strong, at least to a degree that should be given some weight. Since the 1990s, Fuente has used the X Mark as a core pillar of its FUENTE FUENTE OPUS X branding for its cigars and related accessories. (Appx145-146.) Indeed, despite the Board focusing exclusively on the term "OPUSX" (Appx42), the X Mark has been featured in the name of all cigars in the FUENTE FUENTE OPUS X product line, including, for example, the FORBIDDEN X, the RISING X, and the OPUS X PerfecXion No. 2. (Appx173; Appx343; Appx418; Appx773; Appx778; Appx2931-2933; Appx2935-2946.) Fuente has invested significantly in the advertisement and promotion of that product line in many forms of media (Appx149-154; Appx1240), and the X Mark has been central in these efforts. For example, Fuente has used "look-for" advertising (which courts weigh heavily) to draw specific attention to the X Mark as a source identifier for Fuente. (Appx494.) The X Mark has also been prominently featured in many other promotional materials, from ads in publications to significant unsolicited media and consumer commentary. (Opening Br. at 50-57.) In addition, the X Mark is often emphasized at the point of sale on cigar boxes and humidors and is always featured as the most prominent element on the band of every cigar in the FUENTE FUENTE OPUS X product line—a fact the Board significantly discounted. (Opening Br. at 57-59.) And many millions of dollars of these cigars have been sold in the United

States. (Appx146; Appx1240.) As a result, Fuente's X Mark has acquired a separate identity that a substantial portion of the consuming public recognizes as a source identifier for Fuente.

### 3. The Third-Party Marks Identified by Vaporous Do Not Detract from the Commercial Strength of Fuente's X Mark

Vaporous complains that the Board discounted evidence allegedly showing that Fuente's X Mark has "coexisted with several X-based marks in the oral vaporizer space with no known confusion over the space of many years." (Resp. Br. at 22.) The evidence Vaporous identifies includes nine agreements under which Fuente consented to registration or use of third-party marks subject to various restrictions, including use limitations, and testimony from Fuente that it is unaware of any confusion between its products and any of those allegedly offered in connection with the third-party marks subject to those agreements. (Resp. Br. at 22; Appx1169-1175; Appx1138-1139.) The Board properly "accord[ed] little probative weight" to this evidence. (Appx39.)

First, the nine agreements relied on by Vaporous are too minimal to be of any significance. (Resp. Br. at 22; Appx1169-1175.) The Board's decision in *Magno-Humphries Labs., Inc. v. Leiner Health Prods. Inc.*, 2002 WL 220903 (TTAB Feb. 12, 2002) (non-precedential), *aff'd*, 56 F.App'x 501 (Fed. Cir. 2003) is on point. There, the Board held that six third-party uses of a mark were "rather minimal in number," and thus did not indicate that the mark at issue "is so laudable or weak as

to be entitled to only a very narrow scope of protection." *Id.* at *7; *see also In re i.am.symbolic*, 866 F.3d at 1329 (finding that evidence of third-party use fell "short of 'ubiquitous' or 'considerable'" use that would render the cited mark weak). The same must be said of Vaporous's evidentiary showing.

Second, Vaporous's third-party references are irrelevant because it failed to produce evidence showing the extent to which, if any, the marks subject to agreements are in use.[4] *See, e.g.*, *Palm Bay*, 396 F.3d at 1373 ("The probative value of third-party trademarks depends entirely upon their usage."); *Han Beauty, Inc. v. Alberto-Culver Co.*, 236 F.3d 1333, 1338 (Fed. Cir. 2001) (noting that because the record did not provide evidence regarding the extent of the third party uses, the probative value of the evidence was "minimal"); *7-Eleven, Inc. v. Wechsler*, 83 USPQ2d 1715, 1729 (TTAB 2007) (holding that the Board must have evidence to be able to assess whether the third-party use "has been so widespread as to have had any impact on consumer perceptions"). The Board agreed, finding that Vaporous

---

[4] After the parties' trial briefs were submitted to the Board, the Federal Circuit decided *Spireon, Inc. v. Flex Ltd.*, 71 F.4th 1355, 1365 (Fed. Cir. 2023). There, the Court held that where an applicant introduces evidence of third-party registrations for *identical* marks covering *identical* goods, the opposer bears the burden of establishing non-use of such marks. *Id.* at 1365. The narrow holding in *Spireon* is inapplicable here, as none of the third-party applications or registrations identified by Vaporous are for identical marks covering identical goods. (Appx1169-1175; Appx2304-2305.)

"did not supplement the agreements with any evidence that the allowed uses are taking place." (Appx39.)

Vaporous now argues that the record includes evidence "show[ing] important coexistent use taking place in the market without confusion." (Resp. Br. at 23.) Vaporous focuses on a single third-party mark (✕) owned by Pax Labs, Inc. and claims that it "has been in continual use for over 10 years" and "remains in prominent use today, as Pax is a leader in oral vaporizers."[5] (Resp. Br. at 24-25.) But the only record evidence Vaporous identifies to support those statements are the registration file history for Pax's mark and an undated snippet of a webpage showing a product bearing Pax's mark. (Resp. Br. at 23-24; Appx1176; Appx2305-2323.) Neither demonstrates the extent to which consumers encounter Pax's mark in the marketplace. *See, e.g.*, *AMF Inc. v. Am. Leisure Prods., Inc.*, 474 F.2d 1403, 1406 (Fed. Cir. 1973) (finding that like third-party registrations, "various trade magazines" showing products offered under third-party marks "give no indication as to actual sales, when the mark was adopted, customer familiarity with the marks, etc."); *In re Moringa Nyugyo Kabushiki Kaisha*, 120 USPQ2d 1738, 1745 (TTAB 2016) ("[C]itation of third-party registrations as evidence of market weakness is unavailing because third-party registrations standing alone, are not evidence that the

---

[5] Vaporous's description of Fuente's agreement with Pax related to the mark ✕ is incomplete. (*Compare* Resp. Br. at 23, *with* Appx1138-1139.)

registered marks are in use on a commercial scale, let alone that consumers have become so accustomed to seeing them in the marketplace that they have learned to distinguish among them by minor differences.").

Finally, the probative value of the identified agreements is particularly limited given that they were entered into by Fuente to *reduce or eliminate* consumer confusion by imposing limiations on the use and/or registration of the third-party marks subject to the agreements. (Appx1137-1138; Appx1169-1175.) The absence of actual confusion with the third-party marks subject to the agreements is thus neither unexpected nor surprising; indeed, it was the primary purpose for each agreement. (Appx1137-1138.)

For these reasons, the third-party references identified by Vaporous do not detract from the commercial strength of Fuente's X Mark, and the Board was correct to give the references little weight.

### C. The Board Erred in Improperly Balancing the Relevant Likelihood-of-Confusion Factors

After evaluating the relevant factors, the Board summarily dismissed Fuente's opposition without balancing its conflicting findings or articulating how it arrived at its conclusion of no likelihood of confusion. (Appx46.)

In its response, Vaporous trivializes the Board's incomplete and opaque "balancing" of the factors. (Resp. Br. at 26-28.) According to Vaporous, "[i]t is clear that the Board simply concluded – correctly – that the different commercial

impressions and dissimilarity of the marks was a more important factor than the presumption-based channels of trade factor." (Resp. Br. 26.) Not so. The Board explicitly stated that the similarity-of-marks *and similarity-of-goods* factors "largely are determinative here." (Appx24.) While that statement is clear, the Board's unexplained elevation of the similarity-of-marks factor to dispositive status is not. (Appx46.) The Board offered no analysis to suggest what weight or legal significance, if any, it afforded its findings—based on substantial evidence, not mere presumptions as Vaporous suggests (*see* Section II.A.4)—that "[t]he goods, channels of trade and classes of purchasers to whom sales are made are related or overlap." (Appx46.)

Vaporous also argues that "[i]t is perfectly appropriate, and not uncommon, for a finding of dissimilarity of the marks to be dispositive in a likelihood of confusion analysis." (Resp. Br. at 26.) While it may be appropriate in certain cases involving vastly dissimilar marks, this is not one of those cases.

Indeed, the two cases cited by Vaporous to suggest that it is "not uncommon" for the similarity-of-marks factor to carry dispositive weight are readily distinguishable. (Resp. Br. at 27.) In *Kellogg Co. v. Pack'Em Enters., Inc.*, the Court affirmed the Board's finding that FROOT LOOPS and FROOTIE ICE & elephant design "differ[ed] so substantially" such that no other finding would alter the conclusion that confusion was unlikely. 951 F.2d 330, 331-33 (Fed. Cir. 1991).

Similarly, in *Champagne Louis Roederer, S.A. v. Delicato Vineyards*, the Court affirmed the Board's dispositive finding that CRISTAL and CRYSTAL CREEK "evoked very different images in the minds of relevant consumers," with CRISTAL "suggest[ing] clarity of the wine within the bottle" and CRYSTAL CREEK "suggest[ing] a very clear . . . creek or stream." 148 F.3d 1373, 1375 (Fed. Cir. 1998).

Unlike *Kellogg* and *Champagne*, this case involves a mark that incorporates a clear depiction of another's *arbitrary* letter mark and merely adds a dot above the letter. *See Textron Inc. v. Maquinas Agricolas "Jacto" S.A.*, 215 USPQ 162, 164 (TTAB 1982) ("[R]ather clear portrayals of the letters involved in the compared marks tend to result in 'likelihood of confusion' findings."); J. Thomas McCarthy, 3 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:33 (5th ed. 2024) ("[I]f the stylization is minimal and the letters are recognizable, a likelihood of confusion will be found."). The parties' marks are not so substantially dissimilar to justify assignment of conclusive weight to any purported dissimilarities between the marks while ignoring the similarities between the goods, which the Board recognized as a determinative factor together with similarity of the marks. (Appx24.) Moreover, unlike the record in *Champagne*, which "was characterized by a lack of evidence on many of the *DuPont* factors" (*Champagne*, 148 F.3d at 1374), Fuente presented voluminous evidence, much of which the Board improperly ignored or discounted, that supports its claim of likely confusion. *See* Sections II.A, II.B. When

all relevant record evidence is evaluated through the proper legal lens and afforded proper legal weight, confusion is undeniably likely between Fuente's X Mark and Vaporous's X Dot Mark.

## III. CONCLUSION

Fuente respectfully requests that this Court reverse the Board's decision and sustain Fuente's opposition.

Respectfully submitted,

/s/ Virginia L. Carron
Virginia L. Carron
Douglas A. Rettew
R. Gordon Wright
FINNEGAN, HENDERSON, FARABOW,
   GARRETT & DUNNER, LLP
901 New York Ave., NW
Washington, D.C. 20001-4413
(202) 408-4000

September 3, 2024       *Attorneys for Appellant*
*Fuente Marketing Ltd.*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 24-1460

**Short Case Caption:** Fuente Marketing Ltd. v. Vaporous Technologies, LLC

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes __6,929__ words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: __09/03/2024__

Signature: /s/ Virginia L. Carron

Name: Virginia L. Carron